UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY HERTZOFF, EDWIN
HERTZOFF, AND CLAYTON HERTZOFF

     Plaintiffs,

    v.

NOREEN DIAZ, and UNITED
ORTHOPAEDIC APPLIANCES CO. INC.

     Defendant.

**AMENDED
COMPLAINT**

No. 07 CV 3157

Plaintiffs, by their undersigned attorneys, allege as follows:

**NATURE OF THIS ACTION**

1.  This is a diversity action for: (1) breach of contract by the sellers of

an orthopedic appliances company against the purchaser of the company; (2)

breach of a ten-year Employment Agreement that was consideration for the sale of

the company; and (3) an action for unpaid rent.  Pursuant to the parties' Stock

Purchase Agreement, Defendants are obligated to bill and collect certain

designated accounts receivable and to allocate each dollar of those funds to

discharge specifically designated accounts payable. Defendants have failed to do

so. In addition, Defendant United Orthopaedic Appliances Co. Inc. has breached its

Employment Agreement plaintiff Clayton Hertzoff.  Defendants have

constructively discharged plaintiff Clayton Hertzoff by repeatedly requesting that

he engage in wrongful and deceptive billing practices with insurance carriers,

Medicare and Medicaid, as well as by moving its offices away and leaving plaintiff

virtually alone in its prior office space without any telephone service, computer, records and with inadequate supplies, parts, and administrative support. Defendants have also made it impossible for plaintiff to properly perform his job by failing to pay numerous suppliers of the component parts needed to fabricate prostheses, resulting in their refusal to ship component parts. Defendants have also materially breached and repudiated plaintiff Clayton Hertzoff's Employment Agreement by making improper and illegal deductions from his wages, wrongfully attempting to shift to its employee the risk of nonpayment by UOA's customers.

**THE PARTIES**

2.      Plaintiffs Edwin Hertzoff and Beverly Hertzoff, husband and wife, are citizens of New Jersey, residing at 2 Rippling Brook Drive, Short Hills, NJ 07078. Plaintiff Clayton Hertzoff, the son of Edwin and Beverly, is also a citizen of New Jersey, residing at 58 Winthrop Rd, Short Hills, NJ 07078.

3.      Defendant Noreen Diaz is a citizen of the State of New York and is the wife of Mr. Martin Diaz.

4.      Defendant United Orthopaedic Appliances Co. Inc. ("UOA") is a corporation organized under the laws of the State of New York with its principal place of business located at 791 Broadway, New York, NY 10003. Although contracts are made in his wife's name, Mr. Martin Diaz in fact acts as the primary executive officer and owner of UOA.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction under 28 U.S.C. § 1332.  The amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and complete diversity of citizenship exists between the plaintiffs and defendants.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1391.

**FACTS**

7.      UOA was founded in 1907 by plaintiff Beverly Hertzoff's grandfather. It designs, manufactures, and fits orthopedic appliances, braces, and artificial limbs.  UOA's offices are located at 791 Broadway New York, NY 10003.

8.      Prior to August 2006, Plaintiffs owned 100% of the shares of UOA. Plaintiffs spent most of their working lives at UOA. Plaintiff Edwin Hertzoff worked at UOA for 54 years, from 1952 to 2006. Plaintiff Beverly Hertzoff worked at UOA for 34 years, from 1972 to 2006. Plaintiff Clayton has worked at UOA for most of his adult life, from the late 1970's to the present.

9.      In 2006, plaintiffs were approached by Martin Diaz and his wife, defendant Noreen Diaz, about the purchase of UOA. In August, 2006, the parties entered into a Stock Purchase Agreement, effective as of August 20, 2006, a copy of which is annexed hereto as Exhibit A (the "Agreement"). The Agreement did not provide for any payment directly to plaintiffs. Instead, (1) plaintiff Clayton

Hertzoff received a ten-year employment agreement; and (2) the Agreement

provided that defendants would bill and collect certain accounts receivable and that

"*each dollar*" so collected would be applied, as collected, on a priority basis, only

to three designated accounts payables set forth in Schedule 1.3 of the Agreement.

10.     Specifically, Section 1.3 of the Agreement provides as follows:

1.3. Accounts Receivable. Purchaser shall cause the "Net
Accounts Receivable" to be billed and collected, to the extent
reasonably collectable, in the normal course of the Corporation's
operations. For purposes of this payment, "Net Accounts Receivable"
shall be calculated as the accounts receivable of the Corporation
earned prior to and collected during the twenty-four (24) month period
immediately following the Closing Date less any refunds or
repayments. Each dollar of the Net Accounts Receivable actually
collected will be allocated to discharge the Accounts Payable in the
following order of priority: (i) an amount equal to the outstanding
amount of the HSBC line of credit on the Effective Date (provided the
expenses for which the HSBC line of credit was utilized were
expenses incurred in the ordinary operation of the Corporation)
collected, to the extent such amount is actually collected, shall be
applied against and discharge the HSBC Line of Credit (as such term
is defined on Schedule 1.2); (ii) the next One Hundred Thousand
Dollars ($100,000) collected, to the extent such amount is actually
collected, shall be applied against and discharge the Outstanding
Rental Amounts (as such term  is defined on Schedule 1.2); and (iii)
the next One Hundred Forty Five Thousand Dollars ($145,000)
collected, to the extent such amount is actually collected, shall be
applied against and  discharge the Seller Loan Amount (as such term
is defined on Schedule 1.2). To the extent that the Corporation's Net
Accounts Receivable exceed the Accounts Payable, such excess
amount shall be distributed to the Sellers within thirty (30) days of the
second annual anniversary of this Agreement. In the event that the
Corporation's Net Accounts Receivable are less than the Accounts
Payable, Purchaser shall fund such shortfall (the "Net Accounts
Receivable Shortfall") up to a maximum amount of One Hundred
Thousand Dollars ($100,000), and apply such funds to discharge the

Accounts Payable, to the extent that Purchaser is responsible to fund the Net Accounts Receivable Shortfall hereunder, in the order of priority set forth above in this Section 1.3. Such payment by the Purchaser shall fully and completely discharge the Corporation's and the Purchaser's obligations to pay the Accounts Payable hereunder and, notwithstanding any provision to the contrary, the Sellers shall be jointly and severally responsible for discharging and paying the Accounts Payable, to the extent that the Net Accounts Receivable Shortfall exceeds the sum of (a) the Net Accounts Receivable; plus (b) One Hundred Thousand Dollars ($100,000). Any accounts receivables generated by the Company from and after the Effective Date shall be the property of the Company and no Seller shall have any right or interest in adnd [sic] to the same. Notwithstanding any provision to the contrary, the Purchaser shall ensure that the Corporation shall not borrow any additional amounts, as of the Effective Date, under the HSBC Line of Credit. Sellers shall execute and deliver any and all documents or instruments necessary to terminate the HSBC Line of Credit and to cause the removal of any liens or encumbrances related thereto after the HSBC Line of Credit has been repaid as aforesaid.

11.     The three designated accounts payables set forth in Schedule 1.3 of the Agreement are as follows:

1.     The outstanding amount as of the Effective Date under the Business Revolving Line of Credit of up to $250,000, dated August 14, 2005, from HSBC Bank USA, N.A. in favor of the Corporation and the related General Security Agreement, dated the same date, between HSBC Bank USA, N.A. and the Corporation.

2.     Promissory Note from the Company to Beverly Hertzoff in the amount of $145,000.00 relating to monies loaned to the Company to repair damages from a fire in the Company premises.

3.   Accrued and unpaid rent in the amount of $100,000.00 payable by the Company to Beverly Hertzoff and Edwin Hertzoff, as landlord.

12.   Defendants have failed to fulfill their current contractual obligation to cause all "Net Accounts Receivable" to be billed and collected and have failed to allocate each dollar of the Net Accounts Receivable actually collected to discharge the designated Accounts Payable.

13.   A principal consideration received by plaintiffs for the sale of UOA was a 10-year employment contract for plaintiff Clayton Hertzoff at UOA as a Prosthetist and as a manager of UOA's Orthotics & Prosthetics shop. A copy of his Employment Agreement dated as of August 20, 2006 ("Employment Agreement") is annexed hereto as Exhibit C. The Employment Agreement provides for a base salary of $120,000 per year, a bonus of $25,000 per calendar year, and quarterly commissions based upon sales. UOA has materially breached its obligations under the Employment Agreement.

### FIRST CLAIM FOR RELIEF
#### (Breach of Stock Purchase Agreement)

14.   Plaintiffs repeat paragraphs 1 through 13 as if fully set forth  herein.

15.    Defendants have breached their current contractual obligations to plaintiff under the Agreement.

**SECOND CLAIM FOR RELIEF**
**(Breach of Employment Agreement - Failure to Pay Commissions)**

16.     Plaintiffs repeat paragraphs 1 through 15 as if fully set forth  herein.

17.     Pursuant to section 3(b) of the Employment Agreement, defendant UOA is obligated to pay a quarterly sales commissions to plaintiff Clayton Hertzoff equal to 5% of his "Personal Sales Collection." These commissions were due on March 30 1, 2007, but have not been paid in full despite repeated requests for payment.

18.     Annexed hereto as Exhibit D. is a written demand for the payment of this bonus that plaintiff Clayton Hertzoff delivered to defendants by facsimile on April 16, 2007.

