UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY HERTZOFF, EDWIN HERTZOFF, and
CLAYTON HERTZOFF,

Plaintiffs,

v.

NOREEN DIAZ and UNITED ORTHOPAEDIC
APPLIANCES, CO.,

Defendants.

07-CV-3157 (CM) (MHD)

# AFFADAVIT OF CLAYTON HERTZOFF

## TABLE OF CONTENTS

BACKGROUND TO THE DISPUTE ................................................................. 4

    Defendants Purchased a Successful, Profitable 100-Year-Old Company for
    Zero Dollars At Closing. Defendants Then Proceeded to Ignore Their
    Obligations ............................................................................................. 4

    My Prior 33 Years Of Employment At UOA ...................................... 5

THE EMPLOYMENT AGREEMENT I DEMANDED FROM UOA ........................... 6

THE DEFENDANTS' POST-SALE DISMANTLING OF UOA'S
OPERATIONS ................................................................................................. 8

    Defendants Materially Changed My Duties By Eliminating the
    Technicians That Manufactured Prosthetics and Eliminating the Support
    Staff .......................................................................................................... 8

DEFENDANTS' BREACHES .................................................................... 11

    Defendants materially changed my work duties .................................. 11

    Defendants Wrongfully Refused to Credit Me with Commissions for Sales
    That I Wrote, Claiming That Employees That Had Been Fired or Resigned
    Were the "Original" Sole Source ........................................................... 12

    Defendants Failed To Pay Me My First Quarterly Commission When
    Required ................................................................................................... 13

    The New "General Policy" Requiring Me to Become a Financial
    Guarantor of UOA's Clients ................................................................... 14

    Defendants' Claim That I Used "Poor Judgment" In Providing An
    Amputee With An Artificial Leg Without Demanding Cash Up Front ...... 16

    UOA's Unlawful Deductions of The Disputed Amount From My
    Commissions ........................................................................................... 16

    Defendants' Repudiation Of Their Obligations To Make Full Future
    Commission Payments ............................................................................ 17

DEFENDANTS' REPEATED BREACHES OF THEIR DUTY TO PAY
RENT TO MY FAMILY ................................................................................. 19

DEFENDANTS' BREACH OF THEIR DUTY TO BILL AND CREDIT
ACCOUNTS RECEIVABLE. ........................................................................ 19

DEFENDANTS BREACHED MY EMPLOYMENT AGREEMENT BY
REQUESTING THAT I PARTICIPATE IN QUESTIONABLE BILLING
PRACTICES ............................................................................................................. 22

    UOA's Implementation Of Wrongful Policies For Billing and False
    Attestations Of Receipt ........................................................................................ 22

    Wrongful Coding and Submission of Claims ....................................................... 23

    Submitting Claims With A False Identification Of Place Of Service ................. 24

    These Billing Practices Violated My Employment Agreement ........................... 24

MY CURRENT POSITION WITH NEW ENGLAND ORTHOTIC ............................ 25

    I Have Not Used or Disclosed Confidential Information .................................... 26

RESTRAINING MY ABILITY TO WORK WOULD IMPOSE A SEVERE
HARDSHIP ON MY FAMILY AND ME. ................................................................... 29

# TABLE OF EXHIBITS

1.  UOA's May 22, 2007 Letter Concerning Deduction

2.  April 16, 2007 Notice From Clayton Hertzoff to Martin Diaz

3.  April 27, 2007 Letter From Clayton Hertzoff to Martin Diaz

4.  Photographs of state of UOA "Account Receivable" Files

5.  November 2006 Notice Of Breach relating to obligation to bill "Accounts Receivable

6.  December 4, 2006 Settlement Agreement between UOA and Plaintiffs

7.  Correspondence from December 18, 2006, January 2, 2007, January 5, 2007 and January 10, 2007 concerning executed settlement agreement

8.  June 11, 2007 Letter from Traiger & Hinckley LLP to Colleen Tarpley, Esq.

9.  April 18, 2007 Correspondence from Clayton Hertzoff to Martin Diaz concerning billing codes

10. Compendium of insurance claims reports

11. Checks written by Plaintiffs to HSBC bank

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY HERTZOFF, EDWIN HERTZOFF, and
CLAYTON HERTZOFF,

                                    Plaintiffs,    07-CV-3157 (CM) (MHD)

v.

NOREEN DIAZ and UNITED ORTHOPAEDIC
APPLIANCES, CO.,

                                    Defendants.

**AFFADAVIT OF CLAYTON HERTZOFF**

1.      I am a plaintiff in this matter, and submit this affidavit to respond to the motion for a preliminary injunction filed by Defendants.  In particular, I wish to explain to the Court the background by which I entered into an employment agreement with United Orthopaedic Appliances Co., Inc. ("UOA"), how Defendants refused to live up to their promises in the asset purchase agreement, the lease agreement and my employment agreement, how those breaches were material and forced me to leave the company, and how I have adhered to my obligation not to use or disclose confidential information since leaving the company.  I also submit this Affidavit to respond to the allegations contained in the Affidavit submitted by Ms. Noreen Diaz.  Lastly, I wish to explain to the Court the drastic effects that a preliminary injunction would have on my family and me.  If provided the opportunity, I will testify to these facts.

2.      As I explain in more detail later in the Affidavit, my employment agreement with UOA is not typical of these transactions.  Usually, where a purchaser of a business acquires the business, he requires a critical employee to commit to the acquired

company.  This is case is the reverse of that.  Defendants admit in their papers that the employment agreement was demanded by <u>me</u> for my security: "*Defendants were required to employ Clayton for a period of ten years and pursuant to a generous compensation package*."  (See page 1 of Defendants' Memorandum of Law in Support of A Preliminary Motion.)  Although Ms. Diaz attempts to create the impression that I was a key employee and am now seizing on a trivial breach wanted to get out of my contract, nothing is further from the truth.  This was an employment agreement that I very much wanted, and expected to derive the benefits of for many years.  Unfortunately, Defendants' breaches precluded that.

3.      Ms. Diaz's Affidavit is notable in that she <u>does not dispute that UOA first breached the employment agreement</u>, and remains in breach of the agreement.  Also, she does not dispute that <u>UOA was in breach of the rental agreement</u> because it stopped paying rent.  **Those two breaches are uncontested on this motion.**  Instead, Ms. Diaz's only contention seems to be that UOA's breaches were what she calls minor, and do not justify my departure.  My affidavit explains how the Defendants' breaches were not isolated incidents, but were the culmination of a pattern in which Defendants stopped performing their obligations until compelled by litigation.

4.      I also will explain how the deduction from my pay was not "minor", as Ms. Diaz characterizes it, as it violated New York law.  I wish the Court to understand that this is <u>not</u> a case of an employer failing to credit sales commissions because of non-collection. I only received commissions on those sales for which UOA was paid. This is a case of Defendants unilaterally deducting their <u>losses</u> from my paycheck because a

patient did not pay.  I am informed that New York's Labor Law prohibits the making of this kind of improper deduction from wages, and doing so actually is a crime.

5.      Of even greater concern to me was whether Defendants would continue this "general policy" with respect to each future quarterly payment owed me.  It would be repeated.  Defendants had announced a "general policy" holding me liable for a patient's nonpayment, by which it would deduct monies from my pay, against my consent.  I gave Defendants <u>four</u> chances to renounce that policy and pay my full commissions.  After several meetings with Defendants, they advised me that UOA had the right to deduct amounts from my quarterly commissions if a patient did not pay their bill and they believed that I was at fault.  If Defendants had done then, what they do now – not contest that the payroll deductions were illegal – their defenses might have more merit.  Despite my request for assurances, they repudiated their contractual obligation to pay me my full quarterly sales commissions going forward.

6.      Moreover, as I describe herein, there were other breaches of the employment agreement:  the earlier failure to pay the first quarterly commission payment on time, the failure to properly calculate the commission, and the drastic, material changes to my working conditions, impeding my ability to earn the commissions.  These breaches of the employment agreement, combined with the breaches of the lease agreement and the Asset Purchase Agreement, evidence Defendants' overall pattern of breaching all of their obligations to my family and me.

## BACKGROUND TO THE DISPUTE

**Defendants Purchased a Successful, Profitable 100-Year-Old Company for Zero Dollars At Closing. Defendants Then Proceeded to Ignore Their Obligations.**

7.     In August 2006 Defendants purchased UOA for no consideration, other than the duty to:

(a) Pay me my salary and commissions;

(b) Pay my parents rent for the facilities (significantly below market); and

(c) Collect the Account Receivables to pay off UOA debt obligations that my parents personally guaranteed.

By May 2007, Defendants were in default of <u>each</u> of these three obligations – they failed to pay my commissions on time, they were many months behind in paying the rent, and they stopped collecting the account receivables owed to us, causing my mother to pay more than $32,000 to HSBC bank.  (See Exhibit 11, attached).  When we called on them to perform their obligations, Defendants did nothing to change their conduct, save for making a belated payment of past-due rent.  Once they accomplished their litigation purposes of "curing" the breach, Defendants resumed not paying the rent by failing to pay the July rent, which was due on July 1st.

8.     Defendants now ask the Court to ignore UOA's <u>deliberate</u> and across-the-board refusal to live up to their end of the agreement, and instead affirmatively use the agreement, which was created for my benefit, and of which they are in breach, as a sword to deprive me of my livelihood.  That selective enforcement of the agreement, notwithstanding their repeated breaches of it, would not be just.  It is ironic that Defendants now contend that having first breached the agreement, and forcing me to abandon the 10-year security we bargained for, they now should reap the additional

punitive measure by invoking the agreement that they breached to deprive me of my livelihood.

