UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY HERTZOFF, EDWIN HERTZOFF, and
CLAYTON HERTZOFF,

                              Plaintiffs,    07-CV-3157 (CM) (MHD)

v.

NOREEN DIAZ and UNITED ORTHOPAEDIC
APPLIANCES, CO.,

                              Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION**

July 20, 2007

Traiger & Hinckley LLP
880 Third Ave. 9th Floor
New York, NY 10022-4730

George R. Hinckley, Jr.
Tel. 212-759-4933
Fax 212-656-1531
Email grh@hinckley.org

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 2

    Defendants Failed to Pay Commissions Due to Clayton Hertzoff and
    Instituted a "General Policy" Holding Him Responsible for Nonpayment
    by Patients.. ............................................................................................ 5

    The Background of Defendants' Late Payment and Improper Deductions. ........... 5

    Defendants Illegally Deducted Half of Plaintiff's Commissions from His
    Paycheck for Alleged "Poor Judgment" in Providing an Artificial Leg to
    an Amputee without Demanding Cash Prior to Delivery.  This Was Done
    Pursuant a Self-Proclaimed "General Policy" of UOA.. ....................................... 6

ARGUMENT ............................................................................................. 8

I.    THE NON-COMPETITION PROVISIONS IN THE EMPLOYMENT
    CONTRACT DRAFTED BY DEFENDANTS ARE
    UNENFORCEABLE ............................................................................... 8

    A.  Restrictive Covenants Are Uniformly Disfavored in New York. ................... 8

    B.  The Non-Competition Agreement Is Not Necessary to Protect Any
        Legitimate Interest of UOA ............................................................. 9

        1.  Plaintiffs' Position Is Not The Sort That Constitutes A Protectable
            Interest ............................................................................... 10

        2.  The Commercial Division Roundly Rejected a Similar Request
            for a Preliminary Injunction by a Orthotic & Prosthetic Shop
            Against a Certified Practitioner, Finding No Legitimate Interest
            That Needed Protection. ........................................................ 10

II.    DEFENDANTS' BREACHES OF THE RELEVANT AGREEMENTS
    PRECLUDES THEM FROM ENFORCING THE NON-
    COMPETITION PROVISION. ................................................................ 12

    A.  Under Bright Line New York Law, Any Covenant Not to Compete Is
        Unenforceable If the Employer Has Breached the Employment
        Agreement. ................................................................................. 12

    B.  Defendants' Improper Deduction from Plaintiff's Wages Is a Material
        Breach of Contract and Is a Violation of § 193 of the New York Labor
        Law. ........................................................................................ 15

C.   Defendants' Refusal To Renounce The "General Policy" Constituted a Repudiation of Its Obligations under the Employment Contract. .................. 17

D.   Defendants' Improper Billing Practices Constitute a Breach of Section 9a of Plaintiff's Employment Agreement........................................................ 19

E.   Defendants Breached the Employment Agreement By Materially Changing Plaintiff's Duties By Eliminating the Technicians That Manufactured Prosthetics and Eliminating the Support Staff. ....................... 20

F.   Defendants' Failure to Pay Rent Is a Breach of Contract, Rendering the Non-Compete Clause Invalid and Unenforceable. ........................................ 22

G.   Defendants' Failure to Bill and Collect Accounts Receivables, and to Actually Allocate Each Dollar Received to the HSBC Loan, Constituted a Material Breach of Contract.................................................... 22

CONCLUSION.......................................................................................................... 23

## TABLE OF AUTHORITIES

*American Broadcasting Cos. v. Wolf*,
52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 486, 420 N.E.2d 363 (1991) ............................ 8

*American Inst. of Chemical Engineers v. Reber-Friel Co.*,
682 F.2d 382, 387 (2d Cir. 1982) .................................................................................... 9

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*,
42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4 (1977) ............................ 9

*Cornell v. T.V. Dev. Corp.*,
17 N.Y.2d 69, 75, 268 N.Y.S.2d 29, 34, 215 N.E.2d 349 (1966) ............................. 12, 13

*DeCapua, v. Dine-A-Mate, Inc.*,
292 A.D.2d 489, 744 N.Y.S.2d 417 (2d Dep't 2002) ..................................................... 13

*East Coast Orthotic and Prosthetic Corp. v. Allen*,
No. 601293/03 (NY Sup. Ct July 18, 2003) ................................................................... 10

*Edlitz v. Nipkow & Kobelt*,
264 A.D.2d 437, 694 N.Y.S.2d 439 (2d Dept. 1999) ..................................................... 16

*Franconia Assocs. v. United States*,
536 U.S. 129, 153 L. Ed. 2d 132, 122 S. Ct. 1993, 2002 (2002) .................................... 18

*Gebhardt v. Time Warner Entertainment-Advance/Newhouse*,
284 A.D.2d 978, 726 N.Y.S.2d 534 (4th Dept 2001) ..................................................... 16

*In re UFG International, Inc.*,
225 B.R. 51, 55 (S.D.N.Y 1998) .............................................................................. 9, 13

*Jackson Dairy, Inc. v. H.P. Hood & Sons*,
596 F.2d 70, 72 (2d Cir. 1979) ...................................................................................... 11

*Lynch v. Pharmaceutical Discovery Corp.*,
208 A.D.2d 906; 617 N.Y.S.2d 883 (2d Dep't 1994) ..................................................... 20

*Lucente, v. IBM*,
310 F.3d 243, 258 (2d Cir. 2002) ................................................................................... 18

*Michael I. Weintraub, M.D., P.C. v. Schwartz*,
31 A.D.2d 663, 665-66, 516 N.Y.S.2d 946 (2d Dep't 1987) .................................... 13, 14

*Norcon Power Partners v. Niagara Mohawk Power Corp.*,
92 N.Y.2d 458, 682 N.Y.S.2d 664, 667, 705 N.E.2d 656 (1998) .................................... 18

*People v. McDonald,*
88 N.Y.2d 281, 667 N.E.2d 320, 644 N.Y.S.2d 670 (1996) ........................................... 19

*P & L Group, Inc. v. Garfinkel,*
150 A.D.2d 663; 541 N.Y.S.2d 535 (2d Dep't 1989) ...................................................... 16

*Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
 48 N.Y.2d 84, 86, 397 N.E.2d 358, 421 N.Y.S.2d 847 (1979) ........................................ 8

*Purchasing Assoc. v. Weitz,*
13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 247 ................................ 8

*Reed, Roberts Assocs., Inc. v. Strauman,*
40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590 (1976) ............................. 9

*Reilly v Natwest Mkts. Group Inc.*
181 F.3d 253 (2d Cir. 1999), cert denied, 528 US 1119 (2000) ..................................... 16

*Rudman v. Cowles Communications, Inc.,*
30 N.Y.2d 1, 11, 280 N.E.2d 867, 330 N.Y.S.2d 33 (1972) ........................................... 20

*SIFCO Indus., Inc. v. Advanced Plating Technologies, Inc.,*
867 F. Supp. 155, 158-159 (S.D.N.Y. 1994) ................................................................. 13

*TMP Worldwide v. Michael Franzino,*
259 A.D.2d 332 (1st Dep't 2000) ............................................................................... 11

**Laws**
N.Y. Labor Law §193 ................................................................................................ 15

**Treatises**
John D. Calamari and Joseph M. Perillo, *The Law of Contracts* § 12-3 (3d ed. 1987) .... 18

Plaintiffs respectively submit this memorandum of law in opposition to the motion of defendants United Orthopaedic Appliances Co. Inc. ("UOA") and Noreen Diaz for a preliminary injunction.

## PRELIMINARY STATEMENT

Defendants' request for a preliminary injunction is a litigation tactic, and comes in response to plaintiffs claims for breach of contract, rather than to protect any legitimate interest of defendants.  Indeed, defendants have not pleaded any claims whatsoever against Mr. Hertzoff and have not sought any permanent injunctive relief.

Restrictive covenants are uniformly disfavored in New York.  They are enforceable only to protect an employer from unfair competition resulting from the disclosure of trade secrets or the disclosure of confidential customer lists or if the employee is unique and extraordinary.  None of these concerns applies here.  Plaintiff's services are not unique or extraordinary and no claim has been made regarding the disclosure of any trade secrets or confidential customer lists.

Furthermore, under clear, bright line New York law, a breach of contract by the party seeking to enforce a non-compete clause renders the clause invalid and unenforceable. Here, defendants have breached every single agreement that they entered into with plaintiffs. Defendants obtained from plaintiffs a profitable 100-year-old company for <u>zero</u> <u>dollars.</u> Instead they promised to: (1) Employ Clayton Hertzoff and pay him commissions for 10 years; (2) Pay rent to his parents -- at rates 50% below market; and (3) Bill and collect certain receivables of UOA and actually allocate each dollar received to pay off a loan guaranteed by the Hertzoffs.  Right from the start, defendants breached each agreement. Any one of defendant's numerous breaches of contract renders the non-compete invalid.

Although there are numerous breaches of contract, each of which render the non-compete unenforceable, plaintiffs respectfully submit the Court should focus first upon the defendants' improper deduction from sales commissions owed to plaintiff, as the facts of this breach are well documented and essentially undisputed. After being sued for failure to pay any of plaintiff's first-quarter sales commissions, Defendants deliberately, willfully and intentionally deducted half of plaintiff's commissions from his paycheck because of his claimed "poor judgment" in providing an amputee with an artificial leg without demanding cash upfront. This was done pursuant to a "general policy" of the defendants. This conduct plainly violates section 193 of the New York Labor, which lists the only permissible deductions from an employees wages, and is a breach of plaintiff's employment agreement. The Court need look no further than this breach in order to deny defendants motion.

## STATEMENT OF FACTS[1]

UOA was founded in 1907 by plaintiff Beverly Hertzoff's grandfather. It designed, manufactured and fitted orthopedic appliances. Its office was located at 791 Broadway, New York City, in a building owned by Edwin and Beverly Hertzoff. The Hertzoff's spent all of their working lives at UOA. Edwin Hertzoff worked there for 54 years, his wife Beverly worked there for over 30 years, and their son Clayton Hertzoff worked at UOA for 33 years. Beverly and Edwin Hertzoff each owned 37.5% of UOA and Clayton Hertzoff owned 25% of UOA.

Plaintiff Clayton Hertzoff is a "Certified Practitioner" certified in Orthotics and Prosthetics.[2] He works primarily with prosthetics, specifically with artificial limbs. His

---

[1] These facts are set forth in the Affidavit of Clayton Hertzoff, and the exhibits thereto, submitted herewith.

[2] He is certified by the American Board for Certification in Orthotics and Prosthetics. The certification process consists of a three part examination. The first examination is written, followed by a practical exam and an oral exam. There is an educational prerequisite and an internship requirement.

duties are to visit hospital clinics and assist doctors in choosing, measuring and fitting artificial limbs. The artificial limbs were then manufactured by technicians at UOA's in-house Orthotics and Prosthetics shop ("O&P Shop").

In 2006, Edwin and Beverly Hertzoff were approached by Martin Diaz, who sought to purchase UOA. Martin Diaz runs a Orthotics and Prosthetics business in East Meadow, New York named Complete Orthopedic Services Inc., known as "C.O.S.I." (Although Martin Diaz acts as the principal executive officer and his wife Noreen Diaz does not work full time, Martin Diaz insists on all formal paperwork being in his wife's name.) Because Edwin and Beverly Hertzoff were nearing retirement, they decided to sell UOA.

In August 2006, Noreen Diaz obtained 100% of UOA -- a successful, profitable 100-year-old business -- for *zero dollars* at closing. Instead, Ms. Diaz promised to do three things in return:

(1)     Bill and collect certain accounts receivables and *actually allocate each dollar received* to pay off a HSBC line of credit owed by UOA that the Hertzoff's had personally guaranteed;

(2)     Pay rent to Edwin and Beverly Hertzoff of $10,000 per month, which was approximately 50% below the market rate. (This was the rate that the Herzoff's had been previously charging UOA for many years.)

(3)     Provide Clayton Hertzoff with a 10-year employment contract, at a salary of $120,000, an annual bonus of $25,000 and quarterly commissions on sales. The $25,000 per year payment, for 10 years, was intended as compensation for Clayton Hertzoff for his share of UOA. He received no other payment or compensation for his shares.

These agreements were all mutually dependent. Clayton's employment agreement and the lease agreement were both listed as schedules to the stock purchase agreement.

Having acquired UOA for "no money down," the Diazes preceded to renege on each of the three obligations they undertook. They stopped paying rent, they did little to bill and collect the accounts receivables and they failed to pay Clayton Hertzoff his commissions on a timely basis and fail to credit him with all commissions he earned and made improper deductions from his commissions. As an immediate consequence of that current failure to perform, the Hertzoffs had to pay $32,222.65 to HSBC Bank to fund the deficit. Within only three months after the sale, it was necessary for attorneys for the Hertzoffs to contact Mr. Diaz, because he had failed to remit the receivables to HSBC as promised. As owners of UOA, the Diazes then began a campaign of retaliation against their employee, Clayton Hertzoff.

During the ensuing months, the Diazes dismantled UOA, slashing it from twelve employees down to four, and eliminating the technicians that manufactured prostheses. This materially changed Clayton Hertzoff's position, forcing him to spend almost half his time working as a technician in the O&P Shop, rather than as a Certified Practitioner. Plaintiff did not receive any commissions for working as a technician.

Furthermore, Martin Diaz repeatedly requested that Clayton Hertzoff engage in billing improprieties, in direct violation of his employment agreement. First, Mr. Diaz requested that UOA immediately bill insurance companies, including Medicare and Medicaid, for prostheses that had not yet been delivered. He repeatedly demanded that Clayton Hertzoff and other certified practitioners sign, and have their patients sign, a false "receipt" form acknowledging delivery of the prosthetics before UOA had even begun to

process the orders or build the prosthesis. <u>Second</u>, Mr. Diaz demanded that Clayton Hertzoff over-bill and over-provide services. For example, insurers pay approximately 5-10 times as much for a brace with the billing code L-1832 as for a brace with the billing code L-1820.[3] Mr. Diaz repeatedly requested that Clayton Hertzoff bill for code L-1832 when an adjustable knee joint brace was not necessary or provided. <u>Third</u>, UOA is apparently billing insurers, including Medicare and Medicaid, and stating that services were performed at UOA's facility (which until very recently, was accredited) when, in fact, services were not performed at UOA, but were performed elsewhere. Annexed to Clayton Hertzoff's affidavit are copies of documents showing billing for patients who were not patients of UOA, but UOA is nevertheless listed as the place of service.[4]

### Defendants Failed to Pay Commissions Due to Clayton Hertzoff and Instituted a "General Policy" Holding Him Responsible for Nonpayment by Patients.

The facts surrounding the defendants' improper deductions from Clayton Hertzoff's paycheck are crucial and are dispositive on this motion. This is because: (1) the material facts are documented and not subject to serious dispute; and (2) As discussed below, defendants' conduct constitutes a material breach of plaintiff's employment agreement, and a violation of the Labor Law; and (3) Under bright line New York law, a breach by the party seeking enforcement renders a restrictive covenant invalid and unenforceable.

---

[3] Code L- 1820 is for "knee orthotic, elastic with condylar pants and joints, prefabricated with or without patellar control." Code L-1832 is for "knee orthotic, adjustable knee joints, positional orthosis, rigid support, (unicentric or polycentric joints), prefabricated. See Hertzoff Aff. Ex. 9. Intentionally using the wrong billing code for orthotics in a Medicaid claim can result in a criminal conviction. See *People v. McDonald*, 88 N.Y.2d 281; 667 N.E.2d 320; 644 N.Y.S.2d 670 (1996)(affirming convictions for larceny and offering a false instrument where podiatrists submitted Medicaid claims for reimbursement using improper billing code in seeking reimbursement for orthotics).

[4] Copies of these documents are not included in the copy of the affidavit that plaintiffs are filing electronically, so that defendants may have an opportunity to request from Your Honor a protocol for dealing with any material that defendants claim is confidential.

**The Background of Defendants' Late Payment and Improper Deductions.**

As soon as the Diazes took over, Clayton Hertzoff had difficulty collecting his promised sales commissions. After the Diazes purchased UOA, Edwin Hertzoff and both of the other two Certified Practitioners were fired or forced to resign.  As the only remaining certified practitioner, plaintiff was required to work their accounts.  He would go to the hospitals where they had previously worked, and would solicit work from the doctors. He would originate and write up sales.  However, Mr. Diaz wrongfully refused to include those sums in his sales commission, claiming that even though he was working the account, seeing patients and writing up the sales, he was not entitled to commissions because he was not the "original" source of these referrals.  Clayton Hertzoff was entitled to those commissions. Commissions had always been paid to the Certified Practitioner who wrote up a sale, regardless of who had first worked with a particular doctor.

When plaintiff finally did receive his first commission check (absent the disputed commissions), it was only after repeated demands  -- and it was many weeks late.

**Defendants Illegally Deducted Half of Plaintiff's Commissions from His Paycheck for Alleged "Poor Judgment" in Providing an Artificial Leg to an Amputee without Demanding Cash Prior to Delivery.  This Was Done Pursuant a Self-Proclaimed "General Policy" of UOA.**

In March, 2007, plaintiff Clayton Hertzoff assisted an amputee patient, Isaiah Johnson, by providing him with an artificial leg.  It turns out that, although Mr. Johnson was short, he had a version of Blue Cross insurance for federal employees, which sends checks directly to employees rather than to the provider of services, as it is the case with the standard Blue Cross policy.  Learning of this, Mr. Diaz accosted Clayton Hertzoff and asked him whether Mr. Johnson was "good for it" and stated that "it's gonna be on you" if Mr. Johnson does not pay. Mr. Hertzoff disagreed with this. Hertzoff Aff. ¶ 38.

6

In April, Mr. Diaz demanded that Clayton Hertzoff meet with him at COSI's offices in East Meadow, with the office manager Ms. Smith. At the choreographed meeting, Mr. Diaz and Ms. Smith blamed plaintiff for the nonpayment and insisted that they should have collected money up front before delivering the artificial leg to Mr. Johnson.  Mr. Diaz indicated that plaintiff was responsible for UOA's loss due to the nonpayment by Mr. Johnson. UOA did not pay any amount of his first-quarter commission. Hertzoff Aff. ¶ 40.

On April 16, 2007, plaintiff Clayton Hertzoff sent by facsimile to Mr. and Ms. Diaz a formal demand for his first-quarter bonus.  Hertzoff Aff. Ex.2. He expressly reserved all of his rights under the Employment Agreement. Minutes after receiving this formal demand, Mr. Diaz telephoned plaintiff, angrily cursed at him, and demanded that no such letters he sent to him again. Id. ¶49.

On April 19, 2007, plaintiffs filed their amended complaint seeking, in their third cause of action, plaintiff's first-quarter commissions, none of which had been paid.

On April 27, 2007, plaintiff received a paycheck from UOA. His commissions (before taxes) were cut in half, from $8,163 to $4,000. Hertzoff Aff. Ex.2.

In response, on April 27, 2007, counsel for plaintiff sent UOA a notice that "UOA's continued failure to pay [the amount due] constitutes a breach of Mr. Hertzoff's Employment Agreement dated as of August 20, 2006.)." Hertzoff Aff. Ex.3. Thus, Defendants were expressly put on notice that their wrongful withholding of commissions was material breach of plaintiff's employment agreement.

Defendants refused to retract their improper deduction.  On the contrary, they have formally asserted that such deductions are the "**general policy**" of UOA.  By letter dated May 22, 2007, Ms. Diaz wrote giving "**formal notification regarding your employment**

**agreement and commission.**" The letter indicated that "**payment of commission will be paid in accordance with the general policy of U.O.A./C.O.S.I**." The letter accused plaintiff of "poor judgment" for dispensing the artificial leg to Mr. Johnson and purported to dock plaintiff's pay for "material and man-hours consisting of $4,163." A copy of this letter, which is also annexed to the Diaz affidavit, is annexed as Hertzoff Aff. Ex.1.

In sum, based upon the documentary evidence submitted on this motion, there can be absolutely no dispute that defendants illegally deducted more than half of plaintiff's commissions from his paycheck for alleged "poor judgment" in providing an artificial leg to an amputee without demanding cash prior to delivery. This was done pursuant a self-proclaimed "general policy" of UOA. Defendants deliberately and willfully persisted in this wrongful course of conduct after consulting with counsel, and after being informed that this constituted a material breach of the plaintiff's employment agreement.

Defendants were obligated to pay plaintiff commissions pursuant to section 3(b) of the Employment Agreement, which provides that UOA is obligated to pay a quarterly sales commission equal to 5% of his "Personal Sales Collection."

## ARGUMENT

### I. THE NON-COMPETITION PROVISIONS IN THE EMPLOYMENT CONTRACT DRAFTED BY DEFENDANTS ARE UNENFORCEABLE

#### A. Restrictive Covenants Are Uniformly Disfavored in New York.

In *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 48 N.Y.2d 84, 86, 397 N.E.2d 358, 421 N.Y.S.2d 847 (1979), Judge Wachtler observed:

> We begin with the premise that "powerful considerations of public policy * * * militate against sanctioning the loss of a man's livelihood" (*Purchasing Assoc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 247). So potent is this policy that covenants tending to restrain anyone from engaging in any lawful

vocation are almost uniformly disfavored and are sustained only to the extent that they are reasonably necessary to protect the legitimate interests of the employer and not unduly harsh or burdensome to the one restrained.

Thus, under New York law, restrictive covenants in employment contracts are enforceable only in certain limited circumstances. Restrictive covenants will be enforced only if reasonably limited in scope and duration, and then only to the extent necessary to protect the employer from unfair competition resulting from the use or disclosure of trade secrets or confidential customer lists, or if the employee's services are unique or extraordinary. In addition, such covenants are enforceable only if they are not harmful to the general public and not unreasonably burdensome to the employee. *American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 486, 420 N.E.2d 363 (1991); C*olumbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4 (1977); *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590 (1976); *American Inst. of Chemical Engineers v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982); *In re UFG International, Inc.,* 225 B.R. 51, 55 (S.D.N.Y 1998).

### B.    The Non-Competition Agreement Is Not Necessary to Protect Any Legitimate Interest of UOA.

Although this non-competition covenant arises from the sale of a business, this case does not implicate the policy concerns typical in such cases, where a buyer legitimately desires to lock up critical employees in order to obtain the benefits of the purchase.  As Defendants acknowledge, the employment agreement here was for the benefit of the employee, not the buyer.

Defendants have not and cannot show that and a preliminary injunction is necessary to protect the UOA from any unfair competition resulting from the use or disclosure of trade

secrets or confidential customer lists, or that the Clayton Hertzoff services as a Certified

Practitioner are unique or extraordinary.

### 1.    Plaintiffs' Position Is Not The Sort That Constitutes A Protectable Interest

Mr. Hertzoff's position does not warrant the restrictions set forth in the non-

solicitation agreement.  Indeed, here, it was Mr. Hertzoff who required employment after the

transaction, and UOA wanted a shorter period.  As set forth in the declaration of Ronald

Manganiello submitted herewith, the Managing Partner of plaintiff's current employer, New

England Orthotic and Prosthetic Systems, LLC ("NE-OP"), already solicited business at

those hospital facilities on numerous previous occasions.

### 2.    New York Law Already Has Roundly Rejected a Similar Request for a Preliminary Injunction by a Orthotic & Prosthetic Shop Against a Certified Practitioner, Finding No Legitimate Interest That Needed Protection.

In *East Coast Orthotic and Prosthetic Corp. v. Allen*, No. 601293/03 (NY Sup. Ct

July 18, 2003)(annexed hereto Ex. A), Judge Ramos of the Commercial Division faced a

motion for a preliminary injunction quite similar to the instant case. As here, an orthotic and

prosthetic company sought to enforce a non-compete clause to prevent a certified

practitioner from working at a competitor. Judge Ramos denied the motion on numerous

grounds, finding that the orthotic and prosthetic company had not established that

enforcement of the non-compete was necessary to protect any legitimate interest of the

company.  First, the Court noted that the East Coast Orthotic had failed to show that the

employee had misappropriated and utilized any proprietary information or trade secrets in

competing with the company. That is also the case here. Defendants have not made any non-

conclusory claim that plaintiffs have misappropriated any protectable trade secrets. The

Court noted that the identity of the customers of an orthotic & prosthetic shop are a matter of public record. The Court further noted that the co-defendant company had previously been servicing clients at the hospitals frequented by the individual certified practitioner.  That is also the case here.

Judge Ramos further found that a preliminary injunction was not warranted because the services of a Certified Practitioner are not unique, citing *TMP Worldwide v. Michael Franzino*, 259 A.D.2d 332 (1st Dep't 2000)(refusing to uphold a preliminary injunction because there was no indication that the individual defendant had misappropriated any customer lists, trade secrets, business plans or other confidential information, or that his services at employer's company more of a unique or extraordinary nature). As set forth in the Manganiello Declaration:

> The services of Certified Practitioners such as Clayton Hertzoff, while valuable, are not "unique" "extraordinary" or difficult to obtain. New England Orthotic and Prosthetic Systems receives countless resumes from Certified Practitioners offering their services to us. Should it so desire, UOA can easily hire a Certified Practitioner to replace the services of Mr. Hertzoff.

Judge Ramos further found that the plaintiff orthotic & prosthetic shop would not be irreparably injured by the alleged breach, since a monetary award could compensate the employer in the event it was successful on the merits of its underlying claim. (Citing *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979). Here, of course, defendants have elected not to plead any underlying claims for damages. Indeed, it is difficult to see how the defendants can show a likelihood of success on the merits and show an entitlement to *preliminary* injunctive relief when they have not pleaded any claim for *permanent* injunctive relief -- or pleaded any other claims.

Finally, Judge Ramos found that the balancing of the equities favored the individual

certified practitioner.  The Court held that:

> The harm to plaintiff that would result from the failure to grant a preliminary injunction is not greater than the harm Alan and his new employer would suffer should they be enjoined from servicing the doctors and hospitals Alan had served under plaintiff's employment.  If the preliminary injunction were granted defendants would be enjoined from not only servicing clients Allen had previously serviced under plaintiff's employ but also from soliciting or servicing 'any patient, physician, staff member or other person or entity in any way associated or affiliated with the hospital.' This effectively prevents Alan from his pursuing his livelihood and prevents defendant East side from servicing the hospital ….

## II.   DEFENDANTS' BREACHES OF THE RELEVANT AGREEMENTS PRECLUDES THEM FROM ENFORCING THE NON-COMPETITION PROVISION.

### A.   Under Bright Line New York Law, Any Covenant Not to Compete Is Unenforceable If the Employer Has Breached the Employment Agreement.

New York courts have adopted a bright line rule that even a reasonably limited covenant not to compete is unenforceable if – as here – the employer has breached the employment agreement. Once the employer is in breach of the agreement, it may not insist upon the employee's compliance with the covenant.

Generally, a party may not insist upon the performance of a contract or a provision of the way of that party is guilty of a material or substantial breach of the contract.  Thus, in the case of bilateral contracts, if either party commits a material breach of the contract, the other party should be excused from the obligation to perform further. See generally 14 *Williston on Contracts* § 43:6.

Numerous cases show that New York courts will not enforce a non-compete covenant in these circumstances.  For example, In *Cornell v. T.V. Dev. Corp.,* 17 N.Y.2d 69, 75, 268 N.Y.S.2d 29, 34, 215 N.E.2d 349 *(1966)* the New York Court of Appeals held that an otherwise valid covenant against competition is unenforceable "when the party benefited

was responsible for the breach of the contract containing the covenant." The employer in

*Cornell* had breached the contract by not paying $2100 that was earned but not paid to the

employee.

In *In re UFG International, Inc.,* 225 B.R. 51 (S.D.N.Y 1998), the court declined to

enforce a non-competition provision where the employer had failed to salary commissions

and accrued vacation time. Judge Cederbaum held:

> Even a reasonably limited covenant not to compete is unenforceable,
> however, if the employer has breached the employment agreement. *Cornell
> v. T.V. Dev. Corp.*, 17 N.Y.2d 69, 75, 268 N.Y.S.2d 29, 34, 215 N.E.2d 349
> (1966) (otherwise valid covenant against competition is unenforceable "when
> the party benefited was responsible for the breach of the contract containing
> the covenant"); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131 A.D.2d
> 663, 665-66, 516 N.Y.S.2d 946, 948-49 (2d Dep't 1987) (even reasonable
> portion of restrictive covenant unenforceable, because employer breached
> contract by failing to provide timely written notice of termination).
> Accordingly, an employee's otherwise enforceable restrictive covenant is
> unenforceable if the employee has been terminated involuntarily, unless the
> termination is for cause. "Where the employer terminates the employment
> relationship without cause, . . . his action necessarily destroys the mutuality
> of obligation on which the covenant rests as well as the employer's ability to
> impose a forfeiture." *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48
> N.Y.2d 84, 89, 421 N.Y.S.2d 847, 849, 397 N.E.2d 358 (1979). See also
> *SIFCO Indus., Inc. v. Advanced Plating Technologies, Inc.,* 867 F. Supp. 155,
> 158-159 (S.D.N.Y. 1994) (covenants not to compete unenforceable when,
> upon acquiring employer with whom employees had entered into covenants,
> successor company terminated employees' positions by closing factory at
> which employees worked).

225 B.R. at 55.

The policy is so strong, that it is reversible error to enforce a restrictive covenant

where the employer failed to pay the employee required commissions.  In *DeCapua, v.

Dine-A-Mate, Inc.,* 292 A.D.2d 489; 744 N.Y.S.2d 417 (2d Dep't 2002), the plaintiff

engaged in the business of selling discount coupon books and paid royalties on the sales to

the defendant.  The plaintiff sought to enforce a restrictive covenant preventing the

defendant from competing against him in the Hudson Valley, New York area. The Appellate

13

Division found that the plaintiff could not enforce the restrictive covenant since he had

breached the contract by failing to make all required royalty payments. The court held:

> We conclude that the trial court erred in finding in favor of the plaintiff on
> both causes of action. The plaintiff was not entitled to enforce the restrictive
> covenant in the contract since he breached the contract first by failing to
> make royalty payments. When a party benefiting from a restrictive covenant
> in a contract breaches that contract, the covenant is not valid and enforceable
> against the other party because the benefiting party was responsible for the
> breach.

292 A.D.2d at 489, 744 N.Y.S.2d at 491 (citations omitted).

Likewise, in *Michael I. Weintraub, M. D., P. C., v. Schwartz,* 131 A.D.2d 663; 516

N.Y.S.2d 946 (2d Dep't1987), the plaintiff employer attempted to obtain a preliminary

injunction enjoining a neurologist from practicing within a 5 mile radius of any hospital

where he had worked on the plaintiff's behalf. The Court affirmed the denial of the

preliminary injunction because, *inter alia,* the employer had "breached the terms of the

employment contract by failing to provide the defendant with a written notice within one

year of the commencement of his employment as to whether he would be offered a

partnership at the expiration of his employment contract." The Court held that:

> Assuming the plaintiffs have breached their own obligations under the
> contract, they would be precluded from seeking to enforce against the
> defendant even the reasonable portion of the restrictive covenant (see,
> *Cornell v T. V. Dev. Corp.,* 17 NY2d 69, 75).

In sum, restrictive covenants are uniformly disfavored by the New York courts. The

foregoing cases reveal that under New York law, courts will strictly enforce the rule that *any*

breach by the party seeking to enforce covenant will preclude enforcement of the restrictive

covenant.

In this case, as detailed in the Hertzoff Affidavit, defendants breached numerous

provisions of the employment agreement that they drafted, as well as the mutually

dependent stock purchase agreement and lease agreement. Any one of these breaches of contract preclude enforcement of the restrictive covenant.

Defendants have not raised any defense to their breaches of (1) wrongfully deducting monies from his commission, and (2) failing to pay $30,000 in rent. While there may be sharp disputes of fact with regard to certain claims -- requiring expedited discovery and a full evidentiary hearing for resolution -- there can be no dispute that defendants intentionally and deliberately withheld commissions from Clayton Hertzoff's paycheck pursuant to a "general policy." This is dispositive. As discussed below, this deliberate conduct constituted a violation of the New York Labor Law and is a material breach of plaintiff's employment agreement. Thus, the non-complete provision is rendered invalid and unenforceable.

**B. Defendants' Improper Deduction from Plaintiff's Wages Is a Material Breach of Contract and Is a Violation of § 193 of the New York Labor Law.**

Nowhere in Defendants' motion do they dispute the violation of the New York law or the breach of the employment agreement arising from their wrongful deductions from Mr. Hertzoff's pay. Accordingly, that breach must be deemed admitted. Labor Law § 193 provides in pertinent part that:

> 1. No employer shall make any deduction from the wages of an employee, except deductions which:
>
> a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or
>
> "b. are expressly authorized in writing by the employee and are for the benefit of the employee * * *. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee.

Obviously, it goes without saying that deductions for alleged "poor judgment" for

providing artificial limbs to amputees without obtaining cash up front is not permitted by section 193 of the Labor Law.

Nor can there be any dispute that sales commissions are "wages" under section 193 of the Labor Law See, e.g., *P & L Group, Inc. v. Garfinkel,* 150 A.D.2d 663; 541 N.Y.S.2d 535 (2d Dep't 1989)(citing Labor Law § 193 as applying in case of sales commissions); *Gennes v. Yellow Book of New York, Inc.* 23 A.D.3d 520, 806 N.Y.S.2d 646 (2d Dep't 2005)(Labor Law § 193 violated where a portion of account executives' compensation included sales commissions and employer made deduction from account executives' commissions for every account which they were assigned but failed to renew); *Gebhardt v. Time Warner Entertainment-Advance/Newhouse*, 284 A.D.2d 978, 726 N.Y.S.2d 534 (4th Dept 2001) (Labor Law § 193 violated where employer deducted $375 from sales commissions of cable TV account executives; attorneys fees and liquidated damages awarded because deduction was willful).[5]

A case on all fours with this one is *Edlitz v. Nipkow & Kobelt*, 264 A.D.2d 437, 694 N.Y.S.2d 439 (2d Dept. 1999), which, as here, concerned a failure to pay an employee sales commissions under an employment contract.  Like the Diazes in this case, the employer-defendant withheld $3,000 from the plaintiff's wages "due to a customer's failure to pay the defendant." The Court held that "the deduction by the defendant of $3,000 from the plaintiff's wages violated Labor Law § 193 and summary judgment was, therefore, properly granted …"

The same result was found in *P & L Group, Inc., supra*, 150 A.D.2d 663, 541

---

[5] See also *Reilly v Natwest Mkts. Group Inc.* 181 F.3d 253 (2d Cir. 1999), cert denied, 528 US 1119 (2000) (Plaintiff's percentage bonus fell comfortably within definition of "commission" that was expressly included within New York Labor Law's definition of "wages" where his pay was guaranteed under Percentage Bonus formula to be percentage of revenue he generated, and was not left to employer's discretion.)

N.Y.S.2d 535, which also involved unlawful deductions from an employee's commissions.

The Court held:

> Unless authorized by law or by consent, an employer is not permitted the self-help remedy of withholding employees' compensation. Labor Law §§ 197 and 198 reflect a strong legislative policy aimed at protecting an employee's right to wages earned. "The importance of this policy is underlined by the Legislature's decision to make its violation a misdemeanor punishable by a fine, jail, or both" (*Saunders v Big Bros.*, 115 Misc 2d 845, 848).

150 A.D.2d at 664.

Clayton Hertzoff gave up his 25% interest in UOA for an Employment Agreement. A quick perusal of that contract, drafted by Defendants, reveals that it is rather one-sided and gave him little. One of the few things that it did give him was the right to sales commissions. Yet, Defendants refused to pay any of his first-quarter commissions until he was forced to sue them on April 19, 2007. Thereafter, the Diazes made a deliberate, considered decision that they could institute a "general policy" that would permit them to unilaterally dock plaintiff's wages if they felt that his "poor judgment" resulted in a patient not paying a bill. This is a serious, deliberate, and material flouting of their basic responsibilities under the Employment Agreement. It is conduct that is punishable as a misdemeanor under section 198-a labor law, with possible imprisonment of up to one year and/or a fine of up to $20,000. The Court need look no further than this conduct to find that the restrictive covenant may not be enforced, since any covenant not to compete is unenforceable, if the employer has breached the employment agreement.

### C. Defendants' Refusal To Renounce The "General Policy" Constituted a Repudiation of Its Obligations under the Employment Contract.

Beyond materially breaching the employment agreement by deducting sums from Mr. Hertzoff's first quarter commissions, Defendants went further and anticipatorily

repudiated their duty to make subsequent commission payments. This repudiation of their obligations understandably made Mr. Hertzoff insecure about whether Defendants would live up to their future obligations. Defendants were given numerous opportunities to renounce their improper and unlawful deduction from plaintiff's wages. See Hertzoff Aff. ¶ 49. Instead of doing so, they have instead insisted that their conduct is proper and is pursuant to a "general policy of UOA/C.O.S.I." Thus, defendants have declared their intention to dock plaintiff's commissions in future cases of alleged "poor judgment." This is not an empty threat. Indeed, as set forth in the Hertzoff Affidavit, the Diazes have in fact made similar improper deductions from the paychecks of other employees.

Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty. See, e.g., *Lucente, v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002); *Franconia Assocs. v. United States*, 536 U.S. 129, 153 L. Ed. 2d 132, 122 S. Ct. 1993, 2002 (2002); *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 667, 705 N.E.2d 656 (1998); John D. Calamari and Joseph M. Perillo, *The Law of Contracts* § 12-3 (3d ed. 1987. In those cases, the law does not require a party to the contract to continue offering performance and await these future breaches. Instead, that party is entitled to demand assurance that the other side will perform as required, and if that assurance is not provided, the party may declare a material breach and be excused from having to perform his own obligations.

In short, defendants' unilateral improper deduction from plaintiff's commission check was a material breach of contract precluding enforcement of the restrictive covenant. The defendants were given numerous chances to remedy the breach. Instead of doing so, and to remove any doubt on the score, the defendants, after consulting with their attorneys,

18

formally declared that their conduct in making the deduction was pursuant to a "general policy" of their company.  The Diazes have declared their intention not to comply with the New York Labor Law or section 3(b) of the Employment Agreement, which provides that UOA is obligated to pay a quarterly sales commission equal to 5% of his "Personal Sales Collection." They have repudiated their contractual obligations and are therefore precluded from enforcing their non-compete clause.

**D.    Defendants' Improper Billing Practices Constitute a Breach of Section 9a of Plaintiff's Employment Agreement.**

The consequences of becoming involved in improper Medicare and Medicaid billing can be severe.  For example, in *People v. McDonald*, 88 N.Y.2d 281, 667 N.E.2d 320, 644 N.Y.S.2d 670 (1996), the Court of Appeals affirmed criminal convictions for larceny and offering a false instrument where podiatrists submitted Medicaid claims for reimbursement of $46 using improper billing code in seeking reimbursement for orthotics. The podiatrists had used billing code 90473, which suggested the use of a mold, but actually provided custom-made orthotics that were fabricated using 2-D imprint techniques.

Here, Martin Diaz repeatedly demanded that plaintiff use billing code L-1832 to submit claims for a knee braces where the use of that code was not warranted because the devices were a single axis joint, not a multiple joint braces.  Mr. Diaz's response was "what's the difference – the joints are hidden." Herzoff Aff. ¶ 63.  Mr. Diaz's conduct comes perilously close to conduct forbidden by the criminal law.

Likewise, it does not take an expert in health care law to realize that it is blatantly wrong and perhaps criminal to have a patient sign an "acknowledgment of receipt" for goods that have not been delivered and in fact have yet to be fabricated. Yet Mr. Diaz repeatedly requested that plaintiff obtain and sign such false instruments.  No employee

should be put in this intolerable and untenable situation.

Third, as the most senior employee and only Certified Practitioner at UOA's offices at 791 Broadway, plaintiff might well reasonably fear becoming liable or having his professional reputation affected by Mr. Diaz's conduct in billing for numerous patients where the "place of service" is listed as UOA's offices at 791 Broadway, but the patients are not in fact UOA patients and UOA has not performed any services for them. See Hertzoff Aff. Ex. 10.

Section 9.a of the Employment Agreement, drafted by defendants, provides that:

> You acknowledge that Company is fully committed to ensuring its compliance and the compliance of its employees, with all applicable rules, regulations and laws promulgated by the state and federal governments and by third-party payors relating to the provision of billing services.

Clearly, this was not the case here. Defendants breached their obligations under this section. Martin Diaz's improper billing practices put plaintiff in an impossible and untenable position. Having breached their Employment Agreement, the Diazes should not be permitted to use that agreement to prevent Clayton Hertzoff from practicing his trade and earning a living.

### E. Defendants Breached the Employment Agreement By Materially Changing Plaintiff's Duties By Eliminating the Technicians That Manufactured Prosthetics and Eliminating the Support Staff.

Under New York law, if an employee "is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement." *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 11, 280 N.E.2d 867, 330 N.Y.S.2d 33 (1972); *Lynch v. Pharmaceutical Discovery Corp.*, 208 A.D.2d 906; 617 N.Y.S.2d 883 (2d Dep't 1994) ("The law is clear that if an employee is under contract to fill a particular position, any material change in his duties or significant

reduction in rank may be treated by the employee as a breach of the contract").

Here, section 2a. of the Employment Agreement provides that "Employee shall be employed as a Prosthetitst (working in the field of orthotics and prosthetics) and Manager of the Orthotics and Prosthetics Shop ("O&P Shop") and shall report to the Chief Executive Officer or his designee. Employee's duties and responsibilities shall be consistent with Employee's position as the Chief Executive Officer or his designee may from time to time designate. Employee's duty shall include, but not be limited to, overseeing production of the staff of company and the O&P Shop."

As set forth in the Hertzoff Affidavit, the Diazes materially changed plaintiff's duties and significantly reduced his rank by decimating UOA and firing all of the technicians in the O&P Shop that worked on prosthetics. UOA went from a dozen employees to only four. As a result, plaintiff was forced to spend approximately 40% of his time in the shop manufacturing prosthetics, when he did not do so previously. Instead of "managing" shop technicians, plaintiff was working in the shop. This was a significant reduction in his rank, and reduced his commissions, since no commissions were earned from the time plaintiff was forced to spend in the shop.

Moreover, once plaintiff was forced to commence lawsuit against UOA and Ms. Diaz to recover his commissions, he was simply ignored by defendants. Near the end of his employment, the O&P Shop closed down, leaving plaintiff unable to secure timely obtain prostheses for the patients.  Although his employment agreement put him in charge of the O&P shop, Mr. Diaz never took plaintiff to see the new O&P Shop. He did not consult plaintiff on what equipment would need to work in the new place. Mr. Diaz dismantled the old factory, and the two technicians left no longer had work to construct.  Near the end of

21

plaintiff's employment, there was no telephone, fax or computer service. The work conditions bore no resemblance to the work he had agreed to perform in the employment agreement. Defendants breached their obligations under the Employment Agreement. They may not now enforce their restrictive covenant.

F.    **Defendants' Failure to Pay Rent Is a Breach of Contract, Rendering the Non-Compete Clause Invalid and Unenforceable.**

As set forth in the Hertzoff affidavit, defendants are in breach of their contractual duty to pay rent of $10,000 for July. Hertzoff Aff. ¶¶51-52. The lease agreement and employment agreement were mutually dependent agreements simultaneously executed as part of the same transaction. (The lease agreement and employment agreement were both schedules to the stock purchase agreement.) Under the New York law discussed above, this straightforward material breach of contract renders defendants' non-compete clause invalid and unenforceable.

G.    **Defendants' Failure to Bill and Collect Accounts Receivables, and to Actually Allocate Each Dollar Received to the HSBC Loan, Constituted a Material Breach of Contract.**

As set forth in detail in the Hertzoff Affidavit and in the Amended Complaint, defendants have failed to live up to their obligations to bill and collect accounts receivables and actually apply each dollar received to the HSBC loan guaranteed by plaintiffs. As detailed in the Hertzoff Affidavit, defendants fired the individuals who worked on billing the accounts receivables, and simply ignored processing boxes of documents that sat untouched in UOA's offices for months. See Hertzoff Aff. Ex. 4 (photographs of billing records which sat untouched for months in UOA's office). As a result of this current breach, plaintiffs have suffered current damage by having to pay $32,222.63 to HSBC Bank. Defendants' breach of contract renders the non-compete clause invalid and unenforceable.

Should there be a need to determine this claim at this juncture, plaintiffs respectfully request expedited discovery from defendants and the scheduling of a full-blown evidentiary hearing at which plaintiffs can subpoena employees of defendants to testify.

## CONCLUSION

For the reasons set forth herein, and in the accompanying affidavits, plaintiffs' respectfully request that defendants' motion for a preliminary injunction be denied.

Dated: New York, New York
       July 20, 2007

TRAIGER & HINCKLEY LLP


ByS/ _____
    George R. Hinckley Jr. (GH-7511)

    880 Third Avenue
    New York, New York 10022-4730
    Tel. (212) 759-4933
    Fax  (212) 656-1531
    Attorneys for Plaintiffs

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK:COMMERCIAL DIVISION

----------------------------------------X

EAST COAST ORTHOTIC & PROSTHETIC CORP.          Index No. 601293/03

          Plaintiff,

     - against -

RICHARD ANTHONY ALLEN, MATTHEW FLYNN,

DOUG EY, EASTSIDE ORTHONTICS & PROSTHETICS,

INC.

          Defendants.

----------------------------------------X

**Charles Edward Ramos, J.S.C.:**

In motion sequence 001, plaintiff East Coast Orthotic & Prosthetic Group (∧East Coast@) moves pursuant to CPLR 6301 restraining defendant Richard Anthony Allen from (1) providing services to any business that supplies the same type of products as the plaintiff to the Columbia Presbyterian Hospital and/or Children=s Hospital at Columbia Presbyterian Hospital (∧Children=s Hospital@) (collectively, ∧Hospital@), or to any person affiliated with the Hospital who has conducted business with Mr. Allen while he was employed by the plaintiff; (2) from soliciting *any* person or entity affiliated with the Hospital; (3) the remaining defendants from continuing to employ Mr. Allen for purposes of servicing or soliciting *any* person or entity affiliated with the Hospital; and (4) all defendants from using the plaintiff= s proprietary and/or confidential business property and information. The motion is denied.

## Background

This action arises from Mr Allen=s alleged breach of a non-compete clause in continuing to service his former employer=s clientele under the new employer.

East Coast is in the business of designing, manufacturing, selling, and fitting medical equipment to order for patients referred to East Coast by treating physicians and health care facilities, and maintains satellite offices at hospitals and healthcare facilities throughout the metropolitan area.

Mr. Allen entered into East Coast=s employ on February 28, 2002. Prior to entering into the plaintiff=s employ, Allen was a citizen and resident of the United Kingdom. East Coast provided legal counsel to Allen in obtaining an H-1B Visa from the INS so that Allen could be lawfully employed by East Coast. On February 28, 2002, after Allen=s visa had been approved, he was assigned to serve as a Staff Orthotist at the Hospital, where he would provide services to East Coast patients and referring physicians, for an agreed upon salary of $55,000.00 per annum. Prior to undertaking his duties, Allen signed a ∧Non-Competition/Confidentiality@ agreement, stipulating that he would not solicit or provide services to any patient or physician who is a current referral source for East Coast for a period of one year from the date of termination. Around April of 2002, Allen=s salary was increased to $80,000.00 per annum, and around September of 2002, Allen=s salary was increased to $100,000.00 per annum. On January 14, 2003, East Coast was allegedly informed by a referring physician at the Hospital that Allen had been making statements that were critical of the quality of the plaintiff=s products and business practices, and indicative of Allen=s intent to leave the plaintiff=s employ, to the physicians and other staff at the Hospital.

On January 21, 2003, the principals of East Coast met with Allen to address these allegations, at which time Allen vigorously denied the allegations and purportedly declared that he had no intention of leaving plaintiff=s employ.

On March 18, 2003, Allen tendered his resignation as an employee of East Coast, stating in writing that Αpoor product quality@ had made him Αhold back from providing services.@ On March 19, 2003, East Coast became aware of the fact that Allen continued to work at the Hospital after his resignation, actively servicing patients and referring physicians as he had under the plaintiff=s employment.

The complaint consists of six causes of action: (1) that Allen breached the non-compete clause; (2) that Allen breached his contract; (3) that the remaining defendants (new employer and principals thereof) wrongfully induced Allen to breach his contract with East Coast; (4) that Eastside tortuously interfered with contractual relations between East Coast and Allen; (5) that Eastside perpetrated libelous and slanderous statement regarding plaintiffs; and (6) that a preliminary injunction is in order to restrain Allen from engaging in business with and/or soliciting plaintiff=s hospitals and doctors, the remaining defendants from employing Allen, and all defendants from using the plaintiff=s proprietary information.

Defendant Eastside argues that the plaintiff has failed to establish the requisite grounds for a preliminary injunction in that: (1) there is no irreparable harm; (2) there are no legally protected interests at issue; (3) there is no likelihood of success on the merits and (4) the balancing of harms and equities favors the defendants. Eastside further argues that the non-compete clause itself is suspect and therefore unenforceable.

## Discussion

Pursuant to CPLR 6301, a preliminary injunction may be granted to restrain the defendant from the Αcommission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff.@

The requisite grounds for the issuance of a preliminary injunction are: Αa demonstration of the likelihood of success on the merits, irreparable injury absent a grant of injunctive relief and a balancing of the equities in favor of the applicant.@ *Little India Stores, Inc. v Singh*, 101 AD2d 727 (1st Dept 1984). Plaintiff must satisfy all three requirements in order to obtain a preliminary injunction.

## Demonstration of the likelihood of success on the merits

It is well established that New York courts disfavor the enforcement of restrictive covenants. *See American Broadcasting Co., Inc. v Wolf*, 52 NY2d 394 (1981). The party seeking injunctive relief must Αdemonstrate a strong probability of ultimate success and thus a right to the relief sought, particularly in a proceeding to enforce a restrictive covenant against a former employee.@ *Rick v Jarvis Associates, Inc. v David Stotler*, 216 AD2d 649, 650 (3d Dept 199)(internal citation omitted). Significantly, in order to prevail in an action to restrain a former employee defendant from soliciting those customers he had previously served under the plaintiff=s employ, the plaintiff must present Αstrong evidence@ that the individual defendants misappropriated and utilized proprietary information and trade secrets in competing with plaintiffs. *See Laro Maintenance Corp. v Culkin*, 255 AD2d 560 (2d Dept 1998) (Upholding a preliminary injunction prohibiting the plaintiff=s former employees from contacting or soliciting certain customers of the plaintiffs pending the resolution of the action on the basis of strong evidence that individual defendants misappropriated and utilized proprietary information and trade secrets in competing with the plaintiffs.)

Here, the plaintiff has failed to meet this Αstrong evidence@ burden in two ways. First, the identity of the customers was a matter of public record, not contained in a confidential customer list over which the plaintiff had proprietary rights, and persuasive evidence to the contrary has not been provided by the plaintiff. *See Columbia Ribbon & Carbon Manufacturing v A-1-A Corporation*, 42 NY2d 496, 499 (1977). (ΑA customer list is not confidential where the past or prospective customers are Αreadily ascertainable@ from sources outside the employer= s business.@) *See also Starlight Limousine Service, Inc. v Louis Cucinella*, 713 AD2d 195 (2d Dept 2000) (holding that solicitation of an entity=s customers by a former

employee is not actionable because the plaintiffs did not establish that the customer list constitutes a confidential trade secret); *Leo Silfen, Inc. v Cream*, 29 NY2d 387, 392 (1971). (A[W]here the employer=s past or prospective customers= names are readily ascertainable from sources outside its business, trade secret protection will not be enjoined@); *Frank Mau Associates, Inc. v Frederick Boughton*, 281 AD2d 673 (3d Dept 2001) (Refusing to uphold a non-competition clause because triable issue of fact remained as to whether the defendant made use of confidential client information and the plaintiffs offered nothing more than conclusory allegations that concerning their claim that the defendant was actively soliciting their clients). Defendant claims to have been servicing the patients and physicians at the Hospital long before the plaintiff commenced serving the same clientele. Nor has plaintiff set forth convincing evidence to substantiate the allegation that Allen made use of plaintiff=s Atrade secrets@ in furtherance of the competitor-defendant=s business activities.

Plaintiff failed to present any evidentiary support for its assertions that the defendants misappropriated the database or that the database is being used to compete against it. Moreover, even assuming a misappropriation, plaintiff= s allegation that the database contains publicly available information are conclusory and insufficient to establish a likelihood that it constitutes a trade secret or is otherwise confidential. Nor does the restrictive covenant against the soliciting of plaintiff=s customers or prospects for one year after leaving plaintiff= s employ . . . warrant injunctive relief, since such covenants, disfavored by the law, are only enforced to the extent necessary to prevent disclosure or use of trade secrets or confidential information, the probable existence of which is not shown here, or where the employee= s services are unique or extraordinary, here not alleged to be the case. *Business Networks Off. Y., Inc. v Complete Network Solution*, 265 AD2d 194 (1st Dept. 1999)(internal citations omitted).

There is a similar lack of convincing evidence here. Plaintiff has not only failed to assert that Allen=s services are unique, but has also failed to rebut defendant=s assertion that Allen is *not* unique. *See also TMP Worldwide Inc. v Michael Franzino*, 269 AD2d 332 (1st Dept 2000) (Refusing to uphold preliminary injunction because there was no indication that the individual defendant had access to, much less misappropriated any customer lists, trade secrets, business plans or other confidential information, or that his services at plaintiff company were of a unique or extraordinary nature).

Plaintiff has not provided strong evidence that defendants made statements that were critical of East Coast and thereby irreparably damaging its reputation. There are simply too many questions of fact in the present case to establish tenable grounds for a preliminary injunction. While the mere existence of questions of fact is not dispositive of a lack of likelihood of success on the merits, Awhere there is a sharp dispute between the parties concerning the underlying facts, it has been the policy of this Court ... Court, to refuse to enforce a non-competition covenant by a preliminary injunction.@ *Independent Health Association, Inc. v Michael Murray*, 233 AD2d 883 (4th Dept 1996).

Lastly, the merits of the underlying cause of action for violation of the non-compete clause is questionable at best, given that the defendants contest the enforceability of the clause on the basis that the agreement was unreasonably forced upon Allen to his detriment in that he was allegedly informed of the non-compete clause after he had resigned from his position in Great Britain and uprooted his family and himself to the United States. In addition there is no reasonable geographical limitation on the non-compete agreement.

## Irreparable injury absent a grant of injunctive relief

Irreparable harm is an Ainjury for which a monetary award cannot be adequate compensation. . . .@ *Jackson Dairy, Inc. v H. P. Hood & Sons*, 596 F2d 70, 72 (2d Cir 1979). If defendants did make critical statements regarding the plaintiff to the hospital staff and usurp plaintiff=s clients, and Allen did indeed divulge information regarding the new products being developed by plaintiff, the damage to the plaintiff=s reputation and credibility may qualify as an Airreparable injury@ for which no award of pecuniary damages would suffice, warranting the preliminary injunction. However, in this case, two factors indicate that money damages would be adequate as a measure of making the plaintiff whole under the circumstances, making equitable relief unnecessary. The plaintiff has alleged specific money damage

amounts which would redress each of the legal detriments it alleges as having suffered on face of its complaint.

**Balancing of the equities in favor of the applicant**

In order to sustain this application, this Court must conclude that the failure to grant preliminary injunctive relief would cause greater injury to the plaintiff than the imposition of the injunction would cause to the defendants. See, *Laro Maintenance Corp., supra* 255 AD2d at 560. In this case, the harm to plaintiff that would result from the failure to grant a preliminary injunction is not greater than the harm Allen and his new employer would suffer should they be enjoined from servicing the doctors and hospitals Allen had served under plaintiff=s employment. If the preliminary injunction were granted, defendants would be enjoined from not only servicing clients Allen had previously serviced under plaintiff=s employ, but also from soliciting or servicing Αany patient, physician, staff member of other person or entity in any way associated or affiliated with the Hospital.@ This effectively prevents Allen from his pursuing his livelihood and prevents defendant Eastside from servicing the Hospital, with which it has maintained a 30-year relationship and has an outstanding written contract to provide equipment and services. In comparison, the plaintiff has admitted to having a clientele consisting of Αhospitals and healthcare facilities throughout the metropolitan area@ and presumably has been sustaining itself financially despite the economic harm it alleges to have suffered due to the defendant=s actions during the two-month period delay before it chose to initiate this action. The balance of equities favors the defendant.

Accordingly, it is

ORDERED that plaintiff=s motion for a preliminary injunction is denied.

Dated: July 18, 2003

_____

J.S.C.