UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
BEVERLY HERTZOFF, EDWIN HERTZOFF,
and CLAYTON HERTZOFF,                   :

            Plaintiffs,                 :    REPORT & RECOMMENDATION

        -against-                       :    07 Civ. 3157 (CM)(MHD)

NOREEN DIAZ and UNITED ORTHOPAEDIC     :
APPLIANCES CO., INC.,
                                        :
            Defendants.
-----------------------------------x

TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:

    Plaintiffs Beverly, Edwin and Clayton Hertzoff, the former
owners of an entity known as United Orthopaedic Appliances Company
("UOA"), commenced this lawsuit against the current owner, Mrs.
Noreen Diaz, and the company itself, in April 2007, complaining
that Mrs. Diaz had breached the stock purchase agreement by which
the company had been sold to her in August 2006. As summarized in
the amended complaint, served on June 8, 2007, plaintiffs contend
that Mrs. Diaz has failed to comply with a number of the financial
obligations embodied in that agreement and a parallel lease
agreement, and they further contend that Mrs. Diaz and the company
have breached a related employment agreement under which plaintiff
Clayton Hertzoff (the son of Beverly and Edwin Hertzoff) was to be
employed by UOA for a ten-year period commencing in August 2006
under specified terms of compensation. The amended complaint goes
on to allege that defendants constructively discharged Clayton, who

1

apparently left the company and went to work for a competitor on or about June 18, 2007.

Defendants have not answered either the original complaint or its amended successor. Rather, they have recently moved to dismiss portions of the amended version. In addition, however, defendants advised the District Court in late June 2007 that they intended to seek a preliminary injunction to prevent Clayton Hertzoff from continuing to work for the competing company, in asserted violation of a non-compete provision in his employment agreement. They in fact filed such a motion on July 13, 2007, and completed its briefing, pursuant to an agreed-upon schedule, on July 23, 2007.[1] At a hearing that we scheduled for July 24, 2007, both sides waived any live testimony, choosing instead to rely on the affidavits and exhibits submitted in support of, and in opposition to, the motion. Having heard extended oral argument, we now recommend that the motion for a preliminary injunction be denied.[2]

---

[1] As part of defendants' Rule 65 motion, they sought an ex parte temporary restraining order. By report and recommendation dated July 14, 2007, we recommended denial of that request, and the District Court so ruled by endorsed order dated July 25, 2007.

[2] Neither side has ordered a transcript of the oral argument. Hence, when referring to representations made at the argument, we do not cite transcript pages, and instead rely on our contemporaneous notes and independent memory.

A. <u>The Substance of the Dispute as Pled</u>

UOA is a manufacturer and supplier of prosthetic and orthotic devices for patients seen predominantly in hospitals and clinics in New York City. (Am. Compl. ¶ 7). The Hertzoff family owned the company for many years, but agreed to sell it to Mrs. Diaz in August 2006. (<u>Id.</u> ¶¶ 7-9). At the time Beverly and Edwin Hertzoff collectively owned 75 percent of the stock, and their son Clayton owned 25 percent. (<u>Id.</u> ¶ 8 & Ex. A at Sched. A). Under the terms of the stock purchase agreement, Mrs. Diaz was not obligated to pay the sellers any money at the time of the sale. Rather, it was agreed that for a period of two years, until August 20, 2008, the defendants would pursue collection of what was apparently a substantial amount of accounts receivable of the company and would apply those revenues to a number of debts of UOA, including a large loan from HSBC for which Mr. and Mrs. Hertzoff were guarantors. Under the terms of the agreement, as of August 20, 2008, if the monies applied from the accounts receivable had not fully satisfied those outstanding corporate debts, Mrs. Diaz would be required to pay the Hertzoffs the difference, up to a maximum of $100,000.00. (<u>Id.</u> ¶ 10 & Ex. A, § 1.3).

In addition, the parties entered into a lease agreement because UOA was located in a space owned by the Hertzoffs at 791

Broadway in Manhattan. Under the lease UOA was required to make monthly rental payments to the Hertzoffs of $10,000.00. (<u>Id.</u> ¶ 41).

The accompanying employment agreement for Clayton Hertzoff was negotiated at the same time as the stock purchase contract and made an annex to the stock purchase agreement. (<u>Id.</u> ¶ 13 & Ex. C). It specified that Clayton would continue to be employed by UOA, and that his duties would include management of the manufacturing arm of the company (referred to as the Orthotics and Prosthetics Shop), and that he would also continue his work as a licensed prosthetic practitioner for the company. (Am. Compl. ¶ 13 & Ex. C, § 2(a)). Thus, he was to be compensated by an annual salary of $120,000.00, together with commissions at specified rates, and a "discretionary" bonus. (<u>Id.</u> ¶ 13 & Ex. C, § 3(a)(i),(b),(c)). The agreement also contained a prohibition on disclosure of confidential corporate information and a non-compete provision that, in substance, precluded Clayton, if he left UOA, from using specified confidential information of UOA and from competing with UOA within a specified geographic area for a period of one year after his departure from the company. (<u>Id.</u>, Ex. C §§ 7-8).

In their original and amended complaints, plaintiffs allege that Mrs. Diaz breached the stock purchase agreement in several respects. These included her failure actively to pursue collection

of the accounts receivable, and her refusal to apply some of those proceeds to the pre-existing debts of UOA. (Id. ¶ 12). In addition, plaintiffs assert that defendants are in arrears in paying the rent under the lease agreement. (Id. ¶¶ 41-43 & Ex. B). They also allege that Mrs. Diaz and UOA breached Clayton's employment agreement by failing timely to pay him the required compensation, by refusing outright to pay some portion of his earned commissions, by deducting from his salary a sum of money purportedly as a result of a failure by a client to pay his bill (thereby breaching the agreement and violating the New York Labor Law), by materially altering the conditions of his work, and in the process making it difficult or impossible for Clayton to serve as a prosthetic practitioner and thereby diminishing his ability to earn commissions, and by seeking to compel him to engage in illegal or unethical billing practices. (Id. ¶¶ 13, 17-19, 21-23, 25-27, 29, 32-37, 39 & Exs. D & E).

As noted, defendants have not filed a responsive pleading, and instead have moved to dismiss a portion of the amended complaint. In doing so they argue that any complaints by plaintiffs about Mrs. Diaz's handling of the accounts receivable are premature, that the complaint fails to state a claim for breach of the stock purchase agreement or the employment agreement or violation of the Labor Law, that Clayton's constructive-discharge claim is also legally

insufficient, and that the claim for failure to pay rent is "misleading". (See Affidavit of Noreen Diaz, sworn to July 13, 2007, Ex. 8 (Defs.' Dismissal Mem. 7-17)).[3]

B. The Preliminary Injunction Motion

_____The preliminary-injunction motion pressed by Mrs. Diaz and UOA is premised on the contentions that Clayton Hertzoff has violated the non-disclosure and non-compete provisions of his employment agreement in a variety of ways and that he is also causing competitive injury to UOA by making false statements that the company has gone, or is going, out of business. The basis for defendants' assertions is an affidavit by Mrs. Diaz, in which she states that on June 18, 2007, while still employed by UOA, Clayton failed to appear for work or contact the company. According to Mrs. Diaz, he showed up that day at the Metropolitan Hospital clinic, stating that he had been fired by UOA and that he "proceeded to see patients who were scheduled to see other UOA practitioners that day." She asserts "upon information and belief" that he saw those

_____

[3] We note that the employment agreement provides that any lawsuit "with respect to" the agreement must be brought in New York state court. (Am. Compl., Ex. C, ¶ 10(b)). Since defendants have not sought dismissal on this basis and now seek injunctive relief from this court, we infer that both sides have waived this exclusive forum-selection provision. See Miller v. Batesville Co., 219 F.R.D. 56, 58 (E.D.N.Y. 2003)(citing Fed. R. Civ. P. 12(h)(1)); Nat'l Fire & Marine Ins. Co. v. Railroad Resource and Recovery, Inc., 1994 WL 606049, at *1 (S.D.N.Y. Nov. 3, 1994).

patients on behalf of his new employer, New England Orthotic &
Prosthetic Systems, LLC ("New England"). (Diaz Aff. ¶¶ 17, 25).

Mrs. Diaz goes on to suggest that Clayton was in the process
of using confidential UOA information to steal clients from UOA,
although she does not specify how he is doing so; rather, she
simply asserts that, since June 18, he has been seen at clinics at
St. Vincent's Hospital, Woodhull Hospital and Kings County Hospital
and that he is known to these clinics by virtue of his association
with UOA. (Id. ¶ 25). She speculates further in a reply affidavit
that he may be trying to interfere with the company's contractually
guaranteed access to some hospitals and clinics in New York by
making derogatory comments about UOA. (Reply Affidavit of Noreen
Diaz, sworn to July 23, 2007, at ¶ 16). Finally, she claims that he
has falsely stated to some insurance carriers that UOA "has been
'dissolved' and is no longer an active corporation." (Diaz Aff. ¶
31).

For relief, defendants demand that the court enter a broad
preliminary injunction although the precise terms of the relief
that they seek is not entirely clear. For present purposes we
assume that they seek an injunction congruent with the terms of
sections 7 and 8 of the employment agreement, which they purport to
quote. (Id. ¶ 33). According to Mrs. Diaz, that injunction would

7

prohibit Clayton Hertzoff from:

(a) disclosing, in whole or in part, any Confidential Information;

(b) interfering with Company's relationships with its employees, customers, and referral sources, or with any hospital or managed care entity with which Company has a contractual relationship;

(c) rendering any professional services to any customer of UOA who has been solicited by Clayton Hertzoff in violation of the Employment Agreement;

(d) rendering any professional services to any person, firm, corporation, association, or other entity to whom any such Confidential Information, in whole or in part, has been disclosed by Clayton Hertzoff or is threatened to be disclosed by him;

(e) soliciting, interfering with or endeavoring to entice away from UOA, any of its employees, agents, contractors, customers, or referral sources;

(f) for his own account or for the account of others, inducing any customers to patronize any competing billing service provider, requesting or advising any customer to withdraw, curtail or cancel such customer's relationship with UOA or disclosing to any other person, partnership, firm, corporation or other entity the names and addresses of any customers of of UOA;

(g) engaging in the sale of orthotics and prosthetics as an employee, independent contractor, shareholder, partner, or otherwise and whether separately or in conjunction with any other entity or individual within a three (3) mile radius of Company's location; and/or

(h) operating or having any financial or other interest in any entity involved in the business of providing orthotics and prosthetics within a three (3) mile radius of Company's location.

(Diaz Aff. ¶ 33).[4]

In opposition, Clayton Hertzoff provides an affidavit recounting his version of events. In substance, he testifies that within months after taking over UOA, Mrs. Diaz and her husband Martin Diaz (now the CEO of UOA) delayed paying him his salary and commissions, failed to pay his earned commissions in full, and fired or caused the resignations of all other personnel who worked either as prosthetists or as technicians who manufactured the prostheses, with the stated intention of shutting down UOA and keeping only the company's contracts for access to local hospitals and clinics. Clayton further states that Mr. Diaz later decided on a policy of deducting money from Clayton's compensation to pay for what Diaz viewed as costs or losses incurred by the company as a result of Clayton's negligence or incompetence. Plaintiff avers that this policy resulted in Mr. Diaz deducting more than half the compensation to which he was entitled at the end of the first quarter of 2007. In addition, according to Clayton, at about the same time Mr. Diaz pressed Clayton to make false representations to the insurance carriers that the company had delivered prostheses to

_____

[4] Section 8(c) of the employment agreement states that UOA will be "entitled to an injunction restraining [Clayton] from violating the terms of the restrictive covenant set forth herein . . . ." (Am. Comp. Ex. C § 8(c)). Mrs. Diaz's affidavit thus tracks the language of the other relevant subsections -- subsections 8(a) and 8(b) -- to outline those terms. (See Diaz Aff. ¶ 33).

the clients before that in fact had occurred (with the goal of obtaining early reimbursement), and that Diaz had also demanded that Clayton use incorrect codes on the insurance forms to increase the size of payments by the carriers. (Hertzoff Aff. ¶¶ 18-50, 60-68).

Based on these developments, Clayton reports that he finally concluded that he could no longer work for UOA, since he was being denied the payments due him under the employment contract, he was being pressed to engage in unethical or illegal conduct, and he was forced to spend far more time in personally manufacturing the prostheses rather than in supervision or sales (a material change in working conditions that precluded his earning commissions). He accordingly left UOA, albeit apparently without direct prior notice to the Diazes, and started to work as an employee of New England, performing the same type of work in fitting clients at local hospitals and clinics for new prostheses, albeit at a salary and benefit level below that to which he was entitled under his UOA employment contract. (Id. ¶¶ 70-71). He also denies that, since leaving UOA, he ever attempted to solicit a client belonging to that company; rather, he says, the clients that he services are not UOA "customers" since the doctor decides at the time that prosthetics services must be rendered which of the multiple prosthetists typically present at the hospital or clinic should

10

provide those services to a given patient. He further denies that he sought to interfere with UOA's access to hospitals and clinics, whether by denigrating UOA or otherwise. In addition, he denies telling anyone that UOA was closed or in the process of shutting down, even though he claims Mr. Diaz told him that the Diazes would begin to close the business after having acquired the company's contracts with local hospitals and clinics. Finally, Clayton denies having disclosed any confidential information from UOA to his new employer or having used any such materials in his work at New England.(Id. ¶¶ 72-81).

Apart from Clayton's denial of wrongdoing, plaintiffs supply a declaration by Ronald Manganiello, the managing partner of New England. He asserts that since starting work for New England, Clayton has never disclosed any confidential information from UOA to his new employer and has never acted to cause harm to UOA. (Declaration of Ronald Manganiello, executed July 20, 2007, ¶ 3). He also reports that all of the hospitals and clinics to which Clayton goes on behalf of New England are institutions with which New England has long been well acquainted, and that New England does not obtain clients by the use of confidential sources. Rather, he says, hospitals and clinics contract with "numerous" prosthetic companies to send their prosthetists to the hospital or clinic premises, and it is then the doctors at the hospital or clinic who,

when a patient needs prosthetic services, select one of the many prosthetists who are present on-site at the hospital or clinic to serve that patient. (<u>Id.</u> ¶¶ 4-5).

<u>ANALYSIS</u>

A. <u>Standards for Preliminary Injunctive Relief</u>

When a party seeks a preliminary injunction, she bears the burden to demonstrate at least that "she will suffer irreparable harm absent injunctive relief, and . . . either (a) that . . . she is likely to succeed on the merits, or (b) "'that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'" <u>Moore v. Consolidated Edison Co.</u>, 409 F.3d 506, 510 (2d Cir. 2005)(quoting <u>No Spray Coalition, Inc. v. City of New York</u>, 252 F.3d 148, 150 (2d Cir. 2001)(per curiam)). <u>Accord</u>, <u>e.g.</u>, <u>D.D. ex rel. V.D. v. New York City Bd. of Educ.</u>, 465 F.3d 503, 510 (2d Cir. 2006). This form of relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997)(quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948 at 129-30 (2d ed. 1995))(emphasis omitted);

12

Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). See, e.g., Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985)(preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies"). It follows that the trial court has "wide discretion" in deciding whether an injunction pendente lite is appropriate under the circumstances. Moore, 409 F.3d at 511 (citing Green Party of New York v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004); Columbia Pictures Indus., Inc. v. American Broad. Cos., 501 F.2d 894, 897 (2d Cir. 1974)).[5] Additionally, "[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Moore, 409 F.3d at 510 (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992)).

B. The Posture of Defendants' Motion

Before assessing defendants' showing in support of their motion, we address an unusual procedural anomaly in their application. As noted, they have just recently separately moved to dismiss a portion of the amended complaint, and as a consequence

---

[5] In exercising its discretion, the court should also take into account the public interest, if relevant. See Register.com, Inc. v. Verio, Inc. 356 F.3d 393, 424, 432-33 (2d Cir. 2004). Neither side suggests that the public interest is implicated here.

they have not been required to file an answer to that pleading pending resolution of their Rule 12 motion. See Fed. R. Civ. P. 12(a)(4). And in fact, they have chosen not to file a responsive pleading and have further refrained from asserting any claims in this case -- whether counterclaims against the plaintiffs or third-party claims against others. Accordingly, although they have now moved for a preliminary injunction against plaintiff Clayton Hertzoff and argue that they satisfy the applicable standards, including likelihood of success on the merits, they currently have asserted no claims, and hence there is no formally pled cause of action against which to measure their assertion of likelihood of success (or, alternatively, substantial issues going to the merits). Moreover, until they assert a claim, they will have no basis on which to obtain a permanent injunction for which the relief they now seek may be deemed a preliminary remedy.

In plaintiffs' opposition, they take note of the unusual posture of the motion, at least in passing (Hertzoff Aff. ¶ 43), and defendants have offered no substantive response, although they have asserted in reply that they are not required to file a pleading while their Rule 12 motion pends. (Reply Aff. ¶ 19 & n.2). When quizzed about this at oral argument, defendants' counsel first stated that, by virtue of defendants' dismissal motion, her clients are currently precluded from filing any pleading (including

14

presumably a counterclaim against Clayton) because they are seeking partial dismissal of the amended complaint. Then, when challenged on this assertion, counsel retreated to the notion -- also articulated in defendants' reply papers (id.) -- that they were not required to file a pleading because of their dismissal motion.[6] Counsel also admitted, upon questioning, however, that defendants were unaware of any legal authority that would permit a litigant who has asserted no claims against her adversary to seek a preliminary injunction based on the ostensible assumption that at some point in the future she would assert a corresponding claim.

Defendants' failure to assert any claim against the party whom they seek preliminarily to enjoin might be viewed as a potentially fatal impediment to relief, although the omission could be readily correctable. In any event, we note a snippet of legal authority pertinent to the issue that would, in very limited circumstances, allow the court to disregard such a failing.

In Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir. 1966), the plaintiff had applied by order to show cause for preliminary injunctive relief in the midst of a contest for control of the

---

[6] Although Rule 12(a) relieves a defendant of the necessity to file an answer to a complaint if the defendant has filed a Rule 12(b) motion, nothing in the rules precludes the defendant from filing a counterclaim while a dismissal motion is pending.

Studebaker Corporation.[7] The order to show cause, supported by what the circuit court described as a lengthy affidavit by plaintiffs' counsel, was submitted and signed before the plaintiff had served or filed a complaint. The district court conducted a hearing the following day and issued an injunction two days thereafter. At the hearing the defendant waived any objection to the lack of service but objected to the motion on the basis that the plaintiff-movant had not yet served or filed a complaint. As it turned out, the day after the hearing and one day before the issuance of the preliminary injunction, the plaintiff did file a complaint. Id. at 694.

On appeal, the circuit court took note of the issue, which arose in light of "the exigencies of time usual in contests for corporate control," and stated that "it would have been better to file a complaint along with the affidavit and order to show cause." Id. Nonetheless, Judge Friendly, for the Court, concluded that "under the circumstances the [district] court could properly treat the affidavit [of counsel] as a complaint and the order to show cause as requiring an early answer." Id. (citing Fed. R. Civ. P.

_____

[7] The relief sought (and obtained) by the plaintiff was to enjoin the defendant Gittlin, a Studebaker shareholder, from using other shareholders' authorizations in order to obtain the corporation's stockholder list in alleged violation of the SEC's proxy rules under section 14(a) of the Securities Exchange Act of 1934. See Gittlin, 360 F.2d at 695-98.

16

12(a); <u>Hadden v. Rumsey Prods., Inc.</u>, 196 F.2d 92, 95 (2d Cir. 1952)).

In this case we find no comparable time-of-the-essence urgency,[8] and note as well that defendants have been on notice since June 18, 2007 -- more than seven weeks ago -- of the facts on which their preliminary-injunction motion is predicated,[9] and hence have been in a position for that period of time to assert whatever claims they believe they have against Clayton Hertzoff. There is no justification for defendants' delay in pursuing such claims as they may have, and their failure to do so raises some serious questions about the <u>bona fides</u> of their current motion.

As noted, absent the pleading of a claim, we have no explicit baseline against which to measure the movant's prospects of success "on the merits."[10] Moreover, until a claim is asserted, there is no

---

[8] Indeed, in our report and recommendation on defendants' application for a temporary restraining order we noted the slow pace of their requested briefing schedule, which led to full briefing not being completed until five weeks after Clayton Hertzoff's departure from UOA and more than six weeks after plaintiffs served their amended complaint, which asserted a claim on his behalf for constructive discharge.

[9] As noted above, defendants have known since June 8, 2007 that plaintiffs were asserting a claim for constructive discharge.

[10] We note in this respect as well that requiring the pleading of a claim triggers the obligations of Rule 11, which, at least at the margins, imposes limitations on what a party (or

obvious basis for delimiting the time-frame for a preliminary injunction, which, in the normal course, would remain in effect only until the adjudication of the claims on which it is based.

In addition, by not asserting any claims, defendants have failed to join New England as a party, while they seek an injunction that would directly prevent that company from utilizing one of its prosthetic practitioners. Under the standards of Fed. R. Civ. P. 19(a) & (b), New England is plainly a necessary party and might well be deemed an indispensable party, although Mr. Manganiello represents that the company could readily replace Clayton as a prosthetist. (Manganiello Decl. ¶ 6). Yet defendants' approach has effectively prevented New England from litigating in opposition to the relief sought by defendants.[11]

All of that said, if the movants here were to make a compelling case for a preliminary injunction, this omission need not be fatal. Given the breadth of the court's equitable powers, it

---

its lawyer) may assert against another litigant. While Rule 11 also applies to motion practice, the pleading stage is required under the governing rules to define, even if in skeletal terms, the outer limits of the pleading party's assertions of right.

[11] Arguably, New England might seek leave to intervene as a litigant because of the current motion, but absent any claim asserted by the defendants, it is difficult to conceptualize the posture in which that company could be introduced as a party, whether as a counterclaim defendant (on a non-existent counterclaim) or in some other capacity.

could, as was suggested in <u>Studebaker</u>, deem the defendants' preliminary injunction affidavit the functional equivalent of a counterclaim, at least for purposes of adjudicating the motion. Furthermore, to avoid the danger that an injunction may be entered without an obvious termination point at which the underlying claim is tested by either a dismissal motion, a summary-judgment motion, or a trial, the court might condition entry of the injunction on the defendants filing a congruent counterclaim within a specified number of days.

Under these circumstances, rather than recommend denial of the motion on this procedural ground, we address its merits. Nonetheless, in doing so we take account of defendants' dilatory pursuit of their potential claims against Clayton Hertzoff when assessing both the potential merits of a hypothetical set of counterclaims[12] and the asserted harm invoked by the movants.

C. The Defendants' Prospects for Success

In defendants' motion papers, they contend that Clayton Hertzoff breached his employment agreement with UOA in several ways, all related to the terms of the non-compete and non-

---

[12] As will be seen below, at times we must speculate as to the contours of the defendants' potential claims.

19

disclosure provisions of that agreement. He in turn argues (a) that it was defendants who breached that agreement in material respects, thus justifying his repudiation of it, (2) that the non-compete provision is in any event unenforceable, and (3) that he never violated the non-disclosure provision. We conclude that defendants, should they plead claims based on the assertions in their motion papers, will have raised serious issues going to the merits of some of those claims, but will have demonstrated a likelihood of success as to none.

i. The Employment Agreement

The employment agreement specifies that UOA is to employ Clayton Hertzoff from August 20, 2006 through July 31, 2016. It describes two roles that he was to play, "as a Prosthetist (working in the field of orthotics and prosthetics) and Manager of the Orthotics & Prosthetics Shop ("O&P Shop")." (Am. Compl. Ex. C § 2(a)). The operative provision goes on to say that his duties were to be set by the CEO of the company (that is, Mr. Diaz) and that they were to include, but not be limited to, "overseeing production of the staff of [the] Company and the O&P Shop." (Id.).

As for compensation, under the agreement Clayton was to receive a $120,000.00 base annual salary, payable bi-weekly, "less

appropriate and customary payroll deductions." (<u>Id.</u> § 3(a)(i)). The agreement also specified that Clayton was to "maintain a level of 'Personal Sales Collection' greater than six hundred thousand ($600,000) dollars for each Calendar Year." In the event that he failed to do so, his "continued employment" was to be subject to the parties agreeing on a reduced annual salary. (<u>Id.</u> § 3(a)(ii)).

The contract also required the payment of commissions, described as an "Incentive Bonus." These payments, specified as percentages of Clayton's "Personal Sales Collection," were to be three percent of collections for the period ending December 31, 2006, and for later years were to be five percent of collections up to $500,000.00 and ten percent of amounts exceeding $500,000.00. In calculating the incentive bonus, like annual salary, the company was authorized to make subtractions for "appropriate and customary payroll deductions." (<u>Id.</u> § 3(b)).

The contract also provided for the payment of what it termed a "discretionary bonus." Despite this terminology, the paragraph in question could be read to make the payment mandatory, stating that "Company shall pay Employee an [<u>sic</u>] discretionary bonus of twenty-five thousand ($25,000) dollars per Calendar Year." It went on to state that "[t]he discretionary bonus shall be paid within ninety (90) days of the end of the applicable Calendar Year . . . less

21

appropriate and customary payroll deductions." (<u>Id.</u> § 3(c)).

The agreement also provided for other employment benefits for Clayton. These included paid vacation leave, sick leave, personal days, a car allowance and, in specified circumstances, a severance payment. (Am. Compl. Ex. C §§ 3(d), 4(b)).

One provision addressed termination of the agreement for cause by UOA. (<u>Id.</u> § 4). The contract did not address the circumstances of a termination by Clayton, and hence for him the contract was terminable at will.[13]

The contract also contained a series of provisions to protect UOA corporate information and to limit Clayton's ability to compete with the company in the event that he departed. Thus, it acknowledged that corporate records pertaining to customers for whom Clayton rendered services were the property of UOA and were not to be removed or copied "except as reasonably required in the ordinary course of services provided by" Clayton. (<u>Id.</u> § 6(c)). Similarly, the agreement recited that Clayton acknowledged that certain corporate information -- including client names, the identity of "referral sources," internal memoranda and reports, financial statements and business plans -- "are valuable, special

---

[13] Defendants' counsel conceded this point at oral argument.

and unique assets of [the] Company" and are therefore trade
secrets, which he was not to disclose to others or to use "except
in connection with his retention by Company, . . . ." (Id. § 7(a)-
(b)). The agreement also stated that in the event of a breach or
threatened breach of these terms, the company would be entitled to
injunctive relief. (Id., § 7(c)).[14]

The agreement also contained a set of provisions limiting
Clayton's right or ability to compete with the UOA. These provided,
in relevant terms, as follows:

> 8.   Non-Compete and Non-Solicitation
>
> a.   Employee shall not . . . at any time during the
> term of his employment and for twelve (12) months

---

[14] The cited provision appears to authorize broader
injunctive relief than might be suggested by the prohibitions
reflected in the substantive part of this section. Thus it states
that the injunction may restrain Clayton from

> (i) disclosing . . . any such Confidential
> Information, (ii) interfering with Company's
> relationships with its employees, customers and
> referral sources, or with any hospital or managed
> care entity with which Company has a contractual
> relationship; and/or (iii) rendering any
> professional services to (A) any customer of Company
> who has been solicited by Employee in violation of
> this agreement, or (B) any person, firm,
> corporation, association, or other entity to whom
> any such Confidential Information . . . has been
> disclosed by Employee or is threatened to be
> disclosed by him.

(Id., § 7(c)).

following the termination of this Agreement . . .: (i) solicit, interfere with or endeavor to entice away from Company, any of its employees, agent, contractor, customer, or referral sources; (ii) for his own account or for the account of others, induce any customers to patronize any competing billing service provider, request or advise any customer to withdraw, curtail, or cancel such customer's relationship with Company or disclose to any other person, partnership, firm, corporation or other entity the names or addresses of any customers of Company.

   b. Employee shall not, at any time during the term of his employment under this Agreement and for twelve (12) months after the termination of this Agreement: (i) engage in the sale of orthotics and prosthetics as an employee, independent contractor, shareholder, partner, or otherwise and whether separately or in conjunction with any other entity or individual within a three (3) mile radius of Company's location; and/or (ii) operate or have any financial or other interest in any entity involved in the business of providing orthotics and prostheses within a three (3) mile radius of Company's location.

(Am. Compl. Ex. C § 8(a) & (b)). This section went on to state that in the event of a breach the company would be entitled to an injunction against further violations. (Id. § 8(c)). It also provided that Clayton acknowledged that in the event of a breach by him, damages would be insufficient, that the company would be "entitled to make an application for injunctive relie[f] . . . ," that the terms of the restrictive covenant were reasonable in all respects and that defendants had been induced to enter into the employment agreement by Clayton's agreement to "abide by and be bound by" all of the noted "restraints." (Id. § 8(d), (f)). The contract also stated that if a court determined that the

24

restrictive covenant was unenforceable, it should amend the covenant to the extent necessary to make it enforceable. (Id. § 8(g), (h)).

ii. Potential Bases for a Preliminary Injunction[15]

The bases asserted by defendants for a preliminary injunction comprise, in one form or another, the following asserted violations by Clayton of these non-disclosure and non-compete provisions: (1) that on June 18, 2007 he began working for New England, a competitor of UOA located within three miles of defendant company, assertedly in violation of section 8(b)(i); (2) that he has since appeared at some hospitals and clinics within three miles of the UOA headquarters to service patients in need of prostheses; (3) that on June 18, 2007 he appeared at Metropolitan Hospital and serviced some UOA clients even though he was working for New England; (4) that on or since June 18, 2007 he has used his knowledge of the identity of UOA clients to try to persuade them to switch to New England; (5) that he has told UOA suppliers and/or insurance carriers that UOA is in the process of shutting down or has already done so; (6) that he has disparaged UOA to hospitals or clinics; and (7) that in April 2007 he downloaded a list of UOA

---

[15] These bases include assertions in the motion papers as well as bases alluded to during oral argument.

clients and took the lists for purposes other than performing services as a prosthetic technician employed by UOA. We address these contentions <u>seriatim</u>.

1. As noted, Mrs. Diaz reports that on June 18, 2007 Clayton began to work for a competitor, New England, performing some of the same services that he had previously performed for UOA, that is, working as a prosthetist by meeting with patients in need of a prosthesis and doing the necessary measurements and fittings. She contends that this constitutes a violation of the non-compete provision of the employment contract because New England is located within three miles of the headquarters of UOA, which is at 326 Second Avenue in Manhattan. (See Diaz Aff. ¶ 29 & Ex. 6). Plaintiff confirms that he began to perform these functions for New England on that date, but contends that he did not violate the non-compete provision for a variety of reasons, including defendants' previous material breach of the employment agreement, which invalidated the non-compete provision. He also argues the invalidity vel non of the non-compete provision.

The first question raised by the defendants' accusation against Clayton Hertzoff is whether the alleged conduct necessarily violated the non-compete provision. The premise for defendants' argument seems to be that New England is located within

three miles of UOA because it has a branch office on East 38th Street.[16] (Diaz Aff. ¶ 29). Under this theory (expounded during oral argument), any work by Clayton for that company -- even if outside the cited three-mile radius -- would be a violation of the non-compete provision. The language of the provision, however, is at odds with this interpretation.

The cited prohibition precludes Clayton from "engag[ing] in the sale of orthotics and prosthetics," in whatever capacity (including as an independent practitioner or an employee of another company), "within a three (3) mile radius of [UOA's] location." (Compl. Ex. C § 8(b)(i)). The focus of this language is plainly on the location of Clayton's dealings with patients -- that is, his sale of prostheses -- and not the location of the company for which he happens to be working. Indeed, were it otherwise, the provision would not apply if, for example, Clayton were working for a company located in New Jersey or were working on his own out of his New Jersey residence, but seeing patients in Manhattan within three

---

[16] New England is headquartered in Branford, Connecticut although it has an office at 235 East 38th Street in Manhattan. See MANTA, Essential Business Information on Demand, http://www.manta.com/coms2/dnbcompany-mf43c (last visited Aug. 9, 2007); New England Orthotic and Prosthetic Systems, LLC, New York Office, http://www.neops.com/NY_Offices/newyork.html (last visited Aug. 9, 2007). For present purposes we assume that the contractual term relied upon by defendants -- insofar as they read it to cover competing employers found within the three-mile radius -- encompasses branch offices.

miles of UOA's location.[17]  Since the non-compete provision plainly would cover sales by Clayton within the specified radius of UOA, an interpretation that would obscure the only clear prohibition cannot be sustained.[18]

In contrast, section 8(b)(ii) of the employment agreement does focus on the location of the competing employer, that is, whether it is within three miles of UOA's location. That portion of the

---

[17] We also note that defendants' reading would drastically expand the geographic scope of the non-compete provision to cover the world as long as a local office branch existed, a result that defendants have eschewed. (See, e.g., Diaz Aff. ¶ 29; Reply Aff. ¶ 4 (citing only the location of New England's offices as demonstrative of breach rather than offering substantive support for their broad interpretation)). They avoid this discussion with seemingly good reason since such an expansive provision would be highly unlikely to survive judicial scrutiny. Although the reasonableness of a geographic limitation in a non-compete provision is an extremely fact-specific inquiry, defendants' expansive interpretation, which would include worldwide sales does not seem to be supported by the "nature and scope of [UOA's] business," as would be required to support such a restriction. Estee Lauder Cos., Inc. v. Batra, 430 F. Supp. 2d 158, 181 (S.D.N.Y. 2006)(worldwide geographic limitation supported where it might otherwise by "patently unreasonable" because of the demonstrated "international scope" of employer's business and industry competition).

[18] If the defendants' focus on the branch office rather than the location of sales did not lead to this result, it would seemingly mean that defendants read the restriction to prevent sales within the specified radius as well as affiliated offices within that radius, an even more expansive reading also likely to be vulnerable to attacks as to its reasonableness. We note that the defendants do not offer specifics on how their business works that would make apparent whether any sales take place in the branch offices themselves, and we have to really on Clayton's descriptions of how the business works.

non-compete provision, however, does not bar Clayton's employment by such an entity; rather, it says that he may not "operate or have any financial or other interest in" such an entity. There is no evidence in the record that Clayton has any interest in New England or that his ties to that company involve anything other than an employer-employee relationship.

In short, defendants do not demonstrate serious issues going to the merits insofar as they contend that when plaintiff is selling beyond the three-mile radius of UOA's location, he is violating the non-compete provision merely because New England has an office within the three-mile radius of UOA. (See, e.g., Diaz Aff. ¶ 25)(complaining inter alia of Clayton's appearance at Kings County Hospital)). Given this conclusion, we need not, in response to this charge, assess Clayton's other arguments concerning the enforceability of the non-compete provision.

2. Defendants' second claim of violation is based on their assertion that Clayton has been servicing patients at hospitals and clinics within the three-mile radius of UOA.[19] We assume for present

---

[19] This particular permutation of defendants' argument was expounded upon at oral argument. Mrs. Diaz's affidavit and defendants' moving papers focus not upon the location of the hospitals and clinics as here, but instead upon Clayton's alleged use of protected information to solicit UOA business at hospitals and clinics, in other words, focusing on subsections 7(c) and 8(a) rather than subsection 8(b) of the employment contract (see,

purposes that doing so would represent a violation of the non-compete provision as drafted.

A threshold question affecting this claim is whether Clayton has in fact appeared at hospitals or clinics within that radius. The factual basis for defendants' assertion rests solely on the affidavit of Mrs. Diaz, who does not suggest that she has first-hand knowledge of these asserted facts. This leads us to a brief consideration of the appropriateness of relying on hearsay testimony that would be inadmissible on summary judgment or at trial.

There is a body of decisional law suggesting that on a preliminary injunction motion a court may, in its discretion, consider otherwise inadmissible hearsay evidence. See, e.g., Federal Savings & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 558 (5th Cir. 1987)(citing 11 C. Wright & A. Miller, Federal Practice and Procedure § 2949 at 471); Prince of Peace Enterprises, Inc. v. Top Quality Food Market LLC, 2007 WL 704171, *5 n.5 (S.D.N.Y. March 7, 2007)(quoting SEC v. Prater, 289 F. Supp. 2d 39, 50 (D. Conn. 2003))(internal citations omitted). The stated justification for

───────────────

e.g., Reply Aff. ¶¶ 14-15), which we also discuss at pages 51-57, infra. In any event, this version of defendants' contractual interpretation is implicit in their arguments, both written and oral.

allowing some informality in this respect "is that [a preliminary injunction hearing] is used when quick action is necessary to prevent irreparable harm." Dixon, 835 F.2d at 558. Accord Zeneca Inc. v. Eli Lilly and Co., 1999 WL 509471, at *2 (S.D.N.Y. Jul. 19, 1999); American Angus Ass'n v. Sysco Corp., 829 F. Supp. 807, 816 (W.D.N.C. 1992). Thus, the Fifth Circuit quoted Wright & Miller to the following effect:

> [I]nasmuch as the grant of [a] preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be held . . . .

Dixon, 835 F.2d at 558. Consistent with this rationale for giving the trial court some discretion in the matter, courts frequently decline to rely on hearsay evidence, particularly in the absence of a showing that the need for expedition compelled the moving party to rely on evidence that is technically hearsay or that the evidence, even if hearsay, is reasonably reliable. See, e.g., Cedar Swamp Holdings, Inc. v. Zaman, 472 F. Supp. 2d 591, 595 (S.D.N.Y. 2007)(absence of affidavits from persons with personal knowledge); see also Experience Hendrix, LLC v. Chalpin, 461 F. Supp. 2d 165, 170 n.20 (S.D.N.Y. 2006)(significant question as to reliability).

In this case defendants make little effort to justify the use of hearsay through Mrs. Diaz. There was little rush in their

pursuit of a preliminary injunction. Moreover, even after having belatedly requested more than three weeks to brief their motion, they did not seek expedited discovery, which might have avoided the hearsay problems, nor have they given any indication that they sought affidavits from witnesses having personal knowledge of the events to which Mrs. Diaz testifies on a second-hand basis. Finally, even when making assertions about what others may have witnessed, Mrs. Diaz frequently does not even bother to identify her sources (e.g., Diaz Aff. ¶¶ 17, 24, 25, 31), thus underscoring the questionable reliability of her assertions.

For purposes of her assertion that Clayton Hertzoff has provided services within a three-mile radius of UOA headquarters, however, we note that Clayton does not deny that he engaged in such activities. Indeed, he mentions a June 18, 2007 incident at Metropolitan Hospital, which defendants seemed to argue at oral argument might be located within the three-mile geographical limitation specified in the non-compete provision.[20]

_____

[20] UOA is currently located at 326 Second Avenue, which would put Metropolitan Hospital, located at 1901 First Avenue, approximately five miles away.(See, e.g., Google Maps, http://maps.google.com/maps?tab=wl (search field: "from: 1901 First Avenue, New York, New York to: 326 Second Avenue, New York, New York")).

Although we do not determine definitively whether this is the case, we cannot rule out the possibility that defendants might establish a breach of the non-compete provisions in this respect. If Clayton has been selling prostheses within the proscribed area, that would seem to fall within the explicit terms of the non-compete provision. The strength of defendants' prospects on this vewrsion of their claim, however, and therefore their likelihood of success on the merits even if they satisfy the pertinent geographical requirements, remain very much in question for two reasons posited by Clayton. First, if defendants previously materially breached the employment agreement, the non-compete provision would be deemed unenforceable. See, e.g., Cornell v. T.V. Dev. Corp., 17 N.Y.2d 69, 75, 268 N.Y.S.2d 29, 34 (1966); DeCapua v. Dine-A-Mate, Inc., 292 A.D.2d 489, 491, 744 N.Y.S.2d 417, 420 (2d Dep't 2002). Second, Clayton challenges the enforceability vel non of the non-compete provision, a line of argument that, if sustained, would also effectively rebut defendants' breach claims. Both of Clayton's arguments in this regard thus reflect upon the viability each of defendants' hypothesized claims against Clayton. We therefore analyze them in full immediately below and will refer to this discussion as we address defendants' additional, albeit theoretical, breach-of-contract claims later in the analysis.

In support of the contention that defendants materially

33

breached the employment contract, Clayton states in his affidavit that they (1) failed to pay him the full amount of commissions he was due in a timely fashion, (2) denied him commissions to which he was entitled, (3) made improper reductions in his pay to account for the failure of one client to pay his bill, (4) informed Clayton that they would continue to pursue this policy, and (5) terminated or compelled the resignations of all other employees involved in the manufacture of prostheses, thus requiring Clayton to spend far more time actually doing the manufacturing and, in the process, precluding much of his work as a salesman (thereby reducing his commissions and imperiling his continued employment by UOA) and negating his contractually guaranteed position as manager of the manufacturing operation.[21] He also reports that Mr. Diaz, consistent with the forced departures of other employees, stated to him that the Diazes intended to close the company since the Diazes owned another company that was in the same business and that they had acquired UOA only to obtain its contracts with various hospitals and clinics.[22] Finally, he reports that Diaz pressured him to engage

---

[21] Clayton also mentions that the office manager was fired, leaving him additional non-sales tasks. (Hertzoff Aff. ¶ 24).

[22] At several point Clayton also points to defendants' alleged breaches of the stock purchase agreement and of the lease agreement as in effect material breaches that justified repudiation of the employment agreement. (See, e.g., Hertzoff Aff. ¶¶ 51-52 (lease agreement); ¶¶ 53-59 (stock purchase agreement)). For present purposes we do not rely on these assertions since the three contracts were executed separately and contain no terms that explicitly either merge them or make the

34

in illegal or unethical practices in dealing with the insurance carriers that paid the bills of the UOA clients.

Much of what Clayton says with regard to these matters is not specifically disputed by defendants, at least by anyone with personal knowledge of the facts. Instead, defendants seem to summarily argue that none of these activities constituted a material breach. They also argue that his complaint about the failure to pay all of his compensation is premature since some of the payments were not due until June 30, 2007. (Reply Aff. ¶ 29).

As to Clayton's first two allegations -- regarding delayed payment of commissions or their partial non-payment in late 2006 or early 2007 -- we conclude that even if these failures occurred, they do not on this record amount to material breaches of the contract, nor do they seem to have been treated as such by Clayton. For instance, it appears that defendants failed to make timely payment of plaintiff's commissions due at the end of 2006, though apparently they eventually paid it. (Hertzoff Aff. ¶¶ 32-34). This alone cannot properly be deemed a material breach, and in any event Clayton did not treat it as one, choosing instead to continue working at UOA. Similarly, although he alleges that UOA did not pay

---

validity of the employment agreement dependent on defendants' compliance with the two others agreements.

him for certain sales on the ground that he had not originated the accounts (id. ¶ 31), he does not indicate that he terminated his relationship with the company in the wake of this dispute.

Defendants' default with respect to an allegedly improper deduction applied to a subsequent payment, in the Spring of 2007, is a more serious matter and warrants discussion of the factual context of that default in order to determine its potential materiality. Clayton arranged for a prosthesis for a veteran named Isaiah Johnson, but did not insist on prior payment by Mr. Johnson despite the fact that his insurance carrier would not pay UOA directly. Clayton nevertheless made the judgment that Mr. Johnson would transmit the insurance payment to UOA and supplied him with the prosthesis. Mr. Diaz subsequently confronted Clayton because Johnson had not paid, and as a result defendants ultimately deducted $4,163.26 from Clayton's first-quarter 2007 earned commissions -- more than half of what he was due (id. ¶¶ 35-45 & Ex. 1) -- and further indicated that this was going to continue to be the "general policy" at UOA. (Id. ¶ 46 & Ex. 1).

As Clayton properly notes, this deduction from earned compensation was not authorized by any provision of the employment

contract,[23] and also appears to violate the provisions of section 193 of the New York Labor Law, which limits the deductions that an employer may take from an employee's salary. Specifically, this section allows only deductions that

> a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or
>
> b. are expressly authorized in writing by the employee and are for the benefit of the employee; provided that such authorization is kept on file on the employer's premises. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues and assessments to a labor organization, and similar payments for the benefit of the employee.

N.Y. Labor Law § 193(1)(a) & (b). Since the deduction at issue was from Clayton's earned sales commissions -- which constitutes "wages" under the statute, see, e.g., Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 265 (2d Cir. 1999)(quoting N.Y. Labor Law § 190(1); Gennes v. Yellow Book of New York, Inc., 23 A.D.3d 520, 521, 806 N.Y.S.2d 646, 647 (2d Dep't 2005); cf. Truelove v. North Capital & Advisory, Inc., 95 N.Y.2d 220, 224, 715 N.Y.S.2d 366, 368 (2000); Hudacs v. Frito-Lay, Inc., 90 N.Y.2d 342, 349, 660 N.Y.S.2d 700, 703-04 (1997) -- it appears that defendants were in violation

---

[23] The contract refers repeatedly to customary deductions from payroll, plainly a reference to such matters as social security deductions.

of section 193, <u>see</u>, <u>e.g.</u>, <u>Edlitz v. Nipkow & Kobelt, Inc.</u>, 264 A.D.2d 437, 437, 694 N.Y.S.2d 439, 440 (2d Dep't 1999), and furthermore that their violation constituted a criminal offense under section 198. <u>See</u> <u>P & L Group, Inc. V. Garfinkel</u>, 150 A.D.2d 663, 664, 541 N.Y.S.2d 535, 537 (2d Dep't 1989). Moreover, both that deduction and the Diazes' stated intention to continue to engage in such shortchanging of Clayton could fairly be deemed to represent a repudiation of the employment agreement and a material breach of it.

As a fallback position, defendants assert that even if this non-payment was a material breach, Clayton failed to repudiate the employment contract by notifying his employer that he was departing. There is no question that, when faced with a material breach, a contracting party who wishes to treat the contract as terminated and seek damages based on breach must notify the breaching party of his position rather than continue to accept the benefits of the contractual relationship. See, e.g., Albany Medical College v. Lobel, 296 A.D.2d 701, 702-03, 745 N.Y.S.2d 250, 252 (3d Dep't 2002). That said, a trier of fact could well find that Clayton sufficiently communicated his position when he and his parents, through their attorney, served and filed an amended complaint on June 8, 2007 in which he asserted that he had been constructively discharged by UOA. He never went back to UOA and in

38

fact began work for New England ten days later, and hence a trier of fact could deem him to have given the requisite notice.

Clayton's other assertions of material breach by the Diazes add additional uncertainty to the prospects for defendants' hypothesized counterclaim against him based on his alleged sales activity within three miles of UOA. The firing of all other prosthetics technicians at UOA (not contradicted by defendants) and Mr. Diaz's alleged statement (not denied by him on the current record) that he and his wife intended to shut down the company could be viewed as either a breach of the ten-year employment agreement or a violation of the implied covenant of good faith and fair dealing incorporated in all contracts by New York law. See, e.g., P.T. & L. Contracting Corp. v. Trataros Const., Inc., 29 A.D.3d 763, 763-64, 816 N.Y.S.2d 508, 509 (2d Dep't 2006). While the employment contract left some discretion to the CEO as to Clayton's duties and did not explicitly preclude defendants from laying off other workers, it could fairly be argued that the employment agreement gave Clayton certain legitimate expectations both as to his role and as to his ability to meet the sales requirements on which his continued employment depended under the contract.

As noted, despite leaving the details of Clayton's duties to

higher management, the agreement specified that he would serve as the supervisor of the Orthotics and Prosthetics Shop -- that is, the manufacturing operation -- and if, by pushing out all of the technicians, the defendants changed this aspect of his role to that merely of a technician himself, a trier of fact might well see this as a material change in his responsibilities and one undertaken in bad faith since it was done so soon after the Diaz's took over the company as to suggest that they had never intended to run a bona fide operation in which he would have such a supervisory role, a suspicion further supported by Mr. Diaz's alleged statement about their intention in purchasing UOA. See, e.g., Rudman v. Cowles Communications, Inc., 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 40 (1972); Lynch v. Pharm. Discovery Corp., 208 A.D.2d 906, 906, 617 N.Y.S.2d 883, 884 (2d Dep't 1994)(citations omitted).

In addition, according to Clayton, by forcing him to spend a large amount of his time manufacturing prostheses, defendants substantially cut into his ability to engage in his contractually guaranteed role as a prosthetist, that is, performing the measuring, fitting and selling of prostheses -- the activity that earned him potentially significant commissions under the employment agreement. That restriction had two potentially serious consequences. First, as he states, it limited his ability to earn the contemplated commissions. Second, the employment agreement

required that he generate at least $600,000.00 in collected sales revenue each year or face either termination or a negotiated reduction in his salary. (Am. Compl. Ex. C, § 3(a)(ii)). Any conduct by defendants that seriously impaired both his ability to earn commissions and his employment status under the agreement necessarily raises a question of good faith and fair dealing. Moreover, if this conduct by the Diazes was a product of a preconceived plan to cut the agreement short -- an intention presumably not disclosed during contract negotiations -- the case for a breach of the covenant by defendants becomes that much more powerful.

As an alternative basis for finding that defendants materially breached the employment agreement, Clayton cites the efforts by Mr. Diaz to have him seek earlier insurance payments to the company by falsely representing to the carriers that the patients' prostheses had been delivered and by asking him to use improper coding of the product delivered so as to obtain a higher rate of reimbursement from the carrier. These assertions are not notably contradicted on the record. Whether they amount to a material breach of the agreement -- despite the fact that Clayton apparently felt free to reject these demands -- is a matter that we need not address at this stage. As noted, the previously described alleged breaches by defendants -- including the asserted interference with plaintiff's

job status and position, the Diazes' refusal pay the plaintiff all his wages, the threat to continue to take illegal deductions, and their representation that they intended to close down the company -- are plainly material to the contract, and suffice to put into serious question whether defendants breached the employment agreement, thereby undercutting the likely viability of their theorized contract-breach claims against Clayton.

Defendants' claim that Clayton breached the non-compete provision is also subject to question based on his challenge to the enforceability of that provision under New York law. In substance, Clayton asserts that the non-compete provision did not protect a legitimate interest of the employer since he was not in possession of any unique information or skills that could be used by a competitor to injure UOA.

In basic terms, under New York law a restrictive covenant is deemed reasonable, and hence enforceable, "only if [the restraint]: (1) is *no greater* than is required for the protection of the *legitimate* interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854, 856-57 (1999)(citations omitted)(emphasis in original). To sustain such a covenant, the court must find all three elements satisfied.

Id. at 389, 690 N.Y.S.2d at 857. In the context of an employer-employee restrictive covenant, the New York Court of Appeals has limited an employer's "legitimate" interests "to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." Id. at 389, 690 N.Y.S.2d at 857 (quoting Reed, Roberts Assocs. v. Strauman, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679 (1976)).[24]

In this case, although the employment agreement recites that certain documents held by UOA were deemed to be confidential, Clayton Hertzoff argues that in fact the non-compete agreement did not protect any of the recognized legitimate interests of the company because he was not in a position to utilize any corporate trade secrets or confidential customer lists, and he performed services that were plainly not "unique or extraordinary." (Defs.' Mem. 9-12).

Defendants disagree and insist that the restrictive covenant protects their legitimate interests, but they seem to place principal reliance on the recitals in the employment agreement and fail to specifically identify any confidential information or trade

---

[24] The New York courts give more breadth to such interests in assessing non-compete agreements between professionals. See BDO Seidman, 93 N.Y.2d at 389, 690 N.Y.S.2d at 857 (citing cases).

secrets, and, further, how such information was used by plaintiff to solicit UOA clients. We conclude that statements in the contract reciting that these interests are legitimate are not dispositive in this context. See, e.g., Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc., 323 F. Supp. 2d 525, 536-37 (S.D.N.Y. 2004)("Courts applying New York Law with respect to non-compete provisions will not presuppose that employees possess trade secrets or confidential information.")(quoting SG Cowen Sec. Corp v. Messih, 2000 WL 3228, at *5 (S.D.N.Y. May 17, 2000)). See also H. Meer Dental Supply Co. v. Commisso, 269 A.D.2d 662, 664, 702 N.Y.2d 463, 465 (3d Dep't 2000)("[I]t is incumbent upon [movant] to demonstrate that its customers are not known in the trade and are discoverable only by extraordinary efforts.")(internal quotation marks and citations omitted). Indeed, were it otherwise, an employer could avoid any scrutiny of its restrictive covenants by simply including such recitals in all of their employment contracts. That would of course eviscerate the legal principle recognized by the New York courts that restrictive covenants are to be enforced only to the extent that they demonstrably and narrowly serve appropriate employer interests without unduly burdening the employee or harming the public interest. See, e.g., Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 48 N.Y.2d 84, 86, 421 N.Y.S.2d 847, 848 (1979).[25]

---

[25] New York courts recognize a narrow exception to the normal "reasonableness" test for restrictive covenants. Known as the employee-choice doctrine, it applies only "if the employee [was]

In this case, an assessment of the employer's interest in preventing a prosthetist from working for a competitor requires a consideration of how an orthotic and prosthetic company ordinarily acquires business. In this regard, we note that the movants' showing is skeletal at best, being largely confined to conclusory assertions that Clayton Hertzoff is in a position to steal the company's business on behalf of his new employer. For specifics, we must look to the affidavit testimony of Clayton Hertzoff and of Ronald Manganiello, the managing partner of New England, as well as to the corroborative findings of a New York state judge in a similar case decided four years ago, and several admissions made by defendants' counsel during oral argument in this case.

---

afforded the choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture)." Lucente v. International Bus. Machs. Corp., 310 F.3d 243, 254 (2d Cir. 2002); Tasciyan v. Marsh USA, Inc., 2007 WL 950091, at * 3 (S.D.N.Y. March 28, 2007). This rule is not mentioned by either side, and appears inapplicable in any event. As recently summarized, it is unavailable unless the employer demonstrates that it is willing to rehire the employee, and it is unavailable if the employee was involuntarily terminated or if that question is likely not susceptible to summary judgment. See Tasciyan, 2007 WL 950091, at *3 (citations omitted). At the least, there is no indication that UOA is willing to take Clayton back; indeed, the evidence suggests that the company was probably interested in getting rid of him and his employment contract if possible. Also, for reasons noted, there is evidence sufficient at present to suggest that his claim of constructive discharge is subject to triable dispute.  Finally, there is no indication here of any choice given Clayton to preserve the types of benefits that the courts look to in applying this doctrine. See, e.g., id. & 3 n.14 (citing Int'l Bus. Machs. Corp. v. Martson, 37 F. Supp. 2d 613, 619 (S.D.N.Y. 1999))(referring to profit-sharing and stock-option award).

In substance, the evidence of record and further explanations provided at oral argument indicate that prosthetic and orthotic companies acquire access to potential business by entering into contracts with health care institutions that treat orthopedic injuries, notably hospitals and clinics, all of which are likely to be well known in the trade. As explained, the contracts do not guarantee any referrals of patients, but rather allow the prosthetic company to send a licensed prosthetist to the premises of the hospital or clinic, where he will make himself available on any given day. Because the hospitals and clinics contract with numerous prosthetic companies, at any one time there are likely to be a number of such practitioners on site. If a doctor at the hospital or clinic has a patient who needs a prosthetic or orthotic device, he will choose one from among the prosthetists on site to deal with a given patient who has such a need. There is apparently no required procedure for how the doctor (or other referring person) chooses a given prosthetist from among the ones on site on a given day to see a specific patient, and it appears that doctors commonly use a rotation system so that all prosthetists on site at any given time have a roughly equal opportunity to be referred to a patient. (See Hertzoff Aff. ¶ 75; Manganiello Decl. ¶ 5).

In short, the requirements for a prosthetist to be admitted to the institution and thus to be available for such referrals to

patients are two-fold. The company for which he works must have a contractual relationship with the institution, thus permitting access, and he must be licensed.[26] As defendants' counsel represented at oral argument, if the prosthetist, though licensed, appears at a hospital or clinic with which his company does not have a contractual relationship, he will be asked to leave and will not be included in the pool of prosthetists waiting to be referred to a patient.

Once the prosthetist is referred to a patient, he or she will do a series of measurements for the prosthesis in question, and will communicate the measurements to the technicians in charge of manufacturing the prostheses for the company. When a prosthesis has been prepared, the practitioner will meet the patient once again for fitting and determine whether the prothesis is properly fitted or needs adjustments. This process may require several visits with the patient -- presumably at the hospital or clinic since the physician in charge is responsible for the end product -- but once the prosthesis has been successfully fitted, that is presumably the end of the company's involvement with the patient. (Hertzoff Aff.

---

[26] In fact, in Clayton's version of the events of June 18, 2007, when he was present for New England at Metropolitan Hospital, several UOA representatives came to the hospital but were asked by hospital personnel to leave the premises because they were not licensed practitioners. (Hertzoff Aff. ¶ 79).

¶¶ 74-76).[27]

As for payment, that is apparently typically made by the patient's insurance carrier to the company. If the patient is uninsured, however, we infer that he will be billed for the prosthesis unless a government program covers the product. (Hertzoff Aff. ¶ 38).

What this evidence strongly suggests is that Clayton was not in a position, by virtue of his switch to New England, to infringe any of the legitimate interests of his prior employer. There is no evidence that the identities of the hospitals and clinics in the metropolitan area that have a need for available prosthetists are kept secret or are unknown to the trade. (See, e.g., Manganiello Decl. ¶ 4; Hertzoff Aff. ¶ 75). Thus we have no reason to infer that Clayton would have been able to identify to New England any institutions previously unknown to that rather large corporation from which it might seek a contract authorizing access. Moreover, as noted, access to patients is provided by personnel at the clinic or hospital, and is given only to prosthetists from companies that have a contractual relationship with the institution. Thus, when working for New England Clayton could not gain access by himself to institutions -- if any existed -- that did not have the requisite

---

[27] This process was further described during oral argument.

contractual relationship with New England,[28] and hence he could not freely access patients at such places who might otherwise have received services from UOA.

As for the identity of UOA patients, this too has not been shown to constitute a trade secret or otherwise commercially sensitive information since Clayton's knowledge of patients previously served by UOA would not seem to give him an advantage. The record reflects that access to patients comes from the hospital and clinic doctors rather than from direct contacts by the prosthetic company with the patient. Moreover, even if Clayton did keep former UOA patients' names and addresses, there is no evidence in the record suggesting that any patients would come back to UOA (or to Clayton) after they had received properly fitted prostheses. We assume that in virtually all cases a patient, once equipped, would have no further use for a prosthesis supplier, and even if he did, he would be put in contact with one through the medical institution that treated him. In short, there is no evidence that Clayton was in possession of proprietary information or trade secrets when he left UOA that could be used to deprive UOA of business opportunities.

---

[28] Indeed, defendants' counsel conceded as much at oral argument.

Finally, Clayton's employment contract makes generic reference to business plans, financial data and similar materials. While there is evidence that Clayton possessed and had access to some patient account records after he began his employment with New England, which included financial information associated with those accounts, defendants do not specify, much less provide evidence regarding, how he used, or could have used, these records to damage UOA.[29] (See Reply Aff. ¶¶ 6-10). In fact, competent and uncontradicted evidence in the record reflects that he did not so use this data or access or use other data that would fall within the prohibitory language of the non-compete provision.[30] (Hertzoff Aff. ¶¶ 77-78; Manganiello Decl. ¶ 3).

Under these circumstances, and in the absence of any specific evidence by the movants documenting a contrary factual scenario or some evidence that their legitimately protected interests are imperilled, plaintiff's challenge to the legitimacy of the non-

---

[29] Clayton admits that he was in possession of some patient records -- apparently billing records -- when he left UOA. The potential sensitivity of those records, however, would seem to be related to the confidential nature of patients' treatment information, rather than disclosure of UOA's proprietary content or trade secrets. In any event, Clayton swears that he made no use of these records, and there is no meaningful evidence to the contrary in the record.

[30] Mrs. Diaz does not attempt to specify how Clayton could have used the materials to harm UOA, stating only that she "ha[s] no idea what damage Clayton Hertzoff has done to UOA with [those] materials." (Reply Aff. ¶ 10).

compete provision appears strong, and further undermines the prospects for success of defendants' breach claims against him.

In sum, we conclude that, despite Clayton's admitted employment by a rival company since June 18, 2007, and his service as a prosthetist for that company within what could potentially be determined to be a three-mile radius of UOA's headquarters, defendants have not demonstrated a likelihood of success on the merits. Given all the various potential defenses that we have reviewed that would apply to any claim of breach against Clayton as to the non-compete provision, including defendants' alleged breaches of the contract and the potential unenforceability of the non-compete provision, defendants have, at the very most, demonstrated serious issues going to merits of their hypothesized claim.

3. Defendants next argue that Clayton Hertzoff breached the non-compete provision and otherwise engaged in improper conduct because he appeared on June 18, 2007 at the Metropolitan Hospital clinic and saw patients who were scheduled to see other prosthetists working for UOA. Mrs. Diaz appears to say that UOA was prepared to service those clients, and that by somehow interfering with those appointments, Clayton stole the business from UOA.

This claim turns on hearsay testimony by Mrs. Diaz, who apparently was not present, and relies on unnamed UOA personnel whom she initially identifies as "UOA practitioners" who were scheduled to treat these patients. (Diaz Aff. ¶ 17, 25). Clayton, who was unquestionably there, presents a starkly different picture. He reports that he was at Metropolitan Hospital waiting for possible referrals when three individuals from UOA -- including Mrs. Diaz's son -- appeared and caused a disturbance by questioning patients present at the clinic. According to Clayton, hospital personnel intervened and, on learning that none of the three was a licensed prosthetist, ejected them from the hospital. As he also points out, he could not have stolen "UOA" clients because it was up to the doctors at the hospital to select a qualified prosthetist to deal with any patient in need of a prosthesis. (Hertzoff Aff. ¶ 76).

Curiously, in Mrs. Diaz's reply affidavit, she appears to backtrack somewhat from her prior account. Thus she no longer says that UOA practitioners were at the hospital only for scheduled appointments to treat patients. Rather, she also claims that she sent these "other employees" -- not clearly "UOA practitioners" -- to the hospital to find out what Clayton was doing. (Reply Aff. ¶¶ 13-15).

Although movants do not identify the precise nature of their potential claims arising from this series of events, we infer that they might assert a claim of unfair competition by misappropriation or interference with a business opportunity (see Reply Aff. ¶ 19), in addition to another claim for breach of the non-compete provision in the employment agreement.[31] Several of these claims have no prospects for success and the outlook for the remaining one is questionable at best.

First, any tort claims, whether for misappropriation or tortious interference, cannot be deemed to have any prospect for success on the current record. We view Mrs. Diaz's hearsay testimony about what occurred at the hospital as too unreliable to take into consideration and the balance of her testimony about the incident, insofar as contrary to Clayton's version, as unworthy of belief. In short, there is no credible evidence to support either variety of tort theory.

Second, apart from the problems with Mrs. Diaz's testimony on this point, to the extent that defendants may be contending that Clayton's behavior in looking for business at Metropolitan Hospital

---

[31] This claim for breach would presumably be premised on the non-compete's language prohibiting use of proprietary information, such as referral sources and patient names, rather than the geographical limitation already addressed above.

-- which he plainly did on June 18 -- violated the non-compete provision, there is a potentially colorable basis for such a claim since Clayton may have been referred to patients there that day and both UOA and New England had access contracts with that hospital.

This series of events, however, stands on the same footing as defendants' preceding complaint, which attacks Clayton for doing prosthesis business post-June 18 for New England within the three-mile radius of UOA. For reasons we have noted, however, there is significant evidence on the current record suggesting that defendants materially breached the employment contract and that the non-compete provision was therefore unenforceable based on Clayton's treatment of the agreement as repudiated by defendants through his assertion of the constructive-discharge claim on June 8, 2007. Similarly, there is a strong basis to infer that, breaches aside, the restrictive covenant will not be enforceable under New York law. Finally, it appears, as we have noted, that Metropolitan Hospital is outside the contractually defined three-mile radius from UOA. Consequently, we conclude that movants have not shown a likelihood of success on a breach claim premised on the alleged contacts by Clayton with Metropolitan Hospital patients on June 18, 2007. Rather, we view their showing as reflecting, if barely, serious issues going to the merits of such a claim.

54

4-6. Defendants accuse Clayton of a number of other misdeeds, although their accusations are entirely conclusory and seem to rest on pure speculation. Thus they suggest that Clayton has been trying to persuade clients of UOA to switch to New England, that he was possibly using confidential information from the company to give New England access to institutions to which it had no prior access, that he was denigrating the quality of UOA's services to hospitals and clinics, and that he was falsely telling either insurance carriers or suppliers that UOA was closed or closing.

These assertions are made by Mrs. Diaz, who plainly has no first-hand knowledge of any such activities. Moreover, she offers no specifics whatever, much less identifies the specific sources of her information.[32] Given this lack of any demonstrated basis for the allegations, as well as the denials by both Clayton Hertzoff and his current employer, we do not rely on Mrs. Diaz's hearsay assertions.

---

[32] Indeed, the only evidence that she invokes -- for her allegation that Clayton was telling insurance carriers that UOA was out of business -- is a notice from one carrier, dated July 3, 2007 from an entity known as Ingenix advising UOA that it was going to be doing a "claim and medical review" on behalf of one health plan. (Diaz Aff. ¶ 53 & Ex. 9). There is no indication in the record that the health plan believed that UOA was defunct or that this review was triggered by anything said by Clayton Hertzoff or that such a review was anything but routine in this business.

In short, we see neither a likelihood of success nor serious issues going to the merits of these allegations or any claims that could be derived therefrom.

7. In defendants' last round of papers they cite the fact that in or around April 10, 2007 Clayton downloaded a set of documents from UOA that reflected the identities of clients treated within the past few months.[33] They report that they learned of this fact only on July 19, 2007, when plaintiffs' counsel returned the documents to their attorney and represented that Clayton had neither retained copies nor used the documents to interfere with UOA's business. (Reply Aff. ¶¶ 6-7). Defendants suggest that this set of events reflects an intention by Clayton to violate the employment agreement, possibly by retaining the identities of UOA clients, and that his conduct in any event violated a contractual ban on taking corporate documents from its premises for reasons other than work. (Id. at ¶¶ 8-10).

Clayton's explanation through his attorney at oral argument is that these documents are billing records and relate only to the patients with whom he had dealt through the years at UOA. His attorney also represents that he downloaded the documents only to

---

[33] See pages 49-50, supra, for a discussion of whether protection of these account records could be considered a legitimate interest of UOA.

keep a record of his work for purposes of confirming whether he was being properly compensated by defendants at a time when he had already encountered problems with what they were paying him.

We have reviewed these documents <u>in</u> <u>camera</u> and confirmed that they accord with Clayton's description. Moreover, the timing of the download accords with his explanation. He was in dispute with defendants about his commissions and thus presumably had reason to want a record of what revenues he had generated during his employment by them. Moreover, insofar as the download covered work done by him prior to the sale of the company, that is consistent with the fact that he was apparently also in dispute at some point with the Diazes concerning whether he was entitled to commissions for certain older accounts that they claimed he had not originated. In such a case historical billing information for his work could well prove relevant.

As for defendants' alternative theory -- that Clayton was intent on stealing business from UOA -- since there is no evidence that Clayton was involved with another company or contemplating leaving as of April 10, their hypothesis seems less than compelling. Accordingly, to the extent that defendants might be seeking injunctive relief based on a claim of a contractual breach in this final regard, their argument at best presents serious

issues going to the merits and not a probability of success.[34]


D. <u>Irreparable Harm</u>


<u>        </u>To obtain a preliminary injunction under either of the two operative tests in this circuit, the movant must demonstrate that the failure to provide the requested relief will cause her irreparable harm. More specifically, she must show that she "will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" <u>Grand River Enter. Six Nations Ltd</u>, 481 F.3d at 66 (quoting <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112, 114 (2d Cir. 2005)). Moreover, our circuit court has frequently reiterated that "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." <u>Id.</u> at 66-67 (quoting <u>Freedom Holdings</u>, 408 F.3d at 114).[35] If "there is an adequate remedy at law, such as

_____

        [34] Defendants do not articulate a clear legal theory with respect to this matter and offer no analysis of irreparable harm flowing from the downloading of the billing records, as we discuss below.

        [35] The Court has also said that because of the essential role of the irreparable-harm element, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." <u>Grand River Enter. Six Nations Ltd.</u>, 481 F.3d at 66-67. For analytical coherence and in the interest of providing a comprehensive report, we have not followed this route even though, for reasons to be noted, we conclude that defendants have

an award of money damages, injunctions are unavailable except in extraordinary circumstances." Moore, 409 F.3d at 510 (citing cases).

We start with the movants' complaint of wrongdoing by Clayton Hertzoff in seeing some patients at Metropolitan Hospital on June 18, 2007, his first day of work for New England. In substance defendants' argument is premised on the alleged fact that when Clayton saw these patients he did so as an employee of New England and hence took these accounts from UOA. Although defendants offer no specific evidence for this assertion, nor do they allude to whether, as UOA patients, the insurance payments would be sent to that company or to New England, we assume for present purposes that payment went to Clayton's new employer.

Defendants focus on a specific set of patients for whom certain services were allegedly rendered by Clayton and for which payment should have gone to UOA. This would seem to indicate that UOA would have an adequate remedy at law, and that the damage to its business would be susceptible to a reasonable calculation. For instance, if defendants prevail on the claim that Clayton stole these patients using proprietary information, and that such use violated an enforceable provision of the employment agreement, and

_____

not adequately demonstrated actual or imminent irreparable harm.

if New England actually received the payment for treating them, UOA would have a valid basis for reimbursement from New England on several legal theories. Moreover, the amount of the loss would plainly be measurable. In short, a damage award in the amount to which UOA would have been entitled for servicing these patients would be a complete and adequate remedy, and there are no unique or extraordinary circumstances that would justify entry of injunctive relief on such a claim.

As for the other theories of injury pressed by defendants, they make little if any effort to demonstrate that they are in fact faced by imminent or actual irreparable harm. Principally, they argue, based on the recitals in the employment agreement, that plaintiff's asserted violation of the non-compete provision poses a threat to the viability of their business. A company's "loss of a current of future market share," see, e.g., Grand River Enter. Six Nations Ltd., 481 F.3d at 67, or a "threat to the continued existence of a business," see, e.g., Nemer Jeep-Eagle v. Jeep Eagle Sales Corp., 992 F.2d 430, 435 (2d Cir. 1993), may constitute irreparable injury, but the movant must make "a clear showing," Cedar Swamp Holdings, 472 F. Supp. 2d at 595 (quoting Triebwasser v. American Tel. & Tel. Co., 535 F.2d 1356, 1359 (2d Cir. 1976)), to justify a finding by the court that there is at least a likelihood of actual or imminent harm. See, e.g., Grand River

60

Enter. Six Nations Ltd., 481 F.3d at 67. In this case, movants
offer no concrete evidence to suggest the likelihood, much less the
imminence, of such harm. Cf., e.g., Nemer Jeep-Eagle, 992 F.2d at
436 (movant offered concrete evidence of near-term business injury
and likelihood of unmeasurable further losses).

As we have noted, the record evidence indicates that
prosthetics companies have access by contract to the medical
institutions that provide orthopedic services, and that their
prosthetists are given only the opportunity thereby to make
themselves available on-site to await referrals to patients by
hospital or clinic personnel. The record is bare of any evidence
that the presence of Clayton Hertzoff at any given hospital or
clinic as a representative of New England will have any noticeable
impact on the volume of business of UOA. For aught it appears, he
will simply wait, along with many other prosthetic practitioners --
presumably including one or more from UOA in institutions with
which both New England and UOA have contracts -- for the doctors or
other personnel to assign one such practitioner to a patient in
need of his services.

In this regard it bears noting that in a very similar case,
Justice Charles Ramos, of the New York State Supreme Court, denied
an application for a preliminary injunction against a prosthetist

61

who had switched from his employer to a competitor company and
continued to solicit work at the same hospital as before, in
defiance of a one-year restrictive covenant. As here, there was no
indication that the disloyal employee had enabled his new employer
to gain entry to a facility from which it had previously been
barred, and the court found a lack of irreparable harm as well as
an absence of a sufficient basis to enforce the restrictive
covenant, and hence he denied the preliminary injunction motion.
(See East Coast Orthtic & Prosthetic Corp. v. Allen, Index No.
601293/03, Order at 1-4 (Sup. Ct. N.Y. Cty. July 23, 2003)(copy
annexed to Pls.' Mem. at Ex. A).

Similarly, Clayton's work for his new employer, a well-
established prosthetic company, has not been shown to pose an
imminent threat to the market position of UOA, which, by Mrs.
Diaz's own testimony, has contractual access to numerous hospitals
and clinics and has prosthetists to send to those institutions.
Moreover, the existence of the non-compete provision -- which, as
we have noted, has not been shown to protect a legitimate employer
interest -- does not change that conclusion.

Finally, plaintiff's downloading of billing records for his
own prior patients more than two months before he left UOA does not
indicate irreparable harm. Apart from the fact that he has returned

these records and assertedly not retained a copy, movants fail to demonstrate how he could use such records to injure UOA, much less offer any evidence that he has sought to do so.

Preliminary injunctive relief may not be premised on "remote or speculative" harm. <u>Kamerling v. Massanari</u>, 295 F.3d 206, 214 (2d cir. 2002). That is all that movants proffer on this motion.

E. <u>Balance of Hardships</u>

Given the foregoing analysis, we also find, not surprisingly, that movants fail to demonstrate that the balance of hardships tips decidedly in their favor, as required to warrant a preliminary injunction based on claims for which they show only serious issues going to the merits. Indeed, this conclusion follows from their failure to demonstrate any irreparable harm. In contrast, they seek an injunction that would bar Clayton Hertzoff from working at all for New England, an employment situation where he already earns less, and with fewer benefits, than he did when he was with UOA. (Hertzoff Aff. ¶ 71). Instead, defendants suggest that he might find work with a company that is not located in Manhattan (or within three miles of UOA) and that does not send its prosthetic practitioners to work at any medical institution within the same three-mile radius. While it is a matter of speculation whether

63

Clayton could readily find a comparable position elsewhere, the loss of his current employment and the need to look elsewhere geographically for work can scarcely be said to be a trivial burden,[36] and the harm from such a restriction cannot fairly be said to be substantially outweighed by the speculative injuries posited by defendants.

F. <u>Other Equities</u>

_____Finally, we reiterate that the injunction sought by defendants would have at least some adverse impact on a non-party, Clayton's employer New England. We do not believe that the impact would be substantial, since New England's managing partner, Mr. Manganiello, offers his belief that New England could readily replace Clayton. Nonetheless, since defendants have declined to join New England as party to this lawsuit or even to assert any claims concerning which it might intervene, it still bears mention that the relief they seek could impose a burden of some unknown degree on an entity that cannot at present directly oppose their motion. This too is a consideration, albeit a minor one, counseling in favor of denying

_____

[36] Indeed, he notes that the signing of the employment agreement was, from his perspective, an essential element of the transaction in which he and his parents surrendered control of their company without any up-front payment, and it was particularly important for him as he had a family to support and had worked his entire adult life at that company. (Hertzoff Aff. ¶ 11).

64

the defendants' preliminary injunction motion.


CONCLUSION


      For the reasons noted, we recommend that defendants' motion for a preliminary injunction be denied.


      Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Colleen McMahon, Room 640, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**Dated: New York, New York**
**August 13, 2007**

_____

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed today to:

George R. Hinckley, Jr.
Traiger & Hinckley LLP
880 Third Avenue
9th Floor
New York, New York 10022-4730

Colleen M. Tarpey, Esq.
Andrew L. Zwerling, Esq.
Garfunkel, Wild & Travis, P.C.
111 Great Neck Road
Great Neck, New York 11021