19.     Defendant UOA is in breach of its contractual obligations under the Employment Agreement.

**THIRD CLAIM FOR RELIEF**
**(Violation of Section 191-c of the NY Labor Law)**

20.     Plaintiffs repeat paragraphs 1 through 19 as if fully set forth  herein.

21.     And all relevant times, plaintiff Clayton Hertzoff was an employee of defendant UOA. His principal activity was the selling of goods and services and his earnings were based in part on commissions. His principal activity was not of a supervisory, managerial, executive or administrative nature. Plaintiff Clayton Hertzoff was a "commission salesman" as defined in section 190 (6) of the New York Labor Law.

22.    Defendant UOA has failed to pay "wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment" in violation of Section 191(c) and 191-c of the NY Labor Law.

23.    Defendant UOA is liable to plaintiff Clayton Hertzoff, pursuant to Section 191-c of the NY Labor Law for "double damages" and "reasonable attorneys fees, court costs, and disbursements."

### FOURTH CLAIM FOR RELIEF
#### (Violation of Section 193 of the NY Labor Law)

24.    Plaintiffs repeat paragraphs 1 through 23 as if fully set forth herein.

25.    Defendants have intentionally and willfully deducted at least $4,163 from wages owed to plaintiff Clayton Hertzoff in violation of §193 of the New York Labor Law.  According to a letter written to plaintiff Clayton Hertzoff by Defendant Noreen Diaz dated May 22, 2007 (written after plaintiff had brought suit in this Court to collect his wages), this deduction from wages was purportedly for the costs to UOA in "material and man hours" for alleged "lack of judgment" in supplying a prosthetic device to a patient that from which UOA was unable to obtain payment.

26.    The allegations of the May 22, 2007 letter are false.  More significantly (and regardless truth or falsity of the allegations) this deduction from wages violates §193 of the New York Labor Law since it was not made "in

accordance with the provision of any law or any rule or regulation issued by any government agency," nor was it "expressly authorized in writing by the employee and for the benefit of the employee" (limited to "payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization and similar payments for the benefit of the employee").

27.    Pursuant to section 198 of the New York Labor Law, defendants are liable for reasonable attorneys fees and liquidated damages equal to 25% of the total amount of the wages found to be due.

## FIFTH CLAIM FOR RELIEF
### (Material Breach of Employment Contract)

28.    Plaintiffs repeat paragraphs 1 through 27 as if fully set forth  herein.

29.    Defendants have materially breached the Employment Agreement by their willful failure to pay plaintiff Clayton Hertzoff as agreed.  This attempt to shift to its employee the risk of loss for nonpayment by UOA's customers is a material, substantial breach that strikes at the essence of the contract.

30.    Defendants have further materially breached the Employment Agreement by repeatedly requesting that plaintiff Clayton Hertzoff participate in wrongful, deceptive billing practices. Defendants have, on numerous occasions, requested that plaintiff Clayton Hertzoff bill insurance carriers in full for work prior to the actual delivery of orthopedic appliances. Defendants have been

systematically billing insurance carriers, including Medicare and Medicaid, for

work prior to the actual delivery of prostheses. Upon information and belief,

defendants are wrongfully billing insurance carriers, including Medicare and

Medicaid, under UOA's contracts and using UOA's tax identification number, for

work that was actually performed by a different company, Complete Orthopedic

Services Inc.  Defendants have also requested that plaintiff Clayton Hertzoff over-

bill and over-provide services. For example, defendants have requested that

plaintiff Clayton Hertzoff use billing code "L Code 1832," which denotes

adjustable range of motion joints, for all knee braces, whether or not the brace

contains or requires an adjustable range of motion joint. Single axis joints are

substantially less expensive than adjustable range of motion joints. Defendants

have requested that plaintiff Clayton Hertzoff  improperly supply adjustable range

of motion joints when they are not medically necessary or prescribed and that he

bill insurance carriers for adjustable range of motion joints even when they were

not provided to a patient.  On one occasion, when plaintiff Clayton Hertzoff told

Martin Diaz that he refused to improperly bill for an adjustable range of motion

joint, Mr. Diaz responded: "what's the difference -- the joints are hidden."

**SIXTH CLAIM FOR RELIEF**
**(Constructive Discharge)**

31.     Plaintiffs repeat paragraphs 1 through 30 as if fully set forth  herein.

32.     Defendants have deliberately made the working conditions of plaintiff Clayton Hertzoff intolerable.

33.     Defendants have failed to pay plaintiff Clayton Hertzoff sales commissions that are unquestionably due him, improperly attempting to shift to plaintiff the risk of nonpayment by UOA's customers.

34.     As set forth above in paragraph 30, Defendants have repeatedly requested that plaintiff engage in wrongful, fraudulent billing practices.

35.     Plaintiff's working conditions have also become intolerable, and his patients have suffered, because Defendants have failed to pay the suppliers of the component parts needed to fabricate prostheses. As a result, these suppliers have ceased shipping component parts, making it impossible for plaintiff to properly perform his job. These suppliers include Otto Bock, Ossur hf., Generation II, and Pel Supply Co..

36.     Furthermore, Defendants have now left the plaintiff Clayton Hertzoff virtually alone at their offices at 791 Broadway, without any telephone service, computer, fax, records and with little administrative assistance. Defendants have apparently acquired new office space and moved most personnel and equipment to new office space but have not given any office to plaintiff Clayton Hertzoff.

37.     Defendants have constructively discharged plaintiff Clayton Hertzoff, in breach of the Employment Agreement.

## SEVENTH CLAIM FOR RELIEF
### (Anticipatory Repudiation and Breach)

38.     Plaintiffs repeat paragraphs 1 through 37 as if fully set forth  herein.

39.     Defendants, by their letter of May 22, 2007 and by their actions and statements to plaintiff Clayton Hertzoff, have declared their intention not to perform their obligations under the Employment Agreement. Defendants are in breach of their obligations under the Employment Agreement.

## EIGHTH CLAIM FOR RELIEF
### (Non-Payment of Rent)

40.     Plaintiffs repeat paragraphs 1 through 39 as if fully set forth  herein.

41.     Plaintiffs Edwin Hertzoff and Beverly Hertzoff are the owners and landlords of the premises located at 791 Broadway, New York, NY 10003. Defendant UOA is the tenant of said premises, and it entered into possession thereof under an Agreement of Lease made as of August 23, 2006  between plaintiffs and UOA, pursuant to which UOA promised to pay to landlord as fixed rent $10,000 each month in advance on the first day of each month. Pursuant to said agreement there was due to landlord from UOA fixed rent as follows:

|              |          |
|--------------|----------|
| March 1, 2007 | $10,000 |
| April 1, 2007 | $10,000 |
| May 1, 2007   | $10,000 |
| June 1, 2007  | $10,000 |

42.    Plaintiffs have given notice to UOA of their repeated defaults. Annexed hereto as Exhibit B are copies of Notices of Default that were delivered to defendants.

43.    As of today's date, the fixed rent that remains in arrears is $10,000.00. Defendant UOA continues in possession of premises.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully demand judgment as follows:

a)  That plaintiffs be awarded damages for breach of the Agreement in an amount to be determined at trial;

b)  That plaintiff Clayton Hertzoff be awarded damages for constructive discharge, for the breach of his ten-year Employment Agreement and for defendants' violations of the NY Labor Law  in an amount to be determined at trial;

c)  That plaintiffs Edwin Hertzoff and Beverly Hertzoff be awarded damages for defendant UOA's nonpayment rent.

d)  Costs and disbursements of this action, including reasonable attorneys fees, and pre- and post-judgment interest; and

e)  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, plaintiffs

demand a trial by jury in this action.


Dated:       New York, New York
             June 8, 2007

                                    TRAIGER & HINCKLEY LLP

                                    *George Hinckley J.*

                                    By: George R. Hinckley Jr.  (GH-7511)

                                    880 Third Avenue 9th Floor
                                    New York, NY 10022-4730
                                    Tel. (212) 759-4933
                                    Fax  (212) 656-1531
                                    Attorneys for Plaintiffs

# Exhibit A

STOCK PURCHASE AGREEMENT

by and among

BEVERLY HERTZOFF, EDWIN HERTZOFF, CLAYTON HERTZOFF,

and

NOREEN DIAZ

Prepared By:

Garfunkel, Wild & Travis, P.C.
111 Great Neck Road, Suite 503
Great Neck, NY 11021
(516) 393-2200

439987.06

TABLE OF CONTENTS

PAGE

ARTICLE I
    SALE AND PURCHASE OF STOCK.................................................................................1

ARTICLE II
    THE CLOSING AND TRANSFER OF STOCK ...............................................................3

ARTICLE III
    REPRESENTATIONS AND WARRANTIES OF SELLERS............................................4

ARTICLE IV
    REPRESENTATIONS AND WARRANTIES BY PURCHASER ....................................9

ARTICLE V
    SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS............10

ARTICLE VI
    INDEMNIFICATION.....................................................................................................10

ARTICLE VII
    GENERAL PROVISIONS ............................................................................................12

439987.06

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Purchase Agreement") is made effective as of the 20th day of August, 2006 (the "Effective Date") by and among Beverly Hertzoff ("B. Hertzoff"), Edwin Hertzoff ("E. Hertzoff") and Clayton Hertzoff ("C. Hertzoff," together with B. Hertzoff and E. Hertzoff, sometimes referred to herein as "Sellers") and Noreen Diaz ("Purchaser").

### W I T N E S S E T H:

WHEREAS, Sellers own the shares of the issued and outstanding capital stock of United Orthopaedic Appliances Co., Inc. (the "Corporation") set forth on Schedule A hereto, which shares represent one hundred percent (100%) of the issued and outstanding capital stock of the Corporation;

WHEREAS, Sellers have agreed to sell to Purchaser and Purchaser has agreed to purchase from the Sellers that number of shares of capital stock of the Corporation necessary to cause Purchaser to own one hundred percent (100%) of the issued and outstanding capital stock of the Corporation; and

WHEREAS, in furtherance of the foregoing, Sellers desire to sell to Purchaser and Purchaser desires to purchase from Sellers, an aggregate of one hundred (100.00) shares of capital stock of the Corporation (the "Stock"); and

WHEREAS, C. Hertzoff is presently employed by the Corporation and will remain employed subsequent to Closing Date, as defined at Article II hereof, pursuant to an employment agreement made effective as of Closing Date (the "Employment Agreement").

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### SALE AND PURCHASE OF STOCK

1.1.    Purchase and Sale.  On the Closing Date, as defined at Article II hereof, subject to and upon the terms and conditions set forth herein, Sellers will sell, convey, transfer, assign and deliver the Stock to Purchaser and Purchaser shall purchase and accept from Sellers, all right, title and interest of Sellers in and to the Stock.

1.2.    Accounts Payable.  Notwithstanding any provision to the contrary, but subject to the terms of Section 1.3 below, the Corporation shall, as of the Closing Date, assume and remain liable only for the accounts payable set forth in Schedule 1.2 attached hereto ("Accounts Payable").  The parties agree that, except for the Accounts Payable, (i) the Sellers shall assume and remain jointly and severally liable for any and all outstanding debts, loans, obligations or

liabilities of the Corporation as of the Effective Date which obligations shall be paid, performed and/or discharged by the Sellers when due, other than those debts, loans, obligations or liabilities of the Corporation which were incurred in the ordinary operation of the Corporation prior to the Effective Date which obligations shall remain with the Corporation; and (ii) the Corporation shall not assume and shall not be responsible for any of the outstanding debts, loans, obligations or liabilities of the Corporation as of the Closing Date or relating to the operations of the Corporation prior to the Closing Date. The parties acknowledge and agree that, notwithstanding the fact that certain of the Corporation's liabilities and obligations assumed by the Sellers hereunder may not be expressly assignable (or may prohibit assignment), the Sellers shall satisfy such liabilities and obligations when due.

1.3.    Accounts Receivable. Purchaser shall cause the "Net Accounts Receivable" to be billed and collected, to the extent reasonably collectable, in the normal course of the Corporation's operations. For purposes of this payment, "Net Accounts Receivable" shall be calculated as the accounts receivable of the Corporation earned prior to and collected during the twenty-four (24) month period immediately following the Closing Date less any refunds or repayments. Each dollar of the Net Accounts Receivable actually collected will be allocated to discharge the Accounts Payable in the following order of priority: (i) an amount equal to the outstanding amount of the HSBC line of credit on the Effective Date (provided the expenses for which the HSBC line of credit was utilized were expenses in incurred in the ordinary operation of the Corporation) collected, to the extent such amount is actually collected, shall be applied against and discharge the HSBC Line of Credit (as such term is defined on Schedule 1.2); (ii) the next One Hundred Thousand Dollars ($100,000) collected, to the extent such amount is actually collected, shall be applied against and discharge the Outstanding Rental Amounts (as such term is defined on Schedule 1.2); and (iii) the next One Hundred Forty Five Thousand Dollars ($145,000) collected, to the extent such amount is actually collected, shall be applied against and discharge the Seller Loan Amount (as such term is defined on Schedule 1.2). To the extent that the Corporation's Net Accounts Receivable exceed the Accounts Payable, such excess amount shall be distributed to the Sellers within thirty (30) days of the second annual anniversary of this Agreement. In the event that the Corporation's Net Accounts Receivable are less than the Accounts Payable, Purchaser shall fund such shortfall (the "Net Accounts Receivable Shortfall") up to a maximum amount of One Hundred Thousand Dollars ($100,000), and apply such funds to discharge the Accounts Payable, to the extent that Purchaser is responsible to fund the Net Accounts Receivable Shortfall hereunder, in the order of priority set forth above in this Section 1.3. Such payment by the Purchaser shall fully and completely discharge the Corporation's and the Purchaser's obligations to pay the Accounts Payable hereunder and, notwithstanding any provision to the contrary, the Sellers shall be jointly and severally responsible for discharging and paying the Accounts Payable, to the extent that the Net Accounts Receivable Shortfall exceeds the sum of (a) the Net Accounts Receivable; plus (b) One Hundred Thousand Dollars ($100,000). Any accounts receivables generated by the Company from and after the Effective Date shall be the property of the Company and no Seller shall have any right or interest in adnd to the same. Notwithstanding any provision to the contrary, the Purchaser shall ensure that the Corporation shall not borrow any additional amounts, as of the Effective Date, under the HSBC Line of Credit. Sellers shall execute and deliver any and all documents or instruments necessary

2

to terminate the HSBC Line of Credit and to cause the removal of any liens or encumbrances related thereto after the HSBC Line of Credit has been repaid as aforesaid.

ARTICLE II

THE CLOSING AND TRANSFER OF STOCK

2.1.    Closing.    The Closing of the transaction contemplated by this Agreement (the "Closing") shall occur as of August 8, 2006 (the "Closing Date") unless otherwise extended by the mutual agreement of the parties hereto.

2.2.    Purchaser Delivery.    At the Closing, the Purchaser shall deliver to the Sellers:

2.2.1.    An executed Lease by and among the Sellers and the Corporation for the property located at 791 Broadway, New York, NY, in the form attached hereto as Schedule 2.2(b).

2.2.2.    An executed Employment Agreement by and between C. Hertzoff and the Corporation effective the Closing Date, in the form attached hereto as Schedule 2.2(c).

2.3.    Seller Delivery.    At the Closing, the Sellers shall deliver or cause to be delivered:

2.3.1.    Lost Stock Affidavits from each of the Sellers for all the stock issued by the Company, other than the Stock being sold hereunder;

2.3.2.    New stock certificates representing all of the Stock being sold hereunder;

2.3.3.    Stock Transfer Powers representing the Stock, duly endorsed for transfer;

2.3.4.    All books and records of the Corporation; and

2.3.5.    All documents which counsel for the Purchaser shall reasonably deem necessary or advisable in order to accomplish a complete transfer of the shares of Stock to the Purchaser.

2.3.6.    An opinion of counsel to Seller in the form attached hereto as Schedule 2.3.6.

3

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Purchaser as of the date hereof, and as of Closing, as follows:

3.1.    Authority.  Sellers have the full legal power and authority, and the right, without the consent of any other person, to execute and deliver this Agreement and to carry out the transactions contemplated hereby.  Sellers own the Stock being transferred hereunder free and clear of any claims, liens and encumbrances.

3.2.    Validity.  This Agreement has been, and the documents to be delivered at Closing will be, duly executed and delivered by Sellers and will constitute lawful, valid and legally binding obligations of Sellers enforceable in accordance with their respective terms.

3.3.    Ownership of Stock.  Sellers own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Corporation, and no party other than the Sellers possess any rights, title or interest in the capital stock or other form of capital or ownership interest of the Corporation.  Sellers' will, on the Closing Date, convey good and marketable title to the Stock from the Sellers, free and clear of any liens, encumbrances, restrictions on transfer, charges or claims.

3.4.    Conflicts.    Neither the execution of this Agreement by Sellers, nor the consummation of the transactions contemplated hereby will result in (i) the creation of any lien, charge, pledge, security interest or encumbrance of any nature, whatsoever, on any Seller, the Corporation, or on the Stock, or (ii) a breach, default, or violation of, or conflict with (A) any document, instrument, agreement, contract or obligation to which the Corporation or any Seller is a party, or (B) any judgment, order, decree, ruling, law, rule, or regulation of any court, governmental body or arbitrator in proceedings to which the Corporation or any Seller is a party. Sellers affirm that they have not impermissibly issued any stock to some other party that is not a party to this Agreement.

3.5.    Organization and Existence of the Corporations.  The Corporation is a corporation that is duly organized, validly existing and in good standing under the laws of the State of New York.  The Corporation is in compliance with all federal, state and local laws, regulations and ordinances, including, without limitation, the regulations of governmental agencies or authorities having jurisdiction over the Corporation's business where the failure to be in compliance would have a material adverse effect on the Corporation as a whole.  The Corporation possesses all necessary licenses, permits, credentials, certifications, qualifications, and approvals that the Corporation reasonably believes is required by applicable federal and state laws, regulations and ordinances, and that are necessary for the conduct of the Corporation's business in the manner presently conducted.

4

439987.06

3.6.    Litigation.  Except as set forth on Schedule 3.6, there are no claims, complaints, causes of action, suits, litigation, any administrative, arbitration, or enforcement actions, whether before any court or any federal, state, or other governmental or professional bureau, agency, authority or instrumentality of any kind or nature or otherwise (each individually and collectively referred to as an "Action"), pending against or, threatened against, the Sellers or the Corporation. No Action has been asserted against the Sellers or the Corporation, nor have the Sellers or the Corporation been a party to an Action as a defendant.

3.7.    Taxes.  The Corporation has or will have by the date of this Agreement (i) paid all income, sales, use, occupancy, property, real estate, excise, payroll, withholding taxes and all license fees imposed upon the Corporation, and its properties and assets, and (ii) timely filed all federal, state and local tax returns and related documents heretofore, required to be filed by the Corporation, or has a valid extension of time to file.  All tax returns and related documents filed by the Corporation have been prepared in accordance with all applicable laws and requirements and accurately reflect the taxable income of the Corporation.

3.8.    Judgments.  Neither the Sellers nor the Corporation are subject to, or in violation or default of, any judgment, order, writ, injunction or ruling of any court or any federal state, or municipal commission, bureau, agency, authority or instrumentality.

3.9.    Truthful and Accurate.  All representations and warranties of the Sellers and the Corporation contained in this Agreement, or in any document, instrument or agreement delivered pursuant to the provisions of this Agreement shall be true and accurate when made and on the Closing Date.  No representation or warranty by the Sellers or the Corporation in this Agreement contains or will contain any untrue statement of fact or omits or will omit any fact required to be stated therein or necessary in order to make the statements contained therein not misleading.

3.10.    Qualification of the Corporation.    The Corporation is duly qualified and authorized to do business and is in good standing under the laws of each jurisdiction in which the character of the properties owned or leased or the nature of the activities conducted by it make such qualification necessary, except where failure to so qualify does not have a material adverse effect on the assets, financial condition, results of operations or business of the Corporation.

3.11.    Consents and Approvals.  No consent, order, approval or authorization or permit of, or the exemption by or registration or filing with, or notification to (any such consent, approval, authorization, permit, exemption, registration, filing or notification being a "Consent"), any governmental, regulatory or administrative agency, commission or authority, domestic or foreign (a "Governmental Entity"), is necessary or required to be obtained or given or waiting period required to expire as a condition to the execution, delivery and performance of this Agreement by any of the Sellers or the consummation by the Sellers of the sale of the Stock.  No consent, approval, waiver or other action by any person under any contract, agreement, indenture, lease, instrument or other document to which any of the Sellers, or the Corporation, or any of their respective properties are bound or affected, is required or necessary for the execution, delivery and performance of this Agreement by Sellers or the consummation by Sellers of the sale of the Stock where the failure to obtain such consent, approval, waiver or other

5

action will have a material adverse effect on the assets, financial condition, results of operations or business of the Corporation .

     3.12.   <u>No Other Stock Purchase Agreements</u>.   There are no options, agreements, contracts or other rights in existence involving Sellers, the Corporation to purchase or acquire the Stock, in whole or in part, or any other shares of stock in the Corporation, whether now or hereafter authorized or issued. Additionally there are no options, agreements, contracts or other rights in existence to purchase or acquire from the Corporation or any of its or their material assets.

     3.13.   <u>Employee Plans and Agreements</u>.

     (a)    *Plans and Related Documents.* <u>Schedule 3.13</u> of this Agreement lists the 401K Plan (the "401K Plan") and the medical, dental and all other employee benefit plans, including any deferred compensation or top-hat plans to a select group of management and highly compensated employees (the "Employee Plans") for the Corporation, such plans being the only employee benefit plans supplied and/or sponsored by the Corporation, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Except for the Employee Plans listed on <u>Schedule 3.13</u>, there are no other employee benefit plans, programs, arrangements or agreements, whether formal or informal, whether in writing or not, to which the Corporation is a party, with respect to which the Corporation has or is reasonably likely to incur any obligations or liability or which are maintained, contributed to, or sponsored by the Corporation for the benefit of any current or former employee, officer or director, including any deferred compensation or top-hat plans to a select group of management and highly compensated employees. The Corporation does not have any commitment (1) to create, incur liability with respect to, or cause to exist, any other employee benefit plan, program or arrangement, (2) to enter into any contract or agreement to provide compensation or benefits to any individual or (3) to modify, change or terminate any Employee Plan, other than with respect to a modification, change or termination required by ERISA or the Internal Revenue Code of 1986, as amended (the "Code"), except as required by law.

     (b)    *Absence of Certain Types of Plans.* None of the Employee Plans is a multiemployer plan (within the meaning of Section 3(37) or 4001 (a)(3) or ERISA) (a "Multiemployer Plan") or a single employer pension plan (within the meaning of Section 4001 (a)(15) or ERISA) for which the Corporation is reasonably likely to incur liability under Section 4063 or 4064 of ERISA (a "Multiple Employer Plan"). None of the Employee Plans obligates the Corporation to pay separation, severance, termination or similar-type benefits solely as a result of any transaction contemplated by this Agreement or as a result of a "change in control" with respect to the Corporation, within the meaning of such terms under Section 280G of the Code. None of the Employee Plans provides for or promises retiree medical or life insurance benefits to any current or former employee, officer or director of the Corporation.

     (c)    *Compliance with Applicable Law.* Each Employee Plan has been operated in all material respects in accordance with the requirement of all applicable laws, including, without limitation, ERISA and the Code. The Corporation has performed all material obligations

6

required to be performed by such entity, are not in any respect in material default under or in violation of, and have no knowledge of any material default or violation by any party to, any Employee Plan. No legal action, suit or claim is pending or threatened with respect to any Employee Plan.

(d)    *Qualification of Plans.* Each Employee Plan which is intended to be qualified under Section 401(a) of the Code or Section 401(k) of the Code has received a favorable determination letter of the Internal Revenue Service (the "IRS") that it is so qualified and each trust established in connection with any Employee Plan which is intended to be exempt from federal income taxation under Section 501(a) of the Code has received a favorable determination letter from the IRS that it is so exempt, and no fact or event has occurred since the date of such determination letter from the IRS to materially adversely affect the qualified status of any such Employee Plan or the exempt status of any such trust.

(e)    *Absence of Certain Liabilities and Events.* There has been no prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Employee Plan. The Corporation has not incurred any liability for any excise tax arising under Sections 4971, 4972, 4976, 4977, 4979, 4980, 4980B or 5000 of the Code. The Corporation has not incurred any liability under, arising out of, or by operation of, Title IV of ERISA, including, without limitation, any liability in connection with (1) the termination or reorganization of any employee benefit plan subject to Title IV of ERISA, or (2) the withdrawal from any Multiemployer Plan or Multiple Employer Plan. No complete or partial termination has occurred within the five years preceding the date hereof with respect to any Employee Plan governed by or subject to ERISA. No reportable event (within the meaning of Section 4043 of ERISA) has occurred or is expected to occur with respect to any Employee Plan subject to Title IV of ERISA. No Employee Plan had an accumulated funding deficiency (within the meaning of Section 302 of ERISA or Section 412 of the Code), whether or not waived, as of the most recently audited plan year of such Employee Plan. None of the assets of the Corporation is the subject of any Lien arising under Section 302(f) of ERISA or Section 412(n) of the Code. The Corporation has not been required to post any security under Section 307 of ERISA or Section 401(a)(29) of the Code.

(f)    *Plan Contributions and Funding.* All contributions, premiums, or payments required to be made with respect to any Employee Plan have been made, and all such contributions, premiums, or payments have been made on or before their due dates, except where the failure to make such contributions, premiums or payments on or before such due dates does not have a material adverse effect on the Stock, or the assets, financial condition, results of operations or business of the Corporation. All such contributions have been fully deducted for income tax purposes and no such deduction has been challenged or disallowed by any Governmental Entity and no fact or event exists which could give rise to any such challenge or disallowance. As of the Closing, no Employee Plan which is subject to Title IV of ERISA will have an "unfunded benefit liability" (within the meaning of Section 4001(a)(18) of ERISA).

7

3.14.   Environmental Matters

(a)     The Corporation has obtained all permits, licenses and other authorizations which are required with respect of the operation of its respective business under all applicable federal, state or local law, statute, ordinance, rule, regulation, code, permit, consent, approval, license, judgment, order, writ, decree, injunction, agreement or other authorization or mandate by any Governmental Entity relating to (1) pollution, waste disposal (including, but not limited to biohazard medical waste), or the protection, preservation or restoration of the environment, and (2) the use, treatment, storage, release or disposal, recycling, generation, processing, labeling, manufacture, production, sale, transportation or shipment of any hazardous or toxic waste, material, substances, products or by-products.

(b)     The Corporation is in substantial compliance with all environmental laws.

(c)     There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, or demand letter pending or threatened in writing relating to the businesses of the Corporation or any real property or facility owned, leased or operated by the Corporation or by Sellers under any environmental law by Governmental Entity or other person and neither Sellers nor the Corporation have received any written notification that any of them is a responsible party under any environmental law, including, without limitation, any written notice from the owner of any real property or other facility leased or operated by Sellers, or the Corporation , of any violation of any environmental law, or requiring Sellers or the Corporation to take remedial action with respect to the presence of any hazardous substance on any part of the real properties or other facilities, owned, leased or operated by the Corporation or Sellers.

3.15.   Employees.   Schedule 3.16 of this Agreement lists all of the officers, directors, employees and independent contractors (other than physicians performing independent medical exams) employed or retained by the Corporation by entity, and sets forth the following information for each employee: (a) name and job title; (b) current compensation paid or payable; (c) vacation and service credited for vesting in any pension, retirement, profit sharing, deferred compensation, stock option, cash bonus, savings, employee stock ownership, insurance, medical, welfare, vacation, and other employee benefit plans; and (d) current employment status, indicating whether such employee is actively employed, on leave of absence, on disability, or on workers' compensation.     Sellers represent warrant and covenant that the Company has discharged and paid in full any and all liabilities, obligations and funds (including, without limitation, any accrued benefits, vacation days, sick days and holidays) due to the employees listed on Schedule 3.16 through the Closing Date.

3.16.   Licenses and Permits.  The Corporation has all licenses and permits required to operate its respective business in substantial compliance with all federal, state and local statutes and regulations and in accordance with its current practice.

3.17.   Absence of Encumbrances .  Except as set forth on Schedule 3.17, as of the Closing Date, neither the Company nor the Sellers on behalf of the Company has:

8

439987.06

(a)    incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, in excess of $15,000 in the aggregate, except liabilities or obligations incurred in the ordinary course of business and consistent with prior practice which do not exceed $50,000 in the aggregate;

(b)    mortgaged, pledged or subjected to lien, restriction or any other encumbrance any of the property, businesses or assets, tangible or intangible, of the Company, except for purchase money liens;

(c)    made any loans to or guaranteed any loans for any officer, director, shareholder or other affiliate of the Company,

(d)    cancelled, waived, released or otherwise compromised any debt or claim other than in the ordinary course of business, or any material right;

(e)    instituted or threatened any litigation, action or proceeding before any court, governmental or regulatory body, administrative agency or arbitrator relating to it or its property; or

(f)    issued, authorized for issuance or sold any capital stock, notes, bonds or other securities, or any option, warrant or other right to acquire the same, of the Company, or declared or paid any dividend or made any other payment or distribution in respect of its capital stock, or directly or indirectly redeemed, purchased or otherwise acquired any of its capital stock or any option, warrant or other right to acquire such capital stock.

3.18.    Compliance with Laws.  The Corporation is in compliance in all material aspects and not in violation of any federal, state, or local statutes, regulations and administrative orders.

3.19.    No Questionable Practices.  Neither any of the Sellers nor the Corporation nor any officer, director, employee, or agent of the Corporation has directly, or indirectly, made, promised to make, or authorized the making of an offer, payment or gift of money or anything of value to any governmental official, political party or official thereof, candidate for political office or employee, agent or fiduciary of a customer or client, to obtain a contract for or to influence a decision in favor of the Corporation where such offer, payment or gift was or would be, if made, in violation of any applicable law or regulation, or any policy of any such customer.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES BY PURCHASER

Purchaser hereby represents and warrants to Sellers as of the date hereof, and as of the closing, as follows:

4.1.    Authority; Financial Ability.  Purchaser has the full legal right, power and authority, without consent of any other person, to execute and deliver this Agreement and to

carry out the transactions contemplated hereby. Purchaser has and will continue to have adequate financial ability to perform any and all of his obligations to Sellers.

4.2.    Validity. This Agreement has been, and the documents to be delivered at Closing will be, duly executed and delivered by Purchaser and will constitute lawful, valid and legally binding obligations of Purchaser, enforceable in accordance with their respective terms.

4.3.    Conflicts. To Purchaser's knowledge, neither the execution of this Agreement by Purchaser, nor the consummation of the transactions contemplated hereby will result in (i) the creation of any lien, charge, pledge, security interest or encumbrance of any nature, whatsoever, on Purchaser, or (ii) a breach, default, or violation of, or conflict with (A) any document, instrument, agreement, contract or obligation to which Purchaser is a party, or (B) any judgment, order, decree, ruling, law, rule, or regulation of any court, governmental body or arbitrator in proceedings to which Purchaser is a party.

4.4.    Judgments. To Purchaser's knowledge, Purchaser is not subject to, or in violation or default of, any judgment, order, writ, injunction or ruling of any court or any federal, state, or municipal commission, bureau, agency, authority or instrumentality.

4.5.    Truthful and Accurate. All representations and warranties of Purchaser contained in this Agreement, or in any document, instrument or agreement delivered pursuant to the provisions of this Agreement shall be true and accurate when made and on the Closing Date. No representation or warranty by Purchaser in this Agreement contains or will contain any untrue statement of a material fact or omits or will omit any material fact required to be stated therein or necessary in order to make the statements contained therein not misleading.

## ARTICLE V

## SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS

5.1.    Survival. All representations, warranties and covenants contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by the parties hereto, and shall survive the Closing for a period of three (3) year; provided, however, that the three (3) year limitation on the survival of the representations, warranties and covenants contained in this Agreement or in any documents delivered pursuant hereto shall be void and inapplicable in any instance in which (i) any of the Sellers had or should have had knowledge, prior to or at the Closing Date, of the falsity of any such representation, warranty or covenant; (ii) any of the Sellers had knowledge of and failed to disclose to Purchaser, prior to or at the Closing Date, a material liability of the Corporation; or (iii) any liability or obligation in existence prior to the Closing Date results in personal liability to the Corporation's shareholders.

## ARTICLE VI

## INDEMNIFICATION

10

6.1.    Indemnification of Purchaser.

6.1.1.    Each of the Sellers and his/her respective estate and each of their heirs, successors and assigns agrees, jointly and severally, to indemnify and hold harmless Purchaser and the Corporation from and against any and all liabilities, obligations, contingencies, damages, costs, expenses (including, without limitation, all court costs and reasonable attorneys' fees and experts' fees and expenses), losses, and amounts paid in settlement (collectively, a "Loss" or "Losses"), whether incurred by Purchaser or Corporation in connection with any suit, claim, demand, action, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to

(a)    any breach or inaccuracy of any representation or warranty of Sellers contained in or made pursuant to this Agreement or in any document, instrument or certificate delivered in connection with and contemplated by this Agreement; or

(b)    a breach or default in the performance of any covenant, agreement or obligation that Sellers are required to perform under this Agreement or in any document, instrument, or certificate delivered in connection with any contemplated by this Agreement, or

(c)    any and all liabilities and obligations of Sellers or the Corporation incurred prior to the Closing date or arising from the operations of the Corporation prior to Closing; or

(d)    any claims of (i) Sellers' or the Corporation's past or current clients including without limitation, claims alleging malpractice or grounded on or arising out of medical equipment provided by Sellers, or (ii) taxing or other governmental authorities for periods prior to the Closing Date; or

(e)    Any and all actions, suits, proceedings, demands, assessments, judgments, costs and reasonable legal and other third party expenses incident to the foregoing.

6.2.    Medicare/Medicaid; Taxes.    Notwithstanding anything to the contrary contained in this Agreement, Sellers and their respective estate and heirs, successors and assigns, jointly and severally, covenant and agree to fully defend, indemnify and hold harmless Purchaser and the Corporation from and against any and all claims, liabilities, losses, costs, expenses or damages of any kind, nature or amount whatsoever, together with reasonable legal fees, costs and expenses incurred in defense thereof, which arise out of, result from or relate to (i) any audit, assessment, deficiency or other liability asserted by Medicare and/or Medicaid attributable to services rendered by the Corporation on or before the Closing Date, including without limitation any claims or liabilities related to over-billing and/or recoupment of overpayments; and (ii) any audit, assessment, deficiency or other liability asserted by any federal, state or local taxing authority for income, profits, franchise, sales, use, occupation, property, excise, payroll or other taxes of the Corporation and/or Sellers attributable to or arising out of the period prior to the Closing Date.  Purchaser shall provide Sellers with such access to the Corporation's books and records as may be necessary and reasonable in order to defend any action or proceeding in

11

connection with this Section 6.2, and shall fully cooperate with Sellers with respect to the defense of any such action or proceeding. This Section 6.2 shall survive the Closing forever.

6.3.    <u>Survival</u>. The indemnification provisions contained in Section 6.1 and 6.2 of this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by the parties hereto, and shall survive the Closing for a period of three (3) year; provided, however, that the three (3) year limitation on the survival of the indemnification provisions contained in this Agreement or in any documents delivered pursuant hereto shall be void and inapplicable in any instance in which (i) any of the Sellers had or should have had knowledge, prior to or at the Closing Date, of the falsity of any representation, warranty or covenant; (ii) any of the Sellers had knowledge of and failed to disclose to Purchaser, prior to or at the Closing Date, a material liability of the Corporation; or (iii) any liability or obligation in existence prior to the Closing Date results in personal liability to the Corporation's shareholders.

ARTICLE VII

<u>GENERAL PROVISIONS</u>

7.1.    <u>Waiver</u>.  No amendment or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the parties hereto, and then such waiver or consent shall be effective only in a specific instance for the specific purpose for which it is given.

7.2.    <u>Notices</u>.  All notices, demands, and requests required or permitted to be given under the provisions of this Agreement shall be (i) in writing; (ii) delivered by personal delivery or sent by commercial delivery service or registered or certified mail, return receipt requested; (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt; and (iv) delivered to the address designated by each of the parties:

If to Sellers:

Beverly Hertzoff
Edwin Hertzoff
and Clayton Hertzoff
c/o Jay Fox, Esq.
O'Donnell & Fox, P.C.
880 Third Avenue
New York, NY 10022
Fax: (212) 319-3597

With Copy To:

Jay Fox, Esq.
O'Donnell & Fox, P.C.
880 Third Avenue
New York, NY 10022

12

439987.06

Fax: (212) 319-3597

If to Purchaser:

Noreen Diaz
Complete Orthopedic Services, Inc.
2094 Front Street
East Meadow, NY 11554
Fax: (516) 478-4420

With Copy To:

Andrew E. Blustein, Esq.
Garfunkel, Wild & Travis, P.C.
111 Great Neck Road, Suite 503
Great Neck, NY 11021

7.3.    _Expenses_.  Except as otherwise expressly provided herein, each party to this Agreement shall pay its own costs and expenses in connection with the transactions contemplated hereby.

7.4.    _Counterparts_.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

7.5.    _Entire Transaction_.  This Agreement and the documents referred to herein contain the entire understanding among the parties with respect to the transactions contemplated hereby and supersede all other agreements and understandings among the parties on the subject matter hereof.

7.6.    _Applicable Law_.  This Agreement is a contract made and to be performed in the State of New York and shall in all respects be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of law rules, and shall be enforced in any court of competent jurisdiction in the State of New York.

7.7.    _Successors and Assigns; No Third-Party Beneficiaries_.  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, heirs, executors, administrators and assigns; provided, however, that no party shall assign or delegate any of the obligations created under this Agreement without the prior written consent of the other parties. Nothing in this Agreement shall confer upon any person or entity, other than the Corporation, not a party to this Agreement, or the legal representatives of such person or entity, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.

7.8.    _Severability_.  This Agreement shall be deemed severable, and the invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of this Agreement or of any other term or provision hereof. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as part of

439987.06

13

this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

7.9.    _Further Assurances_.  Each party hereto agrees at any time or times and from time to time, to make, execute and deliver any and all such other and further instruments or documents and do any and all such acts and/or things as the other party hereto shall reasonably require for the purpose of giving full force and effect to this Agreement.

7.10.    _Headings_.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

7.11.    _Construction_.  The parties have participated jointly in the negotiation and drafting of this Agreement, and they agree that any ambiguity or question of intent of interpretation that may arise shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

IN WITNESS WHEREOF, each of the parties hereto has entered into this Agreement as of the date first above written.

PURCHASER:                                SELLERS:

_____                   _____
Noreen Diaz                               Beverly Hertzoff

                                          _____
                                          Edwin Hertzoff

                                          _____
                                          Clayton Hertzoff

14

SCHEDULE A

| Shareholder | Stock |
|---|---|
| Beverly Hertzoff | 37.5 |
| Edwin Hertzoff | 37.5 |
| Clayton Hertzoff | 25.0 |

439987.06

## SCHEDULE 1.2

Accounts Payable

1.    The outstanding amount as of the Effective Date under the Buisiness Revolving Line of Credit of up to $250,000, dated August 14, 2005, from HSBC Bank USA, N.A. in favor of the Corporation and the related General Security Agreement, dated the same date, between HSBC Bank USA, N.A. and the Corporation.

2.    Promissory Note from the Company to Beverly Hertzoff in the amount of $145,000.00 relating to monies loaned t the Company to repair damages from a fire in the Company premises.

3.    Accrued and unpaid rent in the amount of $100,000.00 payable by the Company to Beverly Hertzoff and Edwin Hertzoff, as landlord.

439987.06

<u>SCHEDULE 2.2(b)</u>

Lease

439987.06

SCHEDULE 2.2(c)

Employment Agreement

439987.06

<u>SCHEDULE 3.6</u>

Litigation

None.

SCHEDULE 3.13

Employee Plans

1.   United Orthopaedic Appliances Co., Inc. Profit Sharing Plan managed by Allmerican Financial.

2.   Oxford Health Plan Insurance of United Orthopaedic Appliances Co., Inc.

439987.06

## SCHEDULE 3.17

Encumbrances

1.     Business Revolving Line of Credit of up to $250,000, dated August 14, 2005, from HSBC Bank USA, N.A. in favor of the Corporation and the related General Security Agreement, dated the same date, between HSBC Bank USA, N.A. and the Corporation. Outstanding balance of One Hundred Forty-Four Thousand Seven Hundred Forty-Two Dollars and Thirty-Two Cents ($144,742.32) Dollars on the Closing Date.

439987.06

# Exhibit **B**

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933
FACSIMILE   212-656-1531

GEORGE R. HINCKLEY, JR.
grh@hinckley.org

June 5, 2007

## BY HAND AND FACSIMILE

Ms. Noreen Diaz
United Orthopaedic Appliances Co. Inc.
791 Broadway
New York, NY 10003-6809

Re: 791 Broadway, New York, NY 10003-6809

Dear Ms. Diaz:

We represent Edwin  Hertzoff and Beverly Hertzoff ("Landlord").

### NOTICE OF DEFAULT

PLEASE TAKE NOTICE that United Orthopaedic Appliances Co. Inc. ("Tenant") is in default of its obligation to pay Fixed Rent,  under paragraph 1 and paragraph 37 of the Agreement of Lease made as of the 23rd day of August, 2006 (the "Lease").

Landlord has not received the payment of Fixed  Rent of $10,000 due June 1, 2007. Demand is hereby made for this payment.  Notice of Default is hereby given pursuant to paragraph 47 of the Lease.

Sincerely,

George Hinckley Jr.

George R. Hinckley, Jr.

cc:  Colleen M. Tarpey, Esq. (Garfunkel, Wild & Travis, P.C.)

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933                                    GEORGE R. HINCKLEY, JR.
FACSIMILE  212-656-1531                                      grh@hinckley.org

May 7, 2007

## BY HAND AND FACSIMILE

Ms. Noreen Diaz
United Orthopaedic Appliances Co. Inc.
791 Broadway
New York, NY 10003-6809

Re: 791 Broadway, New York, NY 10003-6809

Dear Ms. Diaz:

We represent Edwin  Hertzoff and Beverly Hertzoff ("Landlord").

## NOTICE OF DEFAULT

PLEASE TAKE NOTICE that United Orthopaedic Appliances Co. Inc. ("Tenant") is in default of its obligation to pay Fixed Rent,  under paragraph 1 and paragraph 37 of the Agreement of Lease made as of the 23rd day of August, 2006 (the "Lease").

Landlord has not received the payment of Fixed  Rent of $10,000 due May 1, 2007. Demand is hereby made for this payment.  Notice of Default is hereby given pursuant to paragraph 47 of the Lease.

## NOTICE OF TERMINATION

PLEASE TAKE FURTHER NOTICE that Landlord is hereby exercising its Termination Option pursuant to paragraph 46 of the Lease.

Sincerely,

*George Hinckley Jr.*

George R. Hinckley, Jr.

cc:  Colleen M. Tarpey, Esq. (Garfunkel, Wild & Travis, P.C.)

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933

FACSIMILE   212-656-1531

GEORGE R. HINCKLEY, JR.

GRH@HINCKLEY.ORG

March 2, 2007

<u>Via Federal Express</u>

Ms. Noreen Diaz
United Orthopaedic Appliances Co. Inc.
791 Broadway
New York, NY 10003-6809

<u>Re: 791 Broadway, New York, NY 10003-6809</u>

Dear Ms. Diaz:

We represent Edwin  Hertzoff and Beverly Hertzoff ("Landlord").

## <u>NOTICE OF DEFAULT</u>

PLEASE TAKE NOTICE that United Orthopaedic Appliances Co. Inc. ("Tenant") is in default of its obligation to pay Fixed Rent,  under paragraph 1 and paragraph 37 of the Agreement of Lease made as of the 23rd day of August, 2006 (the "Lease").

Landlord has not received the payment of Fixed  Rent of $10,000 due February 1, 2007 nor the payment of Fixed Rent of $10,000 due March 1, 2007. Demand is hereby made for these payments.  Notice of Default is hereby given pursuant to paragraph 47 of the Lease.

Sincerely,

George Hinckley Jr.

George R. Hinckley, Jr.

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933
FACSIMILE   212-656-1531

GEORGE R. HINCKLEY, JR.
GRH@HINCKLEY.ORG

April 2, 2007

BY HAND

Ms. Noreen Diaz
United Orthopaedic Appliances Co. Inc.
791 Broadway
New York, NY 10003-6809

Re: 791 Broadway, New York, NY 10003-6809

Dear Ms. Diaz:

We represent Edwin Hertzoff and Beverly Hertzoff ("Landlord").

## NOTICE OF DEFAULT

PLEASE TAKE NOTICE that United Orthopaedic Appliances Co. Inc. ("Tenant")
is in default of its obligation to pay Fixed Rent, under paragraph 1 and paragraph
37 of the Agreement of Lease made as of the 23rd day of August, 2006 (the
"Lease").

Landlord has not received the payment of Fixed Rent of $10,000 due April 1,
2007 Demand is hereby made for this payment. Notice of Default is hereby given
pursuant to paragraph 47 of the Lease.

Sincerely,

George Hinckley Jr.

George R. Hinckley, Jr.

Exhibit C

CLAYTON HERTZOFF
EMPLOYMENT AGREEMENT

AGREEMENT (the "Agreement"), entered into August 20, 2006, by and between United Orthopaedic Appliances, Co., Inc, a New York corporation with offices at 791 Broadway, New York, New York ("Company") and Clayton Hertzoff, residing at 58 Winthrop Road, Short Hills, New Jersey, 07078 ("Employee" or "You").

In consideration of the mutual covenants and agreements hereinafter set forth, Company and Employee agree as follows:

1.    Agreement Term.

The term of this Agreement shall commence on August 20, 2006 and continue for ten (10) years until July 31, 2016, unless sooner terminated in accordance with the terms hereof (the "Agreement Term"). During the Agreement Term, the period beginning August 20, 2006 and ending December 31, 2006 shall be referred to as the "Initial Period" and each subsequent twelve (12) month period beginning January 1st and ending December 31st (or earlier upon any termination or expiration of the Agreement) shall be referred to a "Calendar Year."

2.    Employment.

a.    *Employment by Company*.  Company agrees to employ Employee for the Agreement Term upon the terms and subject to the conditions set forth in this Agreement. Employee shall be employed as a Prosthetist (working in the field of orthotics and prosthetics) and Manager of the Orthotics & Prosthetics Shop ("O&P Shop") and shall report to the Chief Executive Officer or his designee. Employee's duties and responsibilities shall be consistent with Employee's position as the Chief Executive Officer of Company or his designee may from time to time designate. Employee's duty shall include, but not be limited to, overseeing production of the staff of Company and the O&P Shop.

b.    *Performance of Duties*.  Throughout the Agreement Term, Employee shall faithfully and diligently perform his duties. Employee shall provide services on a full-time basis and shall devote Employee's entire working time to the business and affairs of Company, subject to vacations and sick leave in accordance with policies established by Company. During Employee's term of employment hereunder, Employee shall not, without the prior written consent of Company, which may be withheld in Company's sole discretion, engage in any other business or professional activity (other than as a passive investor), whether or not such business or professional activity is pursued for gain, profit or other pecuniary advantage.

1

3.  <u>Compensation and Benefits.</u>

a.  *Base Salary.*

    i.  Subject to the requirements of Subsection 3(a)(ii) below, Company agrees to pay to Employee for his services hereunder, a salary (the "Base Salary") in respect of each Calendar Year during the Agreement Term at the annual rate of one hundred twenty thousand ($120,000) dollars per year in the aggregate, prorated for any portion thereof and for the Initial Period. The Base Salary is payable in bi-weekly installments in accordance with the general practice of Company, less appropriate and customary payroll deductions.

    ii.  During Agreement Term, Employee shall be required to maintain a level of "Personal Sales Collection" greater than six hundred thousand ($600,000) dollars for each Calendar Year (prorated for the Initial Period) ("Minimum Sales"). For purposes of this Agreement, Company shall measure "Personal Sales Collection" of Employee, within ninety (90) days of the end of each Calendar Year or the Initial Period, based upon net collections of Company from sales solely initiated and completed by Employee on behalf of Company in any Calendar Year or the Initial Period without giving effect to collection failures related solely to Company billing failures. If, for any Calendar Year or the Initial Period, Company determines that Minimum Sales will not be achieved by Employee, Company's continued employment of Employee shall be conditioned upon the parties agreeing upon a revised mutually acceptable reduced Base Salary.

b.  *Incentive Bonus.* For the Agreement Term, Company shall pay to Employee an Incentive Bonus consisting of a portion of Employee's Personal Sales Collection (measures as set forth in Subsection 3(a)(ii) above). In the Initial Period, the Incentive Bonus shall be calculated as follows: three percent (3%) of the Personal Sales Collection in the Initial Period. In each subsequent Calendar Year, the Incentive Bonus shall be calculated as follow: (i) five percent (5%) of the Personal Sales Collection in any Calendar Year less than or equal to five hundred thousand ($500,000) dollars plus (ii) ten percent (10%) of the Personal Sales Collection in any Calendar Year greater than five hundred thousand ($500,000) dollars. For example purposes only, if Employee's Personal Sales Collection in a Calendar Year is $650,000, his Incentive Bonus for such Calendar Year shall be $40,000 calculated as ($500,000 * .05) + ($150,000 * .10). Employee's Incentive Bonus for each Calendar Year or the Initial Period shall be paid to him on a quarterly basis during the Calendar Year or Initial Period based upon monthly collections of the applicable Personal Sales Collection during such Calendar Year or Initial Period and in accordance with the general practice of Company, less appropriate and customary payroll deductions.

c.  *Discretionary Bonus.* For the Agreement Term, Company shall pay Employee an discretionary bonus of twenty-five thousand ($25,000) dollars per Calendar Year. The discretionary bonus shall be paid within ninety (90) days of the end of the applicable Calendar Year in accordance with the general practice of Company, less appropriate and customary payroll deductions.

2

d.    *Other Benefits.*

i.    Employee shall receive health insurance benefits for himself and his dependents and life insurance benefits for himself as such benefits are customarily provided to other full-time employees of Company, as amended or revised from time to time by Company in its sole discretion, subject to any waiting periods for benefits in accordance with Company's policies. Employee shall further be provided with use of cellular telephone to be used solely in connection with his employment duties under this Agreement.

ii.    Employee shall be entitled, each Calendar Year, to five (5) weeks of paid leave, three (3) sick days and four (4) personal days, prorated as appropriate for any portion thereof and the Initial Period. Unused vacation, personal and sick days shall not carry over into the subsequent Calendar Year. All leave shall be taken in accordance with the policies of Company and at times agreeable to and approved by Company.

iii.    Employee shall be entitled (1) a monthly car allowance of up to $500 per month; (2) reimbursement for his automobile insurance for the car used in connection with his employment hereunder; (3) reimbursement of bridge, tunnel and gas expense incurred in commuting to and from Company; and (4) reimbursement of the downpayment in connection with leasing the Employee's not to exceed $3,500.00. All reimbursement payment for expenses provided under this subsection shall be subject to and only be paid upon Employee's provision of written receipts to Company sufficient to satisfy Company and meet the requirements of the reimbursement policies of Company. Company shall maintain of a parking space in garage near the 791 Broadway, New York, New York office location for use by Employee in connection with his performance of duties hereunder.



4.    <u>Termination of Employment.</u>

a.    *For Cause Termination.*    This Agreement, and the employment relationship between Company and Employee, shall be deemed immediately terminated upon the occurrence of any of the following: (a) Employee's breach of any material term or condition set forth in this Agreement; (b) Employee's failure or refusal to comply with the reasonable directions, policies, standards and regulations that Company may establish from time to time; (c) Employee willfully or intentionally undertakes or commits any conduct that is harmful to Company's business; (d) Company acquiring evidence of Employee's current illegal drug use, alcohol abuse, or other substance abuse; (e) Employee's commission of, indictment for, conviction of, or guilty or nolo contendere plea to, a felony or misdemeanor; (f) Employee's failure as a result of illness, injury or incapacity for a period in excess of ninety (90) days ("permanent disability"); or (g) Employee's death.

b.    *Payments Upon Termination.*

i.    Upon termination of Employee's employment for any reason, Employee shall only be entitled to the Based Salary accrued but unpaid as of the date of the termination of Employee's employment with Company and the Severance Payment set forth in Section 4(b)

3

below in the event such termination is the result of Employee's death or permanent disability. Employee shall not be entitled to any additional compensation from Company.

ii.    Should Employee's employment terminate or expire prior to the end of the Agreement Term solely as the result of Employee's death or permanent disability, Company agrees that it shall pay Employee (or his estate), annually for the remainder of the Agreement Term, a Severance Payment. The annual Severance Payment made to Employee shall be equal to the discretionary bonus paid to Employee for the Calendar Year immediately prior to his death or permanent disability.

5.    Assignment and Transfer.

Employee's duties and obligations under this Agreement shall not be transferable by Employee by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void.

6.    Employer's Authority

a.    Employee agrees to observe and comply with the rules and regulations of Company, as adopted from time to time, whether orally or in writing.

b.    Employee acknowledges that Company shall have final authority over its acceptance or refusal to service customers and over the amount of the fees to be charged customers for professional services.

c.    All files and records of every type pertaining to customers of Company for whom Employee shall render services hereunder shall belong to Company and Employee shall not, without the express written consent of Company, remove them from Company's office, copy them, allow them to be removed from Company's office, or allow them to be copied, except as reasonably required in the ordinary course of services provided by Employee as an employee of Company.

7.    Disclosure of Information; Non-Solicitation

a.    Employee acknowledges that the names of the clients and referral sources of Company, as may exist from time to time, and the financial statements, business plans, internal memoranda, reports, audits, patient surveys, employee surveys, operating policies, quality assurance materials, fees, and other such materials or records of proprietary nature of Company (collectively, the "Confidential Information") are valuable, special and unique assets of Company and are deemed to be trade secrets.

b.    Employee agrees that he will not, after the date hereof and for so long as any such Confidential Information may remain confidential, secret, or otherwise wholly or partially protectable:  (i) use the Confidential Information, except in connection with his retention by

4

Company, or (ii) divulge any such Confidential Information to any third party, unless Company gives its prior written consent to such use or divulgence.

c.      In the event of a breach or threatened breach by Employee of the provisions of this Section 7, Company shall be entitled to an injunction restraining Employee from (i) disclosing, in whole or in part, any such Confidential Information; (ii) interfering with Company's relationships with its employees, customers and referral sources, or with any hospital or managed care entity with which Company has a contractual relationship; and/or (iii) rendering any professional services to (A) any customer of Company who has been solicited by Employee in violation of this Agreement, or (B) any person, firm, corporation, association, or other entity to whom any such Confidential Information, in whole or in part, has been disclosed by Employee or is threatened to be disclosed by him.

d.      Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to Company for such breach or threatened breach, including the recovery of damages from Employee.

8.      Non-Compete and Non-Solicitation

a.      Employee shall not, either directly or indirectly, at any time during the term of his employment and for twelve (12) months following the termination of this Agreement, except with the written consent of Company: (i) solicit, interfere with or endeavor to entice away from Company, any of its employees, agent, contractor, customer, or referral sources; (ii) for his own account or for the account of others, induce any customers to patronize any competing billing service provider, request or advise any customer to withdraw, curtail, or cancel such customer's relationship with Company or disclose to any other person, partnership, firm, corporation or other entity the names or addresses of any customers of Company.

b.      Employee shall not, at any time during the term of his employment under this Agreement and for twelve (12) months after the termination of this Agreement: (i) engage in the sale of orthotics and prosthetics as an employee, independent contractor, shareholder, partner, or otherwise and whether separately or in conjunction with any other entity or individual within a three (3) mile radius of Company's location; and/or (ii) operate or have any financial or other interest in any entity involved in the business of providing orthotics and prosthetics within a three (3) mile radius of Company's location.

c.      In the event of a breach by Employee of the provisions of this Section 8, Company shall also be entitled to an injunction restraining Employee from violating the terms of the restrictive covenant set forth herein (without the necessity of securing a bond) and any other legal or equitable remedies available for such breach or threatened breach.

d.      Employee agrees that damages at law would be an insufficient remedy for Company in the event Employee violates these provisions, and that Company shall be entitled to, among other remedies, make an application to a court of competent jurisdiction, to obtain injunctive relieve of any such action by Employee.

5

440096.05

e.    If Employee violates this restrictive covenant and Company brings legal action for injunctive or other relief, Company shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the restrictive covenant. Accordingly, the restrictive covenant shall be deemed to have the duration specified herein, computed from the date the relief is granted but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by Employee.

f.    Employee acknowledges that (i) the terms contained in this Section 8 are necessary for the reasonable and proper protection of Company's interests, (ii) each and every covenant and restriction is reasonable in respect of such matter, length of time and geographical area; (iii) Company. has been induced to enter into this transaction with Employee in part due to the representation by Employee that he will abide by and be bound by each of the aforesaid covenants and restraints.

g.    If any court or tribunal of competent jurisdiction determines that the duration, geographical limit or any other aspect of the above non competition covenants is unenforceable in accordance with its terms in a particular jurisdiction, such covenant shall not terminate; instead, such covenant shall be deemed amended to the extent required to render it valid and enforceable in such jurisdiction and such court or tribunal is hereby authorized and directed to amend this agreement only to the extent that such court or tribunal determines such an amendment is necessary to make it valid and enforceable in said jurisdiction.

h.    Whenever possible, each provision shall be construed so as to be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement or the application thereof to any party or circumstance shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provision of this Agreement or the application of such provisions to other parties or circumstances. If any restriction contained in this Section 8 shall be deemed to be invalid, illegal or unenforceable by reason of the extent, duration or geographical scope thereof, or otherwise, then the court making such determination may reduce such extent, duration, geographical scope, or other provisions hereof, and in its reduced form, such restriction shall then be enforceable in the manner contemplated hereby.

i.    In the event Company is successful in judicial proceedings to enforce its rights under this Section 8, then Employee agrees to reimburse Company for the legal fees, costs, and disbursements which it incurs as a result of such proceedings. The terms of this Section 8 shall survive the expiration or termination of this Agreement.

9.    Compliance

a.    You acknowledge that Company is fully committed to ensuring its compliance, and the compliance of its employees, with all applicable rules, regulations and laws promulgated by the state and federal governments and by third party payors relating to the provision of billing services.

6

440096.05

b.    You agree to cooperative fully with Company's compliance activities regarding the O&P Shop, including cooperation with Company's efforts to educate and train all employees and staff of the O&P Shop; to conduct audits of records or other appropriate compliance reviews or inquiries; and to institute any appropriate corrective actions when compliance issues are identified. Your failure to cooperate with Company's compliance activities and efforts, as determined in the sole discretion of Company, will constitute grounds for discipline.

10.    <u>Miscellaneous.</u>

a.    *Governing Law.*    This Agreement, including the validity, interpretation, construction and performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

b.    *Venue and Acceptance of Service of Process.*    Each party to this Agreement hereby agrees and consents that any legal action or proceedings with respect to this Agreement shall only be brought in the courts of the State of New York in New York County. By execution and delivery of this Agreement, each such party hereby (i) accepts the jurisdiction of the aforesaid courts; (ii) waives, to the fullest extent permitted by law, any objection which it may now hereafter have to the venue set forth above; and (iii) further waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. .

c.    *Entire Agreement.*    This Agreement contains the entire agreement and understanding between the parties hereto in respect of the subject matter hereof.

d.    *Amendment.*    This Agreement may be amended only by a written amendment which is signed by Employee and, on behalf of Company, by a director or officer other than Employee.

e.    *Severability.*    If any term, provision or covenant of this Agreement or part thereof, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void by a court of competent jurisdiction, the remainder of this Agreement and such term, provision or covenant shall remain in full force and effect, and any such invalid, unenforceable or void term, provision or covenant shall be deemed, without further action on the part of the parties hereto, modified, amended and limited, and the court shall have the power to modify, amend and limit any such term, provision or covenant, to the extent necessary to render the same and the remainder of this Agreement valid, enforceable and lawful.

f.    *Construction.*    The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement. The use herein of the word "including" when following any general provision, sentence, clause, statement, term or matter, shall be deemed to mean "including, without limitation". As used herein, the words "day" or "days" shall mean a calendar day or days.

7

g.    *Non-waiver.*   Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of Company, by its duly authorized officer.

h.    *Remedies Cumulative.*   The rights and remedies of the parties hereto are cumulative and shall not be exclusive, and each such party shall be entitled to pursue all legal and equitable rights and remedies and to secure performance of the obligations and duties of the other under this Agreement, and the enforcement of one or more of such rights and remedies by a party shall in no way preclude such party from pursuing, at the same time or subsequently, any and all other rights and remedies available to it.

i.    *Prevailing Authority.*   In the event and to the extent of any inconsistencies between this Agreement and any Company employee or procedural manual, the terms of this Agreement shall prevail.

j.    *Notices.*  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given: (i) when personally delivered; (ii) when receipt is acknowledged, if sent by facsimile, telecopy or other electronic transmission device; provided, however, that if receipt is acknowledged after normal business hours of the recipient, notice shall be deemed to have been given on the next business day; (iii) one day after deposit with a nationally recognized overnight courier, specifying "next day delivery"; or (iv) three days after being sent by registered or certified mail, postage prepaid, return receipt requested.  Any notice, demand or other communication given by a party in connection with this Agreement shall be sent to the other party at the address set forth above for such other party.

k.    *Disclosure.*   Employee agrees that during the term of his employment with Company, he will disclose solely to Company all ideas, methods, plans, or improvements known by you which relate, directly or indirectly to, the practice of Company, whether acquired by Employee before or during his employment with Company; provided, however, that nothing in this paragraph shall be construed as requiring any such communication where the idea, method, plan or improvement is lawfully protected from disclosure as a trade secret of a third party or by any other lawful prohibition against such communication.

l.    *Authority to Contract.*   Employee shall have no authority to nor shall be entitled enter into any contracts, other than this Agreement or any amendments hereto, which shall be binding upon Company, or otherwise create any obligations on the part of Company.

8

440096.05

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first written above.

Clayton Hertzoff

United Orthopaedic Appliances, Co., Inc.

By:

Name: Noreen Diaz

Title: President

9

440096.05

# Exhibit D

April 16, 2007

<u>BY HAND AND BY FACSIMILE</u>

TO:  Mr. Martin Diaz,  Ms. Noreen Diaz, United Orthopaedic Appliances
Company

FROM:  Clayton Hertzoff

RE:  Quarterly Bonus Payment Due March 31, 2007

Pursuant to section 3 (b) of my Employment Agreement of August 20, 2006,
Orthopaedic Appliances Company is obligated to pay to me a bonus equal to 5% of my

```
************************************************************************
*                                                                    *
*                      TRANSACTION REPORT                            *
*                                              APR-16-2007 04:22 PM  *
*           FOR: UNITED.ORTHOPAFIC         212 473 0658              *
*         ─────────────────────────────────────────────────         *
*    SEND                                                            *
*                                                                    *
*  DATE   START     RECEIVER              PAGES    TIME    NOTE      *
*         ─────────────────────────────────────────────────         *
*  APR-16 04:16 PM 915164784420             1      40"    OK        *
*         ─────────────────────────────────────────────────         *
************************************************************************
```

# Exhibit E



**United Orthopaedic Appliances Co., Inc.**
791 Broadway
New York, NY 10003
Tel: 212-674-2366
Fax: 212-473-0658

May 22, 2007

Clayton Herztoff
791 Broadway
New York, NY 10003

Dear Clayton,

This letter serves as a formal notification regarding your employment agreement and commission with United Orthopaedic Appliances Co., Inc. Commission is based on collected monies for each quarter and is dispensed after management reviews all reports. Payment of commission will be paid in accordance with the general policy of U.O.A./C.O.S.I.

Commission for the time period of January 1, 2007 through March 31, 2007 was $8163.26 less $4,163.26, which represents the cost to U.O.A. Inc. parts and labor for a case that was mishandled by you, employee of United Orthopaedic Appliances Co., Inc. You, never properly maintained the case of Isaiah Johnson ID # 5062, and this led to a deficit of receivables in the amount of $25,000.00. You the O&P manager verbally acknowledged the lack of judgment during a company meeting held on April 30, 2007 regarding the character and integrity of patient, Isaiah Johnson in the presence of Martin Diaz and General Manager, Laurie M. Smith You blatantly admitted your poor judgment and incompetence for dispensing the prosthetic devices to Isaiah Johnson. You also admitted to the owners you take full responsibility for your actions and believed Isaiah Johnson was trustworthy and felt confident he would forward the insurance checks to United Orthopaedic Appliances Co.

Clayton, you also admitted this patient had been seen while being under the influence of alcohol and was not exactly a "model citizen". After more than twenty years in this field, clearly you should be able to make conscientious decisions regarding reimbursement from a non-participating insurance company. You acknowledged that you were aware that Isaiah Johnson was going to receive the insurance checks directly to his home. Therefore, the full liability of this case, which included material and man-hours, consisting over $4163.00, belongs to you, the practitioner.

Sincerely,

Noreen Diaz
President

Cc: Colleen