**My Prior 33 Years of Employment At UOA.**

9.      UOA was founded more than 100 years ago by my great grandfather.  I was employed for more than 33 years with UOA.  Learning my craft under my Dad, I started as a technician in manufacturing prostheses, and later was promoted to be a "Certified Practitioner" for prosthetics, primarily artificial limbs.  Certified Practitioners work with doctors and patients fitting the medically appropriate devices.[1]  As a Certified Practitioner, I go to medical clinics where any Certified Practitioner can make himself or herself available for selection by the doctors treating the patients.  Those doctors make an <u>independent</u> medical decision as to which of the available Certified Practitioners at the hospital would best work with their patients.  If selected by the doctor and patient, I take the orders to our company's technicians, who manufacture the prosthesis.  My secretary then processes the paper work for our services, including preparing the insurance forms necessary to obtain coverage from the insurers.

10.      Eventually, as I advanced in the company, my parents included me in the ownership, giving me 25% of the company, while they each owned 37.5% of the stock.  Throughout the time, my title was as a Certified Practitioner.  My duties were to work with the doctors and patients, attend clinics, and measure and fit prosthesis. My commissions were based on sales.  I also managed the technicians in the Orthotics & Prosthetics Shop ("O&P Shop"), who manufactured the prosthesis.

---

[1]      I am certified by the American Board for Certification in Orthotics and Prosthetics.  The certification process consists of a three part examination.  The first examination is written, followed by a practical exam and an oral exam.  There is an educational prerequisite and an internship requirement.

**THE EMPLOYMENT AGREEMENT I DEMANDED FROM UOA**

11.     In 2006, my parents were approached by Martin Diaz about selling UOA. Because of their advancing age, my parents decided to sell.  Because I was not of retirement age, and was concerned about how I would provide for my wife and my two children, my parents and I were apprehensive about my post-sale employment.  This was my sole source of income, and I previously had only worked for one company.  As a Certified Practitioner, I am not a key employee, and therefore was susceptible to being replaced.  This concern was significant, because the sale would not provide for those needs:  Defendants did not offer or agree to pay **any** money up front.  Instead, the only compensation my parents would receive for selling their lifelong business would be in the form of designated the existing "Accounts Receivable" that Defendants agreed to collect (and allocate each dollar collected) to pay off a line of credit owed by UOA to HSBC Bank, which my parents guaranteed.

12.     In order to provide me with compensation for my ownership interest, we insisted that UOA commit to employing me for the next ten years, guaranteeing me my salary and commissions.  At first, Defendants balked at committing to employ me, wanting a shorter employment term.  I insisted on the security of a longer period. Ultimately, I was able to get Defendants to assent to a long-term employment contract that would cover most of my working life.  As Defendants acknowledge in their legal memorandum, "Defendants were <u>required</u> to employ Clayton for a period of ten years and pursuant to a <u>generous compensation</u> package." (emphasis added; See page 1 of Defendants' Memorandum of Law in Support of A Preliminary Motion.)  I insisted on this in order to ensure my own security, as a material part of the compensation for my share in the company my family and I were selling.

13.     Thus, my only compensation for my 25% ownership interest in UOA was the 10-year employment contract, with a guaranteed salary, commissions and a guaranteed $25,000 per year bonus.  This $25,000 per year bonus, over the years, was intended to be my compensation for giving up my 25% share of the company.

14.     The agreement provides that my duties were to be "as a Prosthetist (working in the field of orthotics and prosthetics) and Manager of the Orthotics & Prosthetics Shop ("O&P Shop")."  Further, my duties included "overseeing production of the staff of Company and the O&P Shop."  (Diaz Ex. 5, Employment Agreement 2.a).  In other words, my duties were to continue as they were before the sale.

15.     The employment agreement contained several forms of compensation. The agreement contained two forms of guaranteed base compensation.  The first was an annual base salary of $120,000, and the second was a guaranteed annual bonus of $25,000, and the third was the quarterly sales commissions I would earn based upon my "Personal Sales Collection."   Under the agreement, I would receive quarterly commissions in the amount of 3% for the first $500,000 of Personal Sales Collection and 10% of sales over $500,000 earned during 2006.  For later years I was entitled to 5% for the first $500,000 in Personal Sales Collections, and 10% for amounts over $500,000.

16.     For my protection, the employment agreement allowed only "appropriate and customary payroll deductions."

17.     In return for UOA promising to timely pay me the above salary and commissions in the full amount, without deductions, I agreed to certain employment restrictions.  In Section 7 of the employment agreement, I agreed that I would only use confidential materials (items such as client lists, "referral sources of the Company"

financial plans, internal memoranda, reports, audits, patient surveys, employee surveys, operating policies, quality assurance materials, fees, and other such materials or records of proprietary nature of Company) in connection with my employment at UOA. (Employment Agreement 7.b)  I also agreed not to disclose such information to any third party.  The employment agreement also limited my ability to compete against UOA in the event I voluntarily chose to leave the company.  As I explain below, I have complied with all enforceable restrictions.

### THE DEFENDANTS' POST-SALE DISMANTLING OF UOA'S OPERATIONS

18.     Shortly after the Diazes took over the company, it became clear that they were not interested in operating the company for itself, but instead made the purchase principally to acquire UOA's existing contracts with insurers that they could attempt to convert for their existing orthopaedic business Complete Orthopaedic Services Co., Inc. ("COSI").  Indeed, at one time after the sale, Mr. Diaz expressly told me words to the effect that "I only bought UOA to get at its insurance contracts."

19.     This became reinforced by the dramatic changes the Diazes made to the manner in which UOA operated.  Rather than operating UOA as an ongoing business, it became apparent that the Diazes were closing down UOA's underlying business operations, and shifting them to their existing company, COSI.  As I explain below, those decisions materially altered the terms and conditions of my employment.

**Defendants Materially Changed My Duties By Eliminating the Technicians That Manufactured  Prosthetics and Eliminating the Support Staff.**

20.     At the time of the sale, and through most of the prior years of operation, UOA was a strong company, consisting of nearly a dozen employees, including 4 certified practitioners, 4 or 5 technicians, 2 secretaries, and a bookkeeper.  That support

8

staff was critical to the functioning of the business, and work that I agreed to perform in the employment agreement. As a Prosthetist, this staff allowed me to visit hospitals to assist doctors in fitting prostheses for patients needing artificial limbs. Other certified practitioners worked on orthotic braces. Our work was fully supported by the 3 or 4 technicians in the O&P Shop, who manufactured the braces and prosthetics. The support staff supported my work by taking care of the billing and business records for the insurers.

21.    Shortly after the Diazes acquired the company, it became clear to me that their plans did not involve operating the business. Over the course of the next 7 months, Mr. Diaz's belligerent and temperamental demeanor drove off virtually all of this support staff, dramatically changing my duties as a Prosthetist, and more importantly, completely changed my role as the Manager of the O&P Shop. At the time I was compelled to leave, UOA's "business operations" had dwindled to no other Certified Practitioners, 2 technicians and 1 secretary, and the O&P Shop had basically closed. The two remaining technicians were orthotic (braces) technicians, and they did not manufacture prostheses. Consequently, I was forced to spend approximately 40% of my time doing work in the shop that was previously performed by technicians. That change impacted my commissions, as I received no commissions for shop work.

22.    Mr. Diaz drove off the only other UOA practitioners. The first to leave was Mr. Richard Manfredi. Following a series of disputes with Mr. Diaz, Mr. Manfredi became fed up with Mr. Diaz's abusive style, and "retired" from the company. Immediately thereafter, Mr. Mark Kuller was told that he had to leave UOA unless he quit the night job he needed to make ends meet. Mr. Kuller had been performing that

night job for years, and it had not previously been an issue.  Mr. Kuller then told Mr. Diaz that he quit UOA.  That left only my father and me as Certified Practitioners.  Over the course of the next months, Mr. Diaz cut my father's hours and pay, and by November or December he had forced my father to resign.

23.     Next, my support staff was dismantled.  Whereas before the Company had two secretaries and four technicians, they too bore the brunt of Mr. Diaz's ire.  Critical to my work is the support provided by the technicians.  They manufacture the prosthetic products that I have sold.  In particular, the O&P Shop technician for prosthetics was Francisco Ramirez, who I had worked with prior to the sale.  Like many other employees who supported my work at the time of the sale to Defendants, Mr. Ramirez was unable to tolerate Mr. Diaz's abusive management, and quit in December 2006.  And, as became a pattern, he was never replaced.  When I learned that Mr. Ramirez had left, I complained to Laurie Smith, the Office Manager, I recall telling her "I need help -- you're killing me here."  My requests for assistance were completely ignored.

24.     I further rely upon secretaries, who billed the work and submitted the insurance claims.  When the office manager Telly was fired, I was required to perform his office tasks, shipping, receiving, ordering shop and office supplies, scheduling patients and answering the phone in addition to going to clinics and seeing patients and fabricate prostheses.  As employees left UOA and were not replaced, I had to assume their duties, not only selling the products, but then also having to manufacture the products.

25.     Also UOA fell behind on paying suppliers, we were unable to purchase parts on a timely basis, as the sellers made a "hard stop" on parts.  This delay then

impacted my ability to perform my job.  Although Ms. Diaz submits some letters from suppliers as part of her Affidavit, they do not rebut the refusal to provide supplies on a necessary basis.

26.    The O&P Shop closed down, leaving me unable to secure timely prostheses for the patients.  Although my employment agreement put me in charge of the shop, Mr. Diaz never took me to see the new O&P Shop. He didn't consult me on what equipment I would need to work in the new place. As of today there is no shop set up to fabricate anything!  Mr. Diaz dismantled the old factory, and the two technicians no longer have work to build.  Near the end of my employment, there was no telephone, fax or computer service.  The work conditions bore no resemblance to the work I had agreed to perform in the employment agreement.

**DEFENDANTS' BREACHES**

27.    Starting immediately after the sale, Defendants began a series of breaches of the employment agreement, starting with changing my work duties, refusing to pay me a full commission on my work, delaying paying the first commission payment that they owed to me, and culminating in their refusal to make full payment of my salary.  Each of those breaches is explained below.

**Defendants Materially Changed My Work Duties.**

28.    As I describe above, the Diazes dismantled UOA after the sale.  While it may have been within Mr. Diaz's authority to terminate these employees, those decisions materially changed my work from that set forth in the employment agreement.  Foremost, UOA replaced none of these vital employees, and thus, I was forced to perform all of the work that previously had been performed by the four-person staff of Certified Practitioners.  In addition, with the shrinking of the O&P Shop staff, my job changed

11

from being a Certified Practitioner to working in the shop:  I was forced to go back and manufacture my own prosthetics.  This was a dramatic and material change to my duties, as this work was previously performed by a technician and I received no commission for this work.

29.     Under the provision of my employment agreement, I was entitled to a quarterly commission based upon the amount of Personal Sales Collections I generated during the quarter.  Although titled a "bonus," the amount was not discretionary, and was tied to my Personal Sales Collections.

30.     The change in my duties also had a profound impact on my compensation under the employment agreement.  Whereas before the sale I spent nearly 100% of my time gaining referrals from doctors at hospitals and treating patients, after the sale I was forced to perform the shop work of technicians in manufacturing the devices.  This cut into my time at the hospitals, and therefore reduced the Personal Sales Collection on which my commissions were calculated.

**Defendants Wrongfully Refused to Credit Me with Commissions for Sales That I Wrote, Claiming That Employees That Had Been Fired or Resigned Were the "Original" Sole Source.**

31.     In addition, the Defendants breached the agreement by refusing to include certain work in my "Personal Sales Collections."  After my father and Mr. Manfredi left the company, and Mr. Kuller was terminated, I was required to work their accounts.  I went to the hospitals where they had previously worked, and attempt to solicit work from the doctors. I wrote up and originate sales.  However, Defendants wrongfully refused to include those sums in my sales commission claiming that even though I was working the account, seeing patients and writing up the sales, I was not entitled to commissions because my father and Mr. Manfredi were the "original" source of these referrals.  I had

many discussions with Mr. Diaz about this issue, but he refused to pay me commissions on these sales that I generated, as required under my contract.

**Defendants Failed To Pay Me My First Quarterly Commission When Required.**

32.     Defendants ignored their obligations from the get-go.  Defendants' first breach related to the timing of my 2006 quarterly bonuses.  Beginning in late 2006, I was owed my first commission payment for the Initial Period, in the approximate amount of $3,000.  By November 23rd, I was owed the commission and when it was not paid, I contacted Mr. Diaz three times and his response was "It's not a priority" and "wait 'til next week."  The next week, his response was the same.  I finally called Ms. Diaz and she brushed me off, saying I had to talk with Mr. Diaz.  I got angry, and told her I expected my commission to be paid on time.  By the first week of December, I called Ms. Diaz, and told her that I still had not received the commission.  She agreed to pay me all commissions due by the end of the year.  Defendants failed to pay me as promised.

33.     By the second week of January 2007, I still had not received payment, and told both Mr. Diaz and Ms. Smith in clear, strong language that this breach was not acceptable.  I telephoned Ms. Diaz, and so requested a personal meeting with both her and Mr. Diaz at COSI's Long Island location.  On the day of my meeting, I drove the 40 or so minutes to the meeting, calling ahead from my car to let Ms. Diaz know that I would be there in 10 minutes.  When I arrived, I was told that Ms. Diaz had left the office.

34.     Eventually, Mr. Diaz did appear at the office, and I told him that the commission payment was now 10 weeks late.  Mr. Diaz told me that my commission payments were not "a high priority" for him, and that I should not "get upset."  I told him that I would not work for a company that plays around with my money and said I would

13

not spend the next ten years fighting every quarter for what is rightfully mine.  Mr. Diaz suggested that, as we were close to the date for the next payment, for administrative ease UOA could pay both the third quarter and fourth quarter commissions one week after the quarter ended.  He also explicitly promised that all future sales commissions would be paid one week after the quarter ended.  I agreed with Mr. Diaz's offer, and we shook hands on it, and went out for dinner.

**The New "General Policy" Requiring Me to Become a Financial Guarantor of UOA's Clients.**

35.    The final straw arose from Defendants' two separate but related breaches of my employment agreement in April 2007 when UOA withheld more than half of my pay.  At this time the relationship was strained as my parents already had been forced to sue Defendants to recover the rent UOA had stopped paying.  Thereafter, Defendants created a new "general policy" by which I now would have to become a financial guarantor for UOA's clients, and that UOA unilaterally would determine the amount of loss to be deducted from my pay, all without my consent.  Both practices are not permitted by my employment agreement, and I believe the later act is a clear violation of the New York Labor Law, which prohibits the deductions that can be taken from an employees paycheck.

36.    I note that although Ms. Diaz's Affidavit spends nearly 4 pages addressing my employment, she does not address (and therefore not dispute) this conduct, which is a material breach of my employment agreement.  Her only response appears to be that this violation does not merit "a Federal case."

37.    In April 2007, based on what it later claimed be a new "***general policy of U.O.A./C.O.S.I.***", UOA deducted more than half of the amount they owed me based upon

a customer's failure to pay his UOA bill in a timely manner. (Attached as Exhibit 1.) This policy had never before been announced, was recorded nowhere, and was inconsistent with my prior 33 years with the Company. I first learned of this change when Mr. Diaz informed me that he had deducted the monies.

38.    Although not spelled out in the letter, it seems the policy required me to guarantee customer payment. In all of my prior 33 years at UOA it never that such a policy, and I had never known the company to hold a Certified Practitioners liable for a client's non-payment. It certainly was not a "customary payroll deduction." It seems to have been created on the fly, based upon my work with a patient, Isaiah Johnson, who required a prosthetic device in March 2007. As had been my practice during my entire time at UOA, I obtained Mr. Johnson's information and forwarded it to my secretary for processing. I was not alerted that UOA did not participate with Mr. Johnson's insurance carrier, and therefore that reimbursements would be made directly to Mr. Johnson rather than to the provider. (Mr. Johnson had a version of Blue Cross for federal employees, which sent checks directly to employees, rather than to UOA, as is the case with standard Blue Cross.) Later, on two occasions about a week apart, Mr. Diaz confronted me and asked me whether Mr. Johnson was "good for it," and said to me "It's gonna be on you" if Mr. Johnson didn't pay. I told him that I did not agree with his threat.

39.    This policy of shifting to me the ordinary risk of non-payment based upon the decision to accept work for the patient was inconsistent with the employment agreement, which specifically provides that it was UOA's (and not my) decision whether or not to proceed with a customer. (Employment Agreement 6.b). UOA was seeking to

reverse that agreement, by holding me responsible where UOA's decision did not work out.

**Defendants' Claim That I Used "Poor Judgment" In Providing an Amputee With an Artificial Leg Without Demanding Cash Up Front.**

40.    In April, Mr. Diaz set up a meeting with me at COSI's East Meadow offices.  At the meeting, Mr. Diaz and Ms. Smith told me that I should have collected the money up front from him before we delivered the prosthetic leg to Mr. Johnson.  I responded by telling them that it was illegal to bill an insurer before delivering the items. (I have on numerous occasions objected to Mr. Diaz's practice of billing insurance carriers and Medicare and Medicaid before delivery of the items.)

41.    Late in April, Mr. Diaz asked me to put together some figures on the materials involved in constructing Mr. Johnson's prosthetic device.  Although I did not finish that analysis, Mr. Diaz took it from my desk, and when I received my next commission payment, I immediately saw that UOA had unlawfully deducted the costs from my pay, reducing my commission check in half. On April 27, 2007, I received a paycheck from UOA, showing that my commissions (before taxes) were cut in half, from $8,163 to $4,000.

42.    I subsequently learned that this policy was not a one-time issue, and that Mr. Diaz had imposed this policy against his Certified Practitioners at COSI.  From discussions with a COSI employee, Steve Priory, I learned that the Diazes likewise made him bear their losses by making deductions from his paycheck.

**UOA's Unlawful Deductions of the Disputed Amount From My Commissions.**

43.    I understand that UOA contends that it has some sort of affirmative claim against me based upon the issue involving Mr. Johnson. (However, UOA has not pleaded

any counterclaims whatsoever against me.) Even if one assumes that my employment agreement might permit Defendants to make a new policy that restricts my compensation – and they cannot – Defendants wrongly deducted those amounts from my pay. I received nothing from Defendants until after making verbal demands, a written demand, and then filing our initial Complaint.

44. As I have stated, my employment agreement provides that the only deductions that UOA could make from my pay were those "appropriate and customary payroll deductions." Even if UOA now claimed to have such a policy, it was precluded by my employment agreement, which provides that "[i]n the event and to the extent of any inconsistencies between this [employment] Agreement and any Company employee or procedural manual, the terms of this Agreement shall prevail." (Employment Agreement at 10.i) Thus, a "general policy" would not allow UOA to override my contract rights.

45. Further, I have been advised that the deduction not only breaches the terms of the employment agreement, but that it also is illegal under New York labor law.

**Defendants' Repudiation of Their Obligations to Make Full Future Commission Payments.**

46. In isolation, the illegal deduction of half of my commissions was a serious failure to live up to the terms of my employment agreement. However, to me the issue went further in terms of my continuing rights as an employee going forward. This was not a case of an accidental oversight or a disputed calculation.

47. UOA was intentionally and deliberately making a deduction from my paycheck because it claimed I used "poor judgment" in providing an amputee with a needed artificial leg without demanding cash prior to delivery. Other patients would

undoubtedly fail to pay in the future and UOA could easily claim "poor judgment" at the drop of a hat. I was very unsure about receiving my future promised compensation. I therefore confronted UOA's Manager, Ms. Smith, about the wrongful deduction; she said that Mr. Diaz instructed her to make the deduction and she referred me to him. Because this matter was very serious, I felt I should speak with the owner of the company and its nominal President, Ms. Noreen Diaz. When I confronted Ms. Diaz about the unpaid commissions, her response was that she was not responsible, since she only processes the payroll in accordance with Martin's instructions, and that I should therefore speak with Mr. Diaz about the matter.

48.    After the Diazes' decision to stake out this position, I understandably felt insecure whether UOA would honor its contractual obligations to me on an on-going basis. When I spoke with Mr. Diaz about this policy and demanded that he discontinue it, Mr. Diaz said that he would speak to UOA's counsel about the policy and his ability to enact the policy.   Thereafter, he told me that, having conferred with its attorneys, UOA believed it had the ability to enact the policy and deduct such payments from my paycheck.

49.    I gave Defendants <u>four</u> chances to make things right and pay my full commissions.  I twice demanded them orally.  I then made a written demand on April 16, 2007, requesting payment and letting them know I considered it a breach, which I sent to Mr. Diaz by facsimile. (Attached as Exhibit 2).  He telephoned me a few minutes later, and cursed at me, saying that he was insulted that I sent him a letter like this and that I better not send him any more "fucking letters like this."  On April 27, 2007, after receiving the payment with the improper deduction, we again demanded payment in the

full amount, and put UOA on notice that we considered it to be a serious breach of the employment agreement. (Attached as Exhibit 3).

50.    Following all of these complaints, and after consulting with their attorney, Defendants wrote a letter stating that they were going to stand by and not remedy their improper payroll deductions. (Exhibit 1).  I had no choice but to view UOA as repudiating its obligations on my employment agreement.  UOA consulted with its attorneys, and after that refused to reverse the policy or to refund me the amounts improperly deducted from my paycheck.  (Colleen Tarpey, Esq. is copied on the letter signed by Ms. Diaz after we filed suit.) Mr. Diaz refused to provide me assurance that UOA would stop these types of breaches and illegal conduct.

## DEFENDANTS' REPEATED BREACHES OF
## THEIR DUTY TO PAY RENT TO MY FAMILY.

51.    At the time that Defendants stopped paying me my full commissions, they also stopped paying us the rent that they owed. The Stock Purchase Agreement, Lease Agreement and my Employment Agreement were all negotiated and signed at the same time and were connected agreements. (The Lease Agreement and my Employment Agreement were listed as schedules to the Stock Purchase Agreement).  By May 2007 the Defendants were 4 months in default of their rent obligations.  Copies of those notices are attached as Exhibit B to the Amended Complaint.

52.    It was only upon the default becoming an issue in litigation that UOA brought itself current for the months of default.  However, even those efforts, presumably done at the urging of their attorneys to further their litigation arguments, were token. Once they made these payments and rushed to Court to advise that there was no longer a

dispute, they again stopped paying the rent.   Currently, UOA is in default of the obligation to pay the July rent.

## DEFENDANTS' BREACH OF THEIR DUTY
## TO BILL AND CREDIT ACCOUNTS RECEIVABLE.

53.      In addition to breaching my employment agreement, and breaching the lease agreement, UOA did not live up to its agreement to bill and collect the Accounts Receivable.   The Asset Purchase Agreement provided that Defendants "shall cause the 'Net Accounts Receivable' to be billed and collected, to the extent reasonably collectable, in the normal course of the Corporation's operations."  (Asset Purchase Agreement at § 1.3).   While there was a reconciliation process whereby Defendants would have to contribute $100,000 if their collection efforts did not result in a threshold amount, that settlement process did not eliminate their duty to make collections.   The duty to bill, collect and credit the accounts receivable would have consequences prior to the 2 year period.   Indeed, as a direct result of Defendants' failure to bill and pay the HSCB line of credit, HSBC declared the line to be due and demanded that my mother pay her guarantee of the approximate $30,000 outstanding balance.   Thus, we have suffered an immediate injury from the failure "to bill and collect," separate from the issue of the reconciliation in August 2008.

54.      From August 2006 when Defendants acquired UOA, until I left in July 2007, Defendants made little to no effort to bill accounts receivable on an ongoing basis. Rather, I personally observed that the account receivable files were left stacked on the floor of the office, and remained untouched by UOA for months at end.   When I raised the issue with Mr. Diaz, he stated that the accounts would be processed later by COSI. Contrary to Mr. Diaz's view, those files were never sent to COSI, and therefore remained

untouched – stacked on the UOA office floors. (A copy of pictures showing the untouched files is attached hereto as Exhibit 4).

55.    Ms. Diaz's affidavit claims that our actions in this suit are simply to harass UOA and the Diazes. Nothing could be further from the truth - we made attempts to resolve this dispute before filing suit, after filing suit, and before I left.

56.    Initially, our attorneys wrote to Defendants in November 2006, demanding that UOA bill and credit the monies as required by the Asset Purchase Agreement. (A copy of this letter is annexed as Exhibit 5.) Thereafter, the parties met and conducted several discussions as to how to resolve this dispute, and ultimately, in early December 2006 we achieved an agreement to resolve the dispute. (A copy of that Settlement is attached as Exhibit 6). Thus, the record shows that our intention was not to harass Defendants, but to resolve our concerns.

57.    After Defendants agreed to a settlement, we repeatedly were told that the settlement had been executed, and that an executed agreement would be sent to our attorneys. (Copies of correspondence repeatedly requesting the signed settlement agreement, from December 18, 2006, January 2, 2007, January 5, 2007, and January 10, 2007, are attached as Exhibit 7).

58.    Unfortunately, those representations were false, and Defendants never sent an executed agreement. Instead, Defendants attempted to use the settlement for their purposes, deducting from their Account Receivable billing certain disputed amounts that we would have allowed UOA to take as part of the settlement. Our acquiescence in that offset was only as part of a larger settlement, outlined in the documents. Even though that settlement agreement was never executed, UOA now is taking that unauthorized off-

set in its billing of the Accounts Receivable.  Thus, UOA is in <u>current</u> breach of their <u>current</u> obligations to allocate these amounts to discharge the Accounts Payable.  We have been damaged now as my parents have had to pay off the defaulted HSBC line of credit.

59.    While Ms. Diaz argues that we should have withdrawn the lawsuit in response to her counsel's Rule 11 threats, such a withdrawal would not have addressed the material breaches outlined above.  (A copy of the letter from my counsel, explaining this to Ms. Diaz's attorneys, is attached hereto as Exhibit 8).

**DEFENDANTS BREACHED MY EMPLOYMENT
AGREEMENT BY REQUESTING THAT I
PARTICIPATE IN QUESTIONABLE BILLING PRACTICES**

60.    From my work in the industry, I am aware of the significant regulations and laws that govern the billing practices and procedures for Medicare and Medicaid. Those obligations are significant to me, and in the employment agreement, UOA represented that it "is fully committed to ensuring its compliance and the compliance of its employees, with all applicable rules, regulations and laws promulgated by the state and federal governments and by third party payors relating to the provision of billing services."  (Employment Agreement at 9.a)  That proved not to be true, as Mr. Diaz initiated new billing policies after the sale that were plainly improper.  Defendants requested that I participate in questionable billing practices, contrary to the provision in my employment agreement.

61.    As I describe below, I encountered a series of instances that made me legitimately concerned about my association with UOA.  Given the existence of potential criminal penalties for being involved with improper Medicare and Medicaid billing, I am fearful of being associated with a company run by Mr. Diaz.

**UOA's Implementation of Wrongful Policies for Billing
and False Attestations of Receipt.**

62.    During the period in which my parents owned the company, we would bill patients upon delivery of the goods.  That changed under Mr. Diaz, as he announced a new billing policy, requiring patients to sign several forms at the outset of the engagement.  Some of these forms were standard, including a financial undertaking to pay for the goods, and HIPA privacy forms.  However, one form required the patients and me sign a "receipt" form acknowledging delivery of the prosthetics before we even begun processed the orders!  I told Mr. Diaz that this was inappropriate, and that I would not sign, nor allow my clients to sign, a false declaration of delivery.  Mr. Diaz was upset with my decision, and he repeatedly requested employees in the office to bill for orthopedic appliances before actual delivery.  I believe that on numerous occasions he has submitted bills to Medicare and Medicaid months before actual delivery.

**Wrongful Coding and Submission of Claims.**

63.    Similar concerns arose with respect to the coding of claims submissions. On regular occasions, Mr. Diaz encouraged me to bill for reimbursement at rates higher than I though were appropriate.  For example, Mr. Diaz instructed me to submit insurance claims for certain knee braces (the "Short Runner" Knee Brace by Breg) using code L-1832. Insurers pay approximately 5-10 times as much for a brace with the billing code L-1832 as for a brace with the billing code L-1820.  I explained to Mr. Diaz that the devices we used were not eligible for classification and reimbursement under the L-1832 code because it was a single axis joint, not a multiple joint.  Code L- 1820 is for "knee orthotic, elastic with condylar pants and joints, prefabricated with or without patellar control."  Code L-1832 is for "knee orthotic, adjustable knee joints, positional orthosis,

rigid support, (unicentric or polycentric joints), prefabricated. Indeed, I believe that the "Short Runner" brace states right on the box that the recommended billing code is L-1820. In what was a regular pattern concerning such issues, Mr. Diaz's response was "what's the difference – the joints are hidden."

64. Ms. Diaz's Affidavit argues that the brace in the catalog attached to her affidavit recommends billing using the L-1832 code. (Diaz Aff. Ex. 11). That exhibit is irrelevant, as it is a multi-joint part, and not the simple type of brace that Mr. Diaz and I discussed.

65. Ms. Diaz also states that I nowhere refused or disagreed with these billing practices. However, as is clearly evidenced by Exhibit 9 hereto, I did object to these practices, telling Mr. Diaz that I would not participate in this activity.

**Submitting Claims with a False Identification of Place of Service.**

66. I also became concerned when I discovered a series of claim forms that had been submitted to insurers. Copies of these are attached hereto as Exhibit 10.[2] The invoices identify UOA as providing the services. However, none of these clients actually were, to my knowledge, UOA patients, and I suspect that they were clients of COSI. I became very concerned when I saw billing to insurance companies for patients that I knew UOA had not seen. Instead, it appears that Mr. Diaz was using UOA as a front for work that was actually being performed by his other companies, including COSI. I believe that it is improper, and perhaps illegal, to submit invoices containing a false location for the providing of services.

---

[2]   Because these documents contain information about individual clients, the documents are being submitted to Judge Dollinger and opposing counsel, but are not being filed until a protocol is agreed upon.

**These Billing Practices Violated My Employment Agreement.**

67.    Section 9a of the Employment Agreement, drafted by defendants, provides that: "You acknowledge that Company is fully committed to ensuring its compliance and the compliance of its employees, with all applicable rules, regulations and laws promulgated by the state and federal governments and by third-party payors relating to the provision of billing services." Clearly, this was not the case here. Defendants breached their obligations, as Mr. Diaz's improper billing practices put me in an impossible and untenable position.

68.    After months of: (i) being asked to perform illegal billing practices; (ii) being denied the full amount of the commissions I was entitled to; (iii) having a new illegal policy of setting off from my pay the amounts that the company was not able to collect from clients; (iv) having my working conditions drastically changed by the absence of any prosthesis technician; and (v) being verbally harassed by Mr. Diaz, I had simply had enough. My working conditions had become intolerable. I could not be part of an organization which had demoted me, asked me to break the law, and now was not even paying me what I was entitled to under the law. The Defendants' conduct in pushing me out was designed to deprive me of the only compensation I would be receiving for selling my 25% interest in our company – what was to have been a "generous" near lifetime employment agreement.

*****

69.    In sum, Defendants purchased UOA for no consideration, other than the duty to (a) pay me my salary, (b) pay rent to my parents, and (c) collect the Account Receivables to pay off obligations guaranteed by my parents. By March 2007, Defendants were in default of each of these three obligations.

## MY CURRENT POSITION WITH NEW ENGLAND ORTHOTIC

70. Although Defendants had breached my 10-year employment agreement by materially changing my working conditions, not paying me, making illegal and impermissible payroll deductions, and effectively discharging me, I nevertheless have attempted to mitigate my damages by securing alternative employment. Therefore, I looked for another job. Fortunately, on June 18, 2007 I began working for New England Orthotic & Prosthetic Systems, LLC ("New England Orthotic").

71. My current job is on less favorable terms that I would have had I been allowed to remain at UOA for the duration of my contract. I do not have the security of a long-term contract that UOA had promised me. I also will not achieve the same bonuses that I was entitled to at UOA. Nonetheless, I am performing the duties of Certified Practitioner that I was promised at UOA but which were changed once Mr. Diaz dismantled UOA.

**I Have Not Used or Disclosed Confidential Information.**

72. Although UOA's breach of my employment agreement has released me from my non-compete clause, I wish to assure the Court that I intend to honor the non-use and non-disclosure obligations in that agreement. I have neither used nor disclosed UOA's confidential information to others. Instead, I am simply plying my trade and earning work based not on any confidential information in my possession, but based upon my skills and abilities as a Certified Practitioner.

73. I have reviewed the Affidavit of Ms. Diaz submitted on the motion, which makes a series of vague accusations that I have misused UOA's confidential information. I would first note that Ms. Diaz's Affidavit lacks personal knowledge about many of the accusations. That is not surprising, as almost all of UOA's business actually was

26

conducted by Mr. Diaz, not Ms. Diaz.  For some reason, Mr. Diaz has not submitted an affidavit.

74.      In any event, the accusations in Ms. Diaz's Affidavit are false, as I have not committed unfair competition while at New England Orthotic. Having reviewed Ms. Diaz's affidavit, I do not believe her to contend that I have used or disclosed any UOA financial plans, internal memoranda, reports, audits, patient surveys, employee surveys, operating policies, quality assurance materials, fees, and other such materials or records of proprietary nature to UOA.  Instead, it appears that Ms. Diaz's complaints are limited to purported use of customer lists or doctor lists.  For example, Ms. Diaz accuses me (without any apparent personal knowledge) of "us[ing] his knowledge of the client names and referral sources of business to UOA to directly compete with UOA and has shared that Confidential Information with his new employer."  (Diaz Aff. ¶ 24).   That is false.  I have not used the UOA client lists, and the "referral sources" are simply the doctors and clinics who assign the work, and who are known to everyone in the industry.

75.      It seems that Ms. Diaz complains about me using my general experience as a Certified Practitioner.  She complains that "Clayton Hertzoff is only in contact with those UOA referral sources and is only allowed to see their patients as a result of his employment with UOA and their familiarity with him because of his employment with UOA."  (Diaz Aff. ¶25).   That is not true on several levels – first, my knowledge of the referral sources (i.e., the hospitals) is not confidential – there is a known group of hospitals at which orthotic providers visit and offer to fill the doctors' prescriptions.  The doctors choose to whom to provide the prosthetics prescription.  That decision is based upon the provider's individual skills and abilities.  Thus, the referral sources are known to

everyone in the industry, and every orthotic manufacturer visits the same hospitals in order to get referrals.

76.    Ms. Diaz also argues that the customers I am servicing are "UOA" customers. That claim is absurd on its face. The customers walking in to hospitals or clinics are not "UOA's customers" – they are unaffiliated people who need assistance. The doctors then assign the work based upon their determination of the best provider.

77.    I acknowledge that some customer materials might be deemed confidential to UOA. For example, over the course of my work for UOA, I was reasonably required to maintain information and customer histories, and to have ready access to that information, and therefore I maintained that information both in the office and away from the office. That was permitted by my employment agreement. (see Section 6.)

78.    During my work with New England Orthotic, I have not used the information in those files to solicit clients, nor have I disclosed the information to my new employer. Although not expressly required to do so under the language of my employment agreement, after learning about Defendants' allegations, and to prevent an issue regarding these files, I returned it to UOA through my attorneys. I wish to reiterate that I did not (i) use this information after leaving UOA to solicit customers, or (ii) disclose that information to New England Orthotic or anyone else. I no longer maintain any copies of this information.

79.    I also have not disparaged UOA to individuals at the hospital clinics, as Ms. Diaz insinuates. (Diaz Aff. ¶ 11-12). Although she is not specific in her allegations, I suspect Ms. Diaz may be referring to an episode on June 18th, when I went to

Metropolitan Hospital. While there, UOA's three "representatives" (Mr. Diaz's son, Nicholas, and two other men) began harassing patients, demanding their names (presumably for purposes of the suit), and causing a commotion at the hospital. When the hospital investigated the commotion, it assembled the three UOA representatives and found that each of them lacked the professional certifications necessary to treat patients. The three young men simply were not Certified Practitioners. The Doctor in charge of the clinic therefore sent them home. That is hardly any of my responsibility. UOA is free to send a Certified Practitioner to Metropolitan Hospital's clinic, or any other clinic.

80.     Ms. Diaz also claims that I have been disparaging UOA to insurers. (Diaz Aff. ¶¶ 31-32). Ms. Diaz does not identify what she believes I have stated, other than that she heard rumors that the insurers were concerned about UOA having been dissolved and no longer being an active corporation. (Diaz Aff. ¶31). I unequivocally deny making any statements to the insurers that UOA had dissolved, as I know full well that UOA has not been "dissolved" and that it remains in existence. While I deal with some of the same insurers in my current employment, I have not engaged in any improper activities with the insurance companies.

81.     In sum, I respectfully submit that until Defendants breached their obligations and violated the law, I have adhered to each and every of my obligations under the employment agreement. Even after Defendants' breach, I have adhered to my obligations not to use or disclose confidential information. While I have taken a position with another orthotic and prosthetic provider, I have done so only to mitigate the damages caused by Defendants' admitted breach of their duties, and to provide for my family's needs.

## RESTRAINING MY ABILITY TO WORK WOULD
## IMPOSE A SEVERE HARDSHIP ON MY FAMILY AND ME.

82.     As I have noted, I am not rich. Over the course of my work, I earned a modest salary. While I also received an ownership interest in UOA, I received nothing from Defendants for that, other than a promise to continue employing me on the same terms as when my parents owned the company. They have breached that duty.

83.     I need to work to support my family. I have two children, ages 17 and 20, who both are in college. I also have a mortgage on my home that I need to pay from my salary. My salary was designed to provide savings to permit me to pay the college tuition, and if I were barred from working, I would not be able to support my family, pay the mortgage, or prepare for my children's future college education.

84.     If the Court were nevertheless to enter an injunction, I would request that the Defendants be required to post a large bond sufficient to protect me when the injunction is found to have been improvidently granted.

85.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 20, 2007

Clayton Hertzoff

30

# AFFIDAVIT
# EXHIBIT 1



**United Orthopaedic Appliances Co., Inc.**
791 Broadway
New York, NY 10003
Tel: 212-674-2366
Fax: 212-473-0658

May 22, 2007

Clayton Herztoff
791 Broadway
New York, NY 10003

Dear Clayton,

    This letter serves as a formal notification regarding your employment agreement and commission with United Orthopaedic Appliances Co., Inc. Commission is based on collected monies for each quarter and is dispensed after management reviews all reports. Payment of commission will be paid in accordance with the general policy of U.O.A./C.O.S.I.

    Commission for the time period of January 1, 2007 through March 31, 2007 was $8163.26 less $4,163.26, which represents the cost to U.O.A. Inc. parts and labor for a case that was mishandled by you, employee of United Orthopaedic Appliances Co., Inc. You, never properly maintained the case of Isaiah Johnson ID # 5062, and this led to a deficit of receivables in the amount of $25,000.00. You the O&P manager verbally acknowledged the lack of judgment during a company meeting held on April 30, 2007 regarding the character and integrity of patient, Isaiah Johnson in the presence of Martin Diaz and General Manager, Laurie M. Smith You blatantly admitted your poor judgment and incompetence for dispensing the prosthetic devices to Isaiah Johnson. You also admitted to the owners you take full responsibility for your actions and believed Isaiah Johnson was trustworthy and felt confident he would forward the insurance checks to United Orthopaedic Appliances Co.

    Clayton, you also admitted this patient had been seen while being under the influence of alcohol and was not exactly a "model citizen". After more than twenty years in this field, clearly you should be able to make conscientious decisions regarding reimbursement from a non-participating insurance company. You acknowledged that you were aware that Isaiah Johnson was going to receive the insurance checks directly to his home. Therefore, the full liability of this case, which included material and man-hours, consisting over $4163.00, belongs to you, the practitioner.

    Sincerely,

Noreen Diaz
President

Cc. Colleen

# AFFIDAVIT
# EXHIBIT 2

April 16, 2007

BY HAND AND BY FACSIMILE

> TO: Mr. Martin Diaz, Ms. Noreen Diaz, United Orthopaedic Appliances Company

FROM: Clayton Hertzoff

RE: Quarterly Bonus Payment Due March 31, 2007

Pursuant to section 3 (b) of my Employment Agreement of August 20, 2006, Orthopaedic Appliances Company is obligated to pay to me a bonus equal to 5% of my "Personal Sales Collection." I have not yet received this payment, despite my repeated requests for it to be made.

Formal demand is hereby made for the payment of this bonus.

I expressly reserve all of my rights under the Employment Agreement and otherwise.

Sincerely,

Clayton Hertzoff

# AFFIDAVIT
# EXHIBIT 3

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933

FACSIMILE  212-656-1531

GEORGE R. HINCKLEY, JR.

GRH@HINCKLEY.ORG

April 27, 2007

<u>Via Facsimile, 516-478-4420</u>

Ms. Noreen Diaz
United Orthopaedic Appliances Co, Inc.
791 Broadway
New York, NY 10003

Dear Ms. Diaz:

We represent Mr. Clayton Hertzoff.

Mr. Hertzoff is due a first-quarter 2007 bonus from United Orthopaedic Appliances Co, Inc. ("UOA") in the amount of $8,163.26 (representing 5% of $163,265.15).

He received today a direct deposit of $4,000, less payroll deductions.

Demand is once again hereby made for the balance of Mr. Hertzoff's first-quarter 2007 bonus of $4,163.26.

UOA's continued failure to pay this amount constitutes a breach of Mr. Hertzoff's Employment Agreement dated as of August 20, 2006

Sincerely,

*George Hinckley Jr.*

George R. Hinckley, Jr.

# AFFIDAVIT
# EXHIBIT 7

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933                                     George R. Hinckley, Jr.
FACSIMILE   212-656-1531                                        grh@hinckley.org


January 10, 2007

Via Facsimile, 212-473-0658

Mr. Martin Diaz
Ms. Noreen Diaz
United Orthopaedic Appliances Co, Inc.
791 Broadway
New York, NY 10003

Dear Mr. and Ms. Diaz:

This is a follow-up to my facsimile letters of Dec. 8, 2006, Dec. 18, 2006, Jan. 2, 2007 and Jan. 5, 2007.

I suggest that from now on we communicate solely in writing, or through counsel, so that there can be absolutely no misunderstandings as to what was said.

We sent you a settlement agreement over a month ago, on Dec. 8, 2007. Ms. Diaz clearly told me that the agreement had been signed, a fact that I communicated to my clients. We have not, however, received the agreement.

We have been instructed to commence litigation immediately unless we receive a signed settlement agreement and a Monthly Report of Net Accounts Receivables and Accounts Payables.

Sincerely,

George R. Hinckley, Jr.

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933                                            George R. Hinckley, Jr.
FACSIMILE   212-656-1531                                               grh@hinckley.org


January 2, 2007

<u>Via Facsimile, 212-473-0658</u>

Ms. Noreen Diaz
United Orthopaedic Appliances Co, Inc.
791 Broadway
New York, NY 10003

Dear Ms. Diaz:

When we spoke by telephone recently, you indicated that you had signed the
Settlement Agreement and would be faxing it to us. However, we have not
received it. Please fax the executed Settlement Agreement to me at 212-656-1531.
I will have my clients execute the Settlement Agreement and return it to you.

Sincerely,

*George Hinckley Jr.*

George R. Hinckley, Jr.

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933                                    GEORGE R. HINCKLEY, JR.
FACSIMILE   212-656-1531                                   GRH@HINCKLEY.ORG

December 18, 2006

<u>Via Facsimile, 212-473-0658</u>                          *Page 1 of 2*

Mrs. Noreen Diaz
United Orthopaedic Appliances Co, Inc.
791 Broadway
New York, NY 10003

Dear Ms. Diaz:

We represent Mr. Edwin Hertzoff and Mrs. Beverly Hertzoff.

This is a follow-up to my previous facsimile letters to you of December 8, 2006, December 18th, 2006 and January 2, 2007.

In our recent telephone conversation, you indicated to me that the Settlement Agreement sent to you on December 8 had been signed by you and was being faxed to our office.  However, despite repeated requests, we have not received it.

Unless an executed Settlement Agreement is received by us by January 8, we will have no choice but to commence litigation forthwith, seeking  the full amount of all Net Accounts Receivable, without any reduction or setoff. An additional copy of the Settlement Agreement is annexed hereto.

Sincerely,

George Hinckley Jr.

George R. Hinckley, Jr.

## SETTLEMENT AGREEMENT

Whereas, Beverly Hertzoff, Edwin Hertzoff and Clayton Hertzoff ("Sellers") and Noreen Diaz ("Purchaser") are parties to a Stock Purchase Agreement dated as of August 20, 2006 (the "Purchase Agreement"); and

Whereas, a dispute has arisen between the parties regarding the Purchaser 's performance under the Purchase Agreement, the parties hereby amend the Purchase Agreement and agree as follows:

1. <u>Definitions.</u> As used herein, the terms: (1) "***Net Accounts Receivable***;" (2) "***Accounts Payable***;" and (3) the "***Corporation;***" shall be defined as set forth in the Purchase Agreement.

2. <u>Payment to HSBC.</u> On or before December 11, 2006, Purchaser will make a payment to HSBC in the amount of $7,000. On or before December 15, 2006, Purchaser will make a payment to HSBC in the amount of $31,000. Payments are to be applied to the Business Revolving Line of Credit referred to in Schedule 1.2 of the Purchase Agreement.

3. <u>Deduction Allowed to Purchaser.</u> Purchaser shall be entitled to deduct and retain $16,500 from the Net Accounts Receivable that have been received by the Corporation. (It is understood that this includes a credit for a $9,000 deposit to HSBC in September 2006 at direction of Purchaser.)

4. <u>All other Net Accounts Receivable to be strictly allocated to Accounts Payable.</u> Notwithstanding anything to the contrary, other than as set forth in paragraph 3 above, any and all Net Accounts Receivable received by the Corporation shall be strictly allocated, on an absolute priority basis, to pay the Accounts Payable set forth in Schedule 1.2 of the Purchase Agreement, without any deduction, reduction or set off of any kind. Net Accounts Receivable collected by the Corporation shall not be used to pay any expenses of the Corporation, or used in any way other than to pay the Accounts Payable set forth in Schedule 1.2.

5. <u>Monthly Report of Net Accounts Receivable and Accounts Payable.</u> On or before the 10th day of each month, Purchaser shall provide to Sellers, by US mail, and to Seller's attorney, by facsimile, a report detailing: (1) each payment of Net Accounts Receivable received by the Corporation during the preceding month, with receivable payments identified both as to source and amount; and (2) each payment made by the Corporation to reduce the Accounts Payable set forth in schedule 1.2 of the Purchase Agreement. Upon request, Purchaser will promptly provide to seller copies of the underlying documents concerning the Net Accounts Receivable and the Accounts Payable.

6. <u>Miscellaneous.</u> This Settlement Agreement is governed by New York law and shall be enforced in any court of competent jurisdiction in the State of New York. The prevailing party in any such action shall be entitled to reasonable attorneys fees, costs and expenses. This amending agreement sets forth the entire understanding of the parties with respect to the transactions contemplated hereby, and shall not be further amended except by written instrument signed by each of the parties. And all prior understandings among the parties regarding the subject matter hereof are superseded by this Settlement Agreement. This Settlement Agreement may be executed in counterparts, and a signed facsimile shall be treated as an original.

Dated: December _____, 2006

_____        _____    _____    _____
Noreen Diaz                                    Beverly Hertzoff                      Edwin Hertzoff                        Clayton Hertzoff

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933
FACSIMILE    212-656-1531

GEORGE R. HINCKLEY, JR.
GRH@HINCKLEY.ORG

December 18, 2006

Via Facsimile, 212-473-0658

Mr. Martin Diaz
Mrs. Noreen Diaz
United Orthopaedic Appliances Co, Inc.
791 Broadway
New York, NY 10003

Dear Mr. and Mrs. Diaz:

We represent Mr. Edwin Hertzoff and Mrs. Beverly Hertzoff.

Mrs. Diaz telephoned me on December 11, 2006 and indicated that a payment of $7,000 was
being made on that day on the HSBC line of credit referred to in Schedule 1.2 Stock Purchase
Agreement dated as of August 20, 2006. However, we have spoken this afternoon to John
Harvey at HSBC, who indicates that no such payment was made. If payment was in fact made,
please immediately fax a copy of a receipt to us.

Nor has the $31,000 payment been made. Nor have we received an executed Settlement
Agreement from you.

Unless payment to HSBC is made immediately and an executed Settlement Agreement is
received by us, we will be commencing litigation forthwith.

Sincerely,

George Hinckley Jr.

George R. Hinckley, Jr.

```
                    ┌─────────────────────────────────────────┐
                    │   TRANSMISSION VERIFICATION REPORT       │
                    └─────────────────────────────────────────┘

                                        TIME  : 12/18/2006 15:11
                                        NAME  : TRAIGER & HINCKLEY
                                        FAX   : 2129375229
                                        TEL   : 2127521161
                                        SER.# : BROF2J501457


        DATE,TIME                   12/18  15:10
        FAX NO./NAME                12124730658
        DURATION                    00:00:23
        PAGE(S)                     01
        RESULT                      OK
        MODE                        FINE
                                    ECM
```

# AFFIDAVIT
# EXHIBIT 8

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730

TELEPHONE 212-759-4933                                    GEORGE R. HINCKLEY, JR.
FACSIMILE   212-656-1531                                    grh@hinckley.org

June 11, 2007

<u>Via Facsimile and E-Mail</u>

Colleen M. Tarpey, Esq.
Garfunkel, Wild & Travis, P.C.
111 Great Neck Rd.
Great Neck, New York 11021
Fax:  (516) 466-5964
ctarpey@gwtlaw.com

<u>Re: Hertzoff v. United Orthopaedic Appliances Co. Inc., 07 Civ. 03157 (S.D.N.Y.)</u>

Dear Ms. Tarpey:

We represent the plaintiffs Edwin Hertzoff, Beverly Hertzoff and Clayton Hertzoff
in the above-referenced action against Noreen Diaz and United Orthopaedic
Appliances Co. Inc. ("UOA").

This is in response to your letter of June 1, 2007, regarding defendants' threat to
bring a Rule 11 motion in response to plaintiffs' Complaint.

At the outset, we are disappointed in your letter, given our earlier discussions in
which you indicated a desire to work together to resolve our respective clients'
differences.  We believe that a motion for sanctions would itself be frivolous.
Although we would much rather focus on resolving our clients' dispute rather than
engaging in needless satellite litigation, we reserve our right to cross-move for
sanctions should defendants proceed with the threatened Rule 11 motion.

The Amended Complaint[1] is non-frivolous for the following reasons:

---

[1] On June 8, 2007 plaintiffs served their Amended Complaint, as of right pursuant to FRCP 15(a).

I.    **The Action For Breach of the Stock Purchase Agreement Is Not Premature. Defendants Are in Breach of Their Current Contractual Obligations.**

Section 1.3 of the Stock Purchase Agreement provides, in pertinent part, that:

> Purchaser shall cause the "Net Accounts Receivable" to be billed and collected, to the extent reasonably collectable, in the normal course of the Corporation's operations.

> For purposes of this payment, "Net Accounts Receivable" shall be calculated as the accounts receivable of the Corporation earned prior to and collected during the twenty-four (24) month period immediately following the Closing Date less any refunds or repayments. Each dollar of the Net Accounts Receivable actually collected will be allocated to discharge the Accounts Payable in the following order of priority …

As set forth in our Amended Complaint, defendants are in breach of their *current* obligation to actually bill and collect all of the "Net Accounts Receivable" and to actually allocate the funds received only to the "Accounts Payable" and not otherwise. See Amended Complaint ¶ 12 ("*Defendants have failed to fulfill their current contractual obligation to cause all "Net Accounts Receivable" to be billed and collected and have failed to allocate each dollar of the Net Accounts Receivable actually collected to discharge the designated Accounts Payable.*")

Apart from defendant's failure to adequately bill and collect, defendants have also plainly failed to allocate *each dollar* of the "Net Accounts Receivable" to the "Accounts Payable" but instead have unilaterally made improper "deductions" from these funds. Indeed, even though defendants failed to sign the prior negotiated settlement agreement (even after informing the undersigned that the settlement agreement had in fact been signed by Ms. Diaz) defendants have attempted to nevertheless avail themselves of concessions that were offered by plaintiffs only in order to secure a supposed settlement agreement that defendants never signed!

The fact that purchasers will have a $100,000 obligation to Sellers in August, 2008 does not eliminate the current independent obligation to actually bill and collect the Net Accounts Receivable actually allocate each dollar received to discharge the

2

designated Accounts Payable. Moreover, Mr. Diaz has stated that defendants will not be making any further payments to HSBC.

Thus, Plaintiffs First Claim For Relief is ripe for adjudication.

## II.    The Nonpayment of Rent Claim Is Not Moot. As of Today's Date, Defendant UOA Is in Arrears in the Amount of $10,000.

We are pleased that, since our Complaint was filed, defendant UOA has made belated payments of past-due rent.

Nevertheless, as of today's date, defendant UOA is in arrears in the amount of $10,000. See Amended Complaint ¶¶ 41-43 and Exhibit B.

Should defendant make all required payments under the Lease, and turn over the premises vacant and in appropriate broom-clean condition, we will of course withdraw our nonpayment claim.

This straightforward rent nonpayment claim is obviously not frivolous.[2]

## III.    Defendants Have Breached the Ten-Year Employment Agreement That Was the Primary Consideration For The Sale of UOA.

Defendant Diaz obtained 100% ownership of UOA - a profitable 100-year-old company - without paying a single dollar for it.  Instead, a primary consideration was the 10-year employment contract for plaintiff Clayton Hertzoff, at an annual salary and mandatory bonus payments of $145,000, plus commissions.

As set forth in the Amended Complaint, defendants have breached that Employment Agreement and have constructively discharged Mr. Hertzoff by repeatedly requesting that he engage in wrongful and deceptive billing practices with insurance carriers, Medicare and Medicaid, as well as by moving its offices away and leaving plaintiff virtually alone in its prior office space without any telephone service, computer, records and with inadequate supplies, parts, and administrative support. Defendants have also made it impossible for Mr. Hertzoff to properly perform his job by failing to pay numerous suppliers of the component parts needed to fabricate prostheses, resulting in their refusal to ship component

---

[2] We note that although your June 1, 2007  letter indicated that copies of rent checks were indexed, none were annexed to the copy of the letter that we received. The June 1, 2007 letter did not contain any exhibits.

parts. Defendants have also materially breached and repudiated the Employment Agreement by making improper and illegal deductions from Mr. Hertzoff's wages, wrongfully attempting to shift to its employee the risk of nonpayment by UOA's customers. The amount of damages at issue, in excess of $145,000 multiplied by over 9 years, clearly is in excess of the $75,000 jurisdictional threshold.

Finally, your June 1, 2007 letter states that "UAO [sic] deducted $4163.26 with Mr. Hertzoff's acknowledgment." With all due respect, this statement is absolutely incorrect.  Mr. Hertzoff has never "acknowledged" or agreed to any such deduction whatsoever.  On the contrary, the self-serving and false May 22, 2007 letter was written by defendant *after* Mr. Hertzoff was forced to bring the instant suit seeking his unpaid commissions.[3]  Defendants purported "deduction" from Mr. Hertzoff's wages is pretextual and is a violation of section 193 and 191-c of the New York Labor Law.


## IV.    The Amount in Controversy Well Exceeds $75,000.

As set forth above, the amount in controversy plainly exceeds $75,000.

## V.    Plaintiffs Have Complied with Rule 26(d). Counsel for Plaintiffs Sent Counsel for Defendants a Proposed Scheduling Order on May 18, 2007.

This action was commenced on April 19, 2007. After conferring with you by telephone, we sent a proposed scheduling order on May 18, 2007. It is now three weeks later  and we have not yet received any response.  We believe that, if the parties move forward expeditiously with discovery, we can meet the guideline set forth in the Court's Order of May 4, 2007, and be ready to file a joint pretrial order prior to December 4, 2007. However, defendants cannot handcuff plaintiffs and prevent plaintiffs from expeditiously moving forward and from conducting third-party discovery by failing to respond to our proposed scheduling order.

The  information sought by the third-party subpoenas is directly relevant to the issue of whether defendants have fulfilled their obligation to actually bill and collect the "Net Accounts Receivable" and whether the funds collected have in fact been strictly allocated to the designated "Accounts Payable" as required by the Stock Purchase  Agreement.

---

[3] I note that the May 22, 2007 letter was not annexed to your June 1, 2007 letter, which contained no exhibits at all.

## VI.    Conclusion.

 In sum, defendants' threatened Rule 11 motion is without any reasonable basis in law or fact. We respectfully submit that engaging in such satellite litigation would simply run up additional unnecessary legal fees for both of our clients and would not be in anyone's best interest.

Should you wish to speak with me about the resolution of this case, or about any of the matters discussed herein, please feel free to give me a call.

Best regards,

*George Hinckley Jr.*

George R. Hinckley Jr.

# AFFIDAVIT
# EXHIBIT 9

Memo to Martin:

April 18, 2007

With all due respect, I cannot use L Code 1832 on the patient we discussed yesterday. The Rx. Does not state "positional" Knee Orthosis besides; the brace I intend on dispensing does not have an adjustable stop. In my professional opinion it would be inappropriate to use this code. In the interest of avoiding jeopardizing the company and myself, I strongly advise against it. If you still want to use this code, please have Lori call Desiree in the morning and instruct to change my recommended L codes.

Respectfully,

Clayton

```
*****************************************************************
*                                                               *
*                    TRANSACTION REPORT                         *
*                                            APR-19-2007 09:21 AM *
*          FOR: UNITED.ORTHOPAFIC          212 473 0658         *
*  _____  *
*                                                               *
*    SEND                                                       *
*                                                               *
*   DATE   START     RECEIVER            PAGES    TIME    NOTE   *
*  _____  *
*  APR-19 09:21 AM 915164784420            1      42"    OK     *
*  _____  *
*                                                               *
*****************************************************************
```

# AFFIDAVIT
# EXHIBIT 10

EXHIBIT 10 has been submitted to the Court and to opposing counsel, but is not being filed because it contains information that may be sensitive to patients and defendants.  It will be filed upon the Court's determination as to the appropriate treatment for the exhibit.

# AFFIDAVIT
# EXHIBIT 11

**BEVERLY L HERTZOFF**
**EDWIN F HERTZOFF**
2 RIPPLING BROOK DRIVE
SHORT HILLS NJ 07078

HSBC Mortgage Corporation (USA)

**1**

ACCT. # 7824149903054548

Date JUNE 4, 2007   1-108/210

Pay to the order of _HSBC BANK U.S.A._   $ 22,222 65/100

TWENTY TWO THOUSAND TWO HUNDRED TWENTY TWO 65/100 Dollars

Security
Features
Details on
Back.

**HSBC**

**HSBC Bank USA, N.A.**

For _UNITED ORTHOPEDIC APP. CO., INC LINE OF CREDIT_

_Beverly P Hertzoff_   MP

⑆0 2 100 1088⑆08 395694 24⑈ 000 1  60



# AFFIDAVIT
# EXHIBIT 4







03157-CM-MHD     Document 27-10     Filed 07/20/2007

30734662

**MEDICAID**

TO: UNITED ORTHOPAEDIC APP INC CO

DATE: 2005-12-05
REMITTANCE NO: 05120503815
PROVIDER ID: 00320172

00320172     2005-12-05
UNITED ORTHOPAEDIC APP INC CO
791 BROADWAY
NEW YORK                    NY  10003

12/23/05

MEDICAID
MANAGEMENT
INFORMATION SYSTEM

0000424 N        P

TO: UNITED ORTHOPAEDIC APP INC CO

DATE: 2005-06-06
REMITTANCE NO: 05060604543
PROVIDER ID: 00320172

00320172        2005-06-06
UNITED ORTHOPAEDIC APP INC CO
791 BROADWAY
NEW YORK            NY  10003



# AFFIDAVIT
# EXHIBIT 5

# TRAIGER & HINCKLEY LLP

ATTORNEYS AT LAW
880 THIRD AVENUE
NEW YORK, NY 10022-4730
WWW.TRAIGERLAW.COM

TELEPHONE 212-759-4933                                   George R. Hinckley, Jr.
FACSIMILE    212-656-1531                                 grh@hinckley.org

November 17, 2006

<u>Via Facsimile, 212-473-0658</u>

Mr. Martin Diaz
Mrs. Noreen Diaz
United Orthopaedic Appliances Co, Inc.
791 Broadway
New York, NY 10003

Dear Mr. and Mrs. Diaz:

We represent Mr. Edwin Hertzoff and Mrs. Beverly Hertzoff.

Pursuant to § 1.3 of the Stock Purchase Agreement dated as of August 20, 2006
(the "Agreement"), all "Net Accounts Receivable" as defined by the Agreement,
earned prior to and collected by United Orthopaedic Appliances Co, Inc. (the
"Corporation") during the 24 months following the Closing Date of August 8, 2006
*must* be allocated, *on a priority basis,* to pay the three items set forth on Schedule
1.2 of the Agreement (i.e.,  <u>first</u>, the HSBC line of credit, up to $250,000, on which
the Hertzoffs are guarantors;  <u>second</u>, the $145,000 promissory note; and <u>third</u>, the
$100,000 of back rent owed).

We understand that in excess of $94,000 of "Net Accounts Receivable" have been
collected by the Corporation. However, only approximately $20,000 has been paid
to HSBC. Purchaser is therefore in breach of the Agreement.

Demand is hereby made, once again, that all "Net Accounts Receivable" collected
by the Corporation be immediately paid, in full and without any deduction, to
HSBC as set forth in Schedule 1.2 of the Agreement.

We have reviewed your letter of November 2, 2006, which purports to list expenses paid on behalf of the Sellers. None of these ordinary expenses of the Corporation are the responsibility of the Sellers. Pursuant to §1.2 of the Agreement, those "debts, loans, obligations or liabilities of the Corporation which were incurred in the ordinary operation of the Corporation prior to [August 20, 2006] shall remain with the Corporation".

In order to avoid unnecessary litigation, please immediately remit to HSBC all "Net Accounts Receivable," and provide a copy of such remittance to this office.

Thank you.

Sincerely,

George Hinckley Jr.

George R. Hinckley, Jr.

2

# AFFIDAVIT
# EXHIBIT 6

## SETTLEMENT AGREEMENT

Whereas,  Beverly Hertzoff, Edwin Hertzoff and Clayton Hertzoff ("Sellers") and Noreen Diaz ("Purchaser") are parties to a Stock Purchase Agreement dated as of August 20, 2006 (the "Purchase Agreement"); and

Whereas, a dispute has arisen between the parties regarding the Purchaser 's performance under the Purchase Agreement, the parties hereby amend the Purchase Agreement and agree as follows:

1.   Definitions.  As used herein, the terms: (1) "*Net Accounts Receivable*;" (2) "*Accounts Payable*;" and (3) the "*Corporation;*"  shall be defined as set forth in the Purchase Agreement.

2.   Payment to HSBC. On or before December 11, 2006, Purchaser will make a payment to HSBC in the amount of $7,000. On or before December 15, 2006, Purchaser will make a payment to HSBC in the amount of $31,000. Payments are to be applied to the Business Revolving Line of Credit referred to in Schedule 1.2 of the Purchase Agreement.

3.   Deduction Allowed to Purchaser. Purchaser shall be entitled to deduct and retain $16,500 from the Net Accounts Receivable that have been received by the Corporation.

4.   All other Net Accounts Receivable to be strictly allocated to Accounts Payable. Notwithstanding anything to the contrary,  other than as set forth in paragraph 3 above,  any and all Net Accounts Receivable received by the Corporation shall be strictly allocated, on an absolute priority basis, to pay the Accounts Payable set forth  in Schedule 1.2 of the Purchase Agreement, without any deduction, reduction or set off of any kind. Net Accounts Receivable collected by the Corporation shall not be used to pay any expenses of the Corporation, or used in any way other than to pay the Accounts Payable set forth in Schedule 1.2.

5.   Monthly Report of  Net Accounts Receivable and Accounts Payable. On or before the 10th day of each month, Purchaser shall provide to Sellers, by US mail, and to Seller's attorney, by facsimile, a  report detailing: (1) each payment of Net Accounts Receivable received by the Corporation during the preceding month, with receivable payments identified both as to source and amount; and (2) each payment made by the Corporation to reduce the Accounts Payable set forth in schedule 1.2 of the Purchase Agreement. Upon request, Purchaser will promptly provide to seller copies of the underlying documents concerning the Net Accounts Receivable and the Accounts Payable.

6.   Miscellaneous. This Settlement Agreement is governed by New York law and shall be enforced in any court of competent jurisdiction in the State of New York. The prevailing party in any such action shall be entitled to reasonable attorneys fees, costs and expenses. This amending agreement sets forth the entire understanding of the parties with respect to the transactions contemplated hereby, and shall not be further amended except by written instrument signed by each of the parties. And all prior understandings among the parties regarding the subject matter hereof are superseded by this Settlement Agreement. This Settlement Agreement may be executed in counterparts, and a signed facsimile shall be treated as an original.

Dated: December ____, 2006


_____        _____    _____    _____
Noreen Diaz                  Beverly Hertzoff          Edwin Hertzoff     Clayton Hertzoff