Andrew L. Zwerling (AZ-5455)
Colleen M. Tarpey (CT-7572)
GARFUNKEL, WILD & TRAVIS, P.C.
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200
Attorneys for Defendants Noreen Diaz and
United Orthopaedic Appliances Co., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BEVERLY HERTZOFF, EDWIN HERTZOFF,  :  **ANSWER TO AMENDED**
and CLAYTON HERTZOFF,              :  **COMPLAINT WITH**
                                   :  **COUNTERCLAIMS**
                  Plaintiffs,      :
                                   :  07 CV 3157 (CM)(MHD)
     -against-                     :
                                   :
NOREEN DIAZ and UNITED ORTHOPAEDIC :
APPLIANCES CO., INC.               :
                                   :
                  Defendants.      :
                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendants Noreen Diaz ("Mrs. Diaz") and United Orthopaedic Appliances Co., Inc.

("UOA") (collectively, "Defendants"), by and through their attorneys, Garfunkel, Wild & Travis,

P.C., as and for their answer to the Amended Complaint of Beverly Hertzoff, Edwin Hertzoff,

and Clayton Hertzoff ("Clayton" or "Mr. Hertzoff") (collectively, "Plaintiffs"), allege as follows:

1.      Defendants decline to answer the allegations set forth in Paragraph 1 of the

Amended Complaint insofar as the allegations set forth therein are the subject of a motion to

dismiss certain portions of the Amended Complaint, which motion is currently pending before

the Court. To the extent that the allegations in this paragraph are not subject to the motion to

dismiss and require an answer, Defendants deny those allegations. With respect to any

allegations in this paragraph regarding any agreements allegedly entered into between the

675630v.2

parties, the Defendants deny the allegations and respectfully refer the Court to the agreements referenced therein for their true terms and the legal effects thereof, if any

2.      Defendants decline to answer the allegations set forth in Paragraph 2 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations.

3.      As to the allegations set forth in Paragraph 3 of the Amended Complaint, Defendants admit the allegations.

4.      Defendants decline to answer the allegations set forth in Paragraph 4 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations, except admit that UOA is a corporation organized under the laws of the State of New York.

5.      Defendants decline to answer the allegations set forth in Paragraph 5 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer all legal conclusions to the Court.

2

6.      Defendants decline to answer the allegations set forth in Paragraph 6 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer all legal conclusions to the Court.

7.      Defendants decline to answer the allegations set forth in Paragraph 7 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations concerning UOA's formation, admit the allegations regarding the type of services offered by UOA, and deny the remaining allegations.

8.      Defendants decline to answer the allegations set forth in Paragraph 8 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations.

9.      Defendants decline to answer the allegations set forth in Paragraph 9 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before

3

the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer the Court to the Agreements referenced therein for their true terms and the legal effects thereof, if any.

10.     Defendants decline to answer the allegations set forth in Paragraph 10 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer the Court to the Agreements referenced therein for their true terms and the legal effects thereof, if any.

11.     Defendants decline to answer the allegations set forth in Paragraph 11 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer the Court to the Agreements referenced therein for their true terms and the legal effects thereof, if any.

12.     Defendants decline to answer the allegations set forth in Paragraph 12 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

13.     Defendants decline to answer the allegations set forth in Paragraph 13 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to

4

dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

14.     Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

15.     Defendants decline to answer the allegations set forth in Paragraph 15 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

16.     Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

17.     Defendants decline to answer the allegations set forth in Paragraph 17 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and otherwise respectfully refer the Court to the Agreements referenced therein for their true terms and the legal effects thereof, if any.

18.     Defendants decline to answer the allegations set forth in Paragraph 18 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to

675630v.2

dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer the Court to the demand referenced therein for their true terms and the legal effects thereof, if any.

19.    Defendants decline to answer the allegations set forth in Paragraph 19 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

20.    Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

21.    Defendants decline to answer the allegations set forth in Paragraph 21 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

22.    Defendants decline to answer the allegations set forth in Paragraph 22 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

6

23.      Defendants decline to answer the allegations set forth in Paragraph 23 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

24.      Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

25.      Defendants decline to answer the allegations set forth in Paragraph 25 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

26.      Defendants decline to answer the allegations set forth in Paragraph 26 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

27.      Defendants decline to answer the allegations set forth in Paragraph 27 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

7

675630v.2

28.     Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

29.     Defendants decline to answer the allegations set forth in Paragraph 29 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

30.     Defendants decline to answer the allegations set forth in Paragraph 30 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

31.     Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

32.     Defendants decline to answer the allegations set forth in Paragraph 32 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

33.     Defendants decline to answer the allegations set forth in Paragraph 33 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to

8

dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

34.    Defendants decline to answer the allegations set forth in Paragraph 34 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

35.    Defendants decline to answer the allegations set forth in Paragraph 35 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

36.    Defendants decline to answer the allegations set forth in Paragraph 36 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

37.    Defendants decline to answer the allegations set forth in Paragraph 37 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before

the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

38.     Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

39.     Defendants decline to answer the allegations set forth in Paragraph 39 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

40.     Defendants repeat and reallege the above paragraphs as if set forth more fully herein.

41.     Defendants decline to answer the allegations set forth in Paragraph 41 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations and respectfully refer the Court to the Lease referenced therein for its true terms and the legal effects thereof.

42.     Defendants decline to answer the allegations set forth in Paragraph 42 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before

675630v.2

the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

43.     Defendants decline to answer the allegations set forth in Paragraph 43 of the Amended Complaint insofar as the allegations set forth therein are the subject of a motion to dismiss certain portions of the Amended Complaint, which motion is currently pending before the Court. To the extent that the allegations in this paragraph are not subject to the motion to dismiss and require an answer, Defendants deny the allegations.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

44.     Plaintiffs' claims must be dismissed for failure to state a claim upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

45.     Plaintiffs' claims for breach of contract must be dismissed as a result of Plaintiffs' prior material breach.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

46.     Plaintiffs' claims are barred by the doctrines of unclean hands, waiver, and/or estoppel.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

47.     Plaintiffs' claims are barred for their failure to mitigate damages.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

48.     Plaintiffs' claims are barred because they are a result of Plaintiffs' own culpable conduct.

11

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

49.    Plaintiffs claims are barred for lack of this Court's subject matter jurisdiction.

## FACTS COMMON TO ALL COUNTERCLAIMS

Introduction

50.    Defendants in the captioned proceeding are United Orthopaedic Appliances Co., Inc. ("UOA") and Noreen Diaz ("Mrs. Diaz"), the current sole shareholder and President of UOA.

51.    The Hertzoffs -- Plaintiffs Beverly, Edwin, and Clayton (collectively referred to as "Plaintiffs" or the "Hertzoffs")-- are mother/wife, father/husband, and son respectively, and formerly owned and operated UOA as a family business for many years.

52.    Plaintiffs have engaged in a pattern of wrongful conduct that is designed to harass and annoy UOA and destroy its business reputation.  Plaintiffs' conduct, if left unchecked, will cause UOA irreparable harm.

53.    UOA has been in the business of manufacturing and selling standard and custom-built orthopedic appliances, prosthetics, and braces to customers referred to it by their physicians for approximately 100 years.

54.    In addition, UOA's prosthetists also provide services in certain hospital clinics, which clinics provide an additional source of customers for UOA.

12

55.    Most of UOA's customers' braces and prosthesis are paid for by third-party insurers, and the ability to bill those insurers for the work performed by UOA is crucial to UOA's continuation as a viable business.

56.    UOA was operated out of a building owned by the Hertzoff family at 791 Broadway, New York, New York and paid rent to the Hertzoffs. In addition to rental income, the Hertzoffs also received salaries as employees of the business and other revenue the business generated over the years.

57.    Over time, however, the Hertzoffs proved to unable to transition the company to compete in the modern healthcare environment and were forced to sell the company to Mrs. Diaz in August 2006, having accumulated significant corporate and personal debt in the attempt to remain operational. For example, upon information and belief, Beverly Hertzoff had lent the company significant sums of her own personal money, the company was in arrears on its rent to the Hertzoffs for many months as of the date of their sale of the company, and the company had other corporate debt.

58.    In addition, the Hertzoffs simply had failed to modernize UOA. Mrs. Hertzoff kept the company's books and records by hand, for example, and the company had no computer system for maintaining payroll accounts, keeping track of referral sources, or organizing and tracking inventory. Its reliance on computers was minimal.

59.    Since taking over in August, 2006, Mrs. Diaz has invested significant resources in modernizing UOA, including computerizing its systems and the processes by which it gets orders, tracks referral sources, customers, and inventory, and collects accounts receivables.

13

675630v.2

60.    Further, UOA has rid itself of employees of the former owners who were discovered to have been stealing from UOA, and otherwise properly and legitimately streamlined its staff to reduce its overhead.

61.    The Plaintiffs, on the other hand, have done all they can since the sale of UOA to strip away the value of UOA from its new owner, by interfering with its former business in Hospital clinics, disparaging UOA to insurers and patients, and by Clayton Hertzoff's blatant violation of a restrictive covenant in his employment agreement with UOA, which covenant was intended to protect UOA from the type of harm it is now suffering.

62.    Absent Court intervention to prevent and penalize Plaintiffs' conduct, Mrs. Diaz will be completely deprived of any benefit she obtained through the purchase of UOA.

<u>The Parties' Agreements Entered Into At The Sale Of UOA</u>

63.    Mrs. Diaz purchased all outstanding UOA stock on or about August 20, 2006. A copy of the Stock Purchase Agreement is fully incorporated herein and annexed hereto as Exhibit 1.

64.    Pursuant to the terms of the agreement that Mrs. Diaz entered into with the Hertzoffs, she paid nothing upon the closing of the transaction, but was obligated to cause UOA to continue to bill and collect for outstanding accounts receivables owed to UOA prior to the closing date and, by August 20, 2008, to apply the incoming A/R to certain accounts payable of the corporation.

65.    The "Net Accounts Receivable" ("A/R") that UOA is obligated to collect and apply to the accounts payable are defined by the Stock Purchase Agreement as "the accounts

14

receivable of [UOA] earned prior to and collected during the twenty-four (24) month period

immediately following the Closing Date [of August 8, 2006] less any refunds or repayments."

66.    The accounts payable to which the A/R was to be applied included: a) an HSBC

line of credit; b) a promissory note that was owed to Beverly Hertzoff personally by UOA; and

c) accrued and unpaid rent owed by UOA to its landlords, the Hertzoffs.

67.    In the event of a surplus of the A/R over accounts payable, the Hertzoffs were to

receive that surplus on August 20, 2008.

68.    In the event that the A/R was insufficient to cover all accounts payable, UOA was

obligated to make a $100,000 payment to the Hertzoffs on August 20, 2008 – the two year

anniversary of the closing.

69.    Also on August 20, 2006, Defendant UOA and Plaintiff Clayton Hertzoff entered

into a ten-year employment agreement, whereby UOA agreed to pay certain salary, bonuses, and

commissions to Clayton, in exchange for his services as a prosthetist and his ability to maintain

personal sales of orthopedic services and equipment over and above $600,000 per year. A copy

of the parties' Employment Agreement is fully incorporated herein and annexed hereto as

Exhibit 2.

70.    In addition, pursuant to the Employment Agreement, Clayton Hertzoff received

life and health insurance benefits, and certain other perquisites, such as a company car, cell

phone use, company credit account, and five weeks of paid vacation plus sick and personal days.

71.    Finally, UOA signed an Agreement of Lease with Plaintiffs, as the owners of the

premises at 791 Broadway, in which UOA agreed to pay rent to the Hertzoffs in the amount of

15

$10,000 per month. A copy of the Agreement of Lease is fully incorporated herein and annexed hereto as Exhibit 3.

72.    Pursuant to the terms of the Agreement of Lease, UOA had fifteen days to cure any default in payment of rent from the date of UOA's receipt of a default notice from the Hertzoffs.

Clayton Hertzoff's Breaches Of His Employment Agreement

73.    In early 2007, a dispute arose between the Parties regarding UOA's collection of the A/R and regarding commissions to which Clayton Hertzoff felt he was entitled.

74.    The negotiations between the parties finally broke down and Plaintiffs filed their initial complaint in this action on April 19, 2007. In the initial complaint filed in this litigation, the Hertzoffs alleged three essential claims against UOA – breach of the Asset Purchase Agreement, a claim for unpaid rent to the Hertzoff's, and a claim for unpaid commission to Clayton Hertzoff in the amount of approximately $4,000.

75.    Clayton Hertzoff, however, continued to work at UOA and to enjoy the benefits of his employment, including use of the company car and credit account and, of course, his salary and benefits.

76.    Shortly after receipt of the Complaint, UOA's legal counsel wrote to the Hertzoff's lawyer, advising him that the claim for breach of the Asset Purchase Agreement was premature and could not be asserted until August 2008, that the unpaid rent had been paid and was no longer a viable claim, and asking that he withdraw the Complaint, since the underlying

16

dispute appears to have been for only approximately $4,000 and thus did not meet the amount required to pursue the litigation in Federal Court.

77.    In response, the Hertzoffs did not withdraw the Complaint and let the parties settle their differences over the $4,000 allegedly owed to Clayton Hertzoff.

78.    Instead, Plaintiffs served an "Amended Complaint" – apparently in recognition that the original Complaint lacked merit and was not sufficient to warrant being heard in Federal court.

79.    In the Amended Complaint, dated June 8, 2007, the Hertzoffs did not withdraw their claim for alleged breach of the Asset Purchase Agreement, despite having been advised of its premature nature.

80.    Instead, Clayton Hertzoff alleges a claim for "constructive discharge," and "breach" of his Employment Agreement, making scandalous and knowingly false accusations against UOA. (The purported grounds underlying this claim were not previously a source of complaint by Clayton.)

81.    At the time of the filing of the Amended Complaint, however, Clayton Hertzoff was still working for UOA and had neither been "discharged," nor had he resigned from his post.

82.    Indeed, following the filing of the Amended Complaint, Clayton Hertzoff went on a one-week paid vacation from June 11-15, 2007. During that time, he still retained possession of the company car and credit card given to him.

17

83.    Following his week of paid vacation, Clayton simply failed to report to work on the morning of Monday, June 18, 2007.  Certainly Clayton was aware of his obligation to report to work that day.  In fact, on Sunday, June 17, 2007, UOA's general manager telephoned Clayton to remind him to report to work at UOA's new location.

84.    UOA placed several calls to Clayton's cell phone that morning, inquiring as to where he was and why he had failed to show up for work, but none of the calls were returned.

85.    Instead, Clayton appeared at a clinic at Metropolitan Hospital at which UOA provides services, told the staff at the clinic that he had been "fired" from UOA, and proceeded to see patients who were scheduled to see other UOA practitioners that day on behalf of his new employer, New England Orthotic & Prosthetic Systems, LLC ("NEO").

86.    NEO is a direct competitor of UOA with an office within only a mile and a half of the location UOA was operating out of as of June 18, 2007, the first date upon which Clayton Hertzoff is known to have worked on behalf of NEO.

87.    Amazingly, even while claiming that he had been fired by UOA, Clayton was still in possession of the vehicle leased for him by UOA, and was scheduled to see UOA patients the week that he failed to arrive at work.  Accordingly, it is plain that at no time prior to his employment with his new employer was Clayton ever "fired" by UOA.

88.    It was only after learning of these facts (and others) that UOA ultimately terminated Clayton Hertzoff's employment, for cause, by letter to him dated June 18, 2007.

89.    The June 18, 2007 termination letter reminds Mr. Hertzoff that, pursuant to the Employment Agreement, he is required to refrain from "interfering with UOA's business in any

way, including the disclosure to third parties of any proprietary information as set forth in the Agreement."

90.    Indeed, by signing the Employment Agreement, Clayton Hertzoff agreed to protect UOA's proprietary business information and not to compete with UOA, should his employment with UOA end for any reason.

91.    More specifically, the Employment Agreement states, at Paragraph 7.a. that:

> Employee acknowledges that the names of the clients and referral sources of Company, as may exist from time to time, and the financial statements, business plans, internal memoranda, reports, audits, patient surveys, employee surveys, operating policies, quality assurance materials, fees, and other such materials or records of proprietary nature of Company (collectively, the "Confidential Information") are valuable, special and unique assets of Company and are deemed to be trade secrets.

Ex. 2, ¶7.a.

92.    The Employment Agreement further states at Paragraph 7.b. that:

> Employee agrees that he will not, after the date hereof and for so long as any such Confidential Information may remain confidential, secret, or otherwise wholly or partially protectable: (i) use the Confidential Information, except in connection with his retention by Company, or (ii) divulge any such Confidential Information to any third party, unless Company gives its prior written consent to such use or divulgence.

Ex. 2, ¶7.b.

93.    Moreover, the Employment Agreement states at Paragraph 8.a. that:

> Employee shall not, either directly or indirectly, at any time during the term of his employment and for twelve (12) months following

19

the termination of this Agreement, except with the written consent of Company: (i) solicit, interfere with or endeavor to entice away from Company, any of its employees, agent, contractor, customer, or referral sources; (ii) for his own account or for the account of others, induce any customers to patronize any competing billing service provider, request or advise any customer to withdraw, curtail, or cancel such customer's relationship with Company or disclose to any other person, partnership, firm, corporation or other entity the names or addresses of any customers of Company.

Ex. 2, ¶8.a.

94.    Further, the Employment Agreement states at Paragraph 8.b. that:

Employee shall not, at any time during the term of his employment under this Agreement and for twelve (12) months after the termination of this Agreement: (i) engage in the sale of orthotics and prosthetics as an employee, independent contractor, shareholder, partner, or otherwise and whether separately or in conjunction with any other entity or individual within a three (3) mile radius of Company's location; and/or (ii) operate or have any financial or other interest in any entity involved in the business of providing orthotics and prosthetics within a three (3) mile radius of Company's location.

Ex. 2, ¶8.b.

95.    Despite these unequivocal contractual obligations, however, since his termination on June 18, 2007, Clayton Hertzoff has, as an employee of NEO, used his knowledge of the client names and referral sources of business to UOA to directly compete with UOA and has shared that Confidential Information with his new employer.

96.    Clayton Hertzoff's current employer, NEO, maintains an office at 235 East 38th Street in New York, New York, less than two miles from UOA's present location. According to NEO's website, NEO is in the business of providing "high quality orthotic and prosthetic patient care services and products."

20

675630v.2

97.    Accordingly, Clayton Hertzoff is in direct violation of the provisions of his Employment Agreement that prohibit him from working for a competitor.  Clayton Hertzoff is also in violation of the provisions of his Employment Agreement that prohibit him from using UOA's Confidential Information on behalf of any entity other than UOA and sharing it with third parties.

98.    Indeed, Clayton Hertzoff printed and took home literally hundreds of patient records belonging to UOA shortly before filing suit, which records contain the patient's insurance information, contact information, referring physician information, and history of work that UOA has performed for them.  He did not return them to UOA, through his legal counsel, for more than a month after beginning his employment with NEO and more than 3 months after taking them from UOA, and only shortly before a court appearance in this matter.

99.    The patient records were taken from UOA's offices by Clayton Hertzoff without UOA's knowledge or consent.

100.    Indeed, the account information was all printed from UOA's system in early April, just nine days prior to Plaintiff's commencement of this action, and could easily have been – and likely have been – disclosed by Clayton Hertzoff to his new employer or to any other third party with whom he sought employment.

101.    Finally, Clayton Hertzoff is in direct violation of those portions of the Employment Agreement that prohibit him from soliciting or interfering with UOA's customers and referral sources.

675630v.2

102.    In addition to his theft of patient account and contact information, and his decision to take employment with a direct competitor of UOA within the geographical scope of the restrictive covenant, Clayton Hertzoff has substantially interfered with UOA's contracts with the various hospital clinics at which it had previously been allowed to see patients and provide services.

103.    For example, Clayton Hertzoff has been observed by UOA practitioners at the clinics at Metropolitan Hospital, St. Vincent's Hospital, Woodhall Hospital, and Kings County Hospital, locations where he is only known through his work with UOA.

104.    Clearly, Clayton Hertzoff is only in contact with those UOA referral sources and is only allowed to see their patients as a result of his employment with UOA and their familiarity with him because of his employment with UOA.

105.    Instead, Clayton has interfered with UOA's relationship with the Metropolitan Hospital clinic by telling the doctors and administrators there that he had been fired from UOA, that UOA was no longer run by the same people, and that UOA could no longer be relied upon to provide quality service. As a direct result of Clayton Hertzoff's actions and statements to Metropolitan Hospital, the administrator there asked UOA to re-credential its practitioners.

106.    Further, since Clayton's departure from UOA, UOA found a facsimile addressed to Clayton Hertzoff at UOA dated May 3, 2007, from Metropolitan Hospital bearing an "Urgent" legend, advising UOA that Metropolitan Hospital required UOA to submit a "request for proposal" regarding UOA's servicing of Metropolitan's patients on or before May 29, 2007. Clayton hid this document, never showed it to UOA management, and as a result, Metropolitan may not allow UOA to continue servicing its patients.

22

107.    In addition, Montefiore Medical Center's purchasing department informed UOA that it checked its records and discovered that it has no agreement with Clayton or his new employer that allows either of them to see Montefiore patients, but that Clayton had been showing up at the clinic there and seeing patients, apparently cashing in on his previous relationship with that UOA referral source for the benefit of his new employer.

108.    Rather than get involved in the dispute between the parties, and because of statements made by Clayton about UOA and its ability to provide services, Montefiore simply chose to cancel its arrangement with UOA.

109.    Kingsbrook Jewish Medical Center and Kings County Hospital have also raised issues with UOA based upon Clayton's statement to personnel at those facilities that UOA is no longer able to provide services, thus jeopardizing UOA's relationships with these entities.

110.    As a direct result of Clayton Hertzoff's interference at hospital clinics, UOA is no longer allowed to send practitioners to St. Vincent's Catholic Medical Center or Montefiore Medical Center.  UOA is now sharing its time at St. Barnabus Hospital and NY Hospital Downtown with NEO, where it previously was not required to do so, and has been blocked from providing services at the prosthetics clinic at Metropolitan Hospital.

111.    The loss of business associated with the hospital clinics has lead to approximately a 40% decrease in UOA's overall revenue.

112.    In addition to the above, it has also come to UOA's attention, through letters received by certain insurers and conversations with those insurers that Clayton Hertzoff has been advising certain insurers that UOA has been "dissolved" and is no longer an active corporation.

23

675630v.2

113.    These insurers have since commenced audits of UOA's billings to them from August, 2006 forward, in an effort to ascertain whether they have been paying an active entity. These audits will cost UOA time and money to comply with, and Clayton's actions in this regard are clearly an "interference" with insurers with whom UOA contracts to provide services to the insurers' insureds in breach of his Employment Agreement.

The Broader Campaign By Plaintiffs To Undermine UOA

114.    The patent violations of his employment agreement by Clayton are intended to harm and have harmed the financial viability of UOA, and, if left unrestrained, will cause irreparable harm to UOA.

115.    The egregiousness of Clayton's actions take on even greater meaning, however, when viewed in conjunction with other actions of Plaintiffs that are prejudicial to UOA.

116.    These actions of Plaintiffs, whether viewed singularly or collectively, are part of a blatant attempt by Plaintiffs to re-write the deal they agreed to in August, 2006.

117.    Now that Clayton Hertzoff has discovered that he doesn't want to work for UOA under its new management, the Hertzoffs have taken an aggressive, uncompromising, and hostile attitude toward Mrs. Diaz and UOA, attempting at every turn to destroy the good will of the business with its referral sources, customers, and third party payors.

118.    By way of example, Plaintiffs have commenced this litigation, claiming breaches of the Stock Purchase Agreement that are not only utterly false, but which, even if true, are woefully premature and could not be actionable until the two-year anniversary of the Asset Purchase Agreement in August 2008.

24

119.    Despite the fact that their claims in this regard are premature and do not ripen

until September 20, 2008, Plaintiffs commenced this action for this "breach" nonetheless, and

refused to withdraw this claim after fair warning from UOA's legal counsel that the claim had

been brought too early, if it did indeed have any merit at all.

120.    Further, Plaintiffs are aware that A/R has been collected and even applied to the

HSBC line of credit.

121.    Plaintiffs' refusal to withdraw this claim is plainly intended to simply "keep the

pressure" on Defendants to renegotiate the deal, albeit unreasonably so.

122.    In addition to frivolous claims regarding alleged "breaches" of the Stock Purchase

Agreement," Clayton Hertzoff has literally made a federal case out of a $4,000 dispute with

UOA over some lost commissions.

123.    Indeed, at the same time he was receiving his base salary, his life insurance and

health benefits, paid vacation, personal and sick days, a company car, and practically every other

benefit to which he was entitled under his Employment Agreement, Clayton Hertzoff was

alleging "breach" by UOA and "constructive discharge" from his job. These allegations, while

salacious, are similarly lacking in merit. People who have been truly constructively discharged

do not thereafter take a one-week paid vacation.

124.    Instead, what is apparent is that Clayton Hertzoff and his parents dropped an

ailing and debt-ridden corporation on Mrs. Diaz, made the new UOA the uncompensated

collection agent for the old accounts receivables that the Hertzoffs had been unable to collect,

25

and had the audacity to sue when it became clear that Mrs. Diaz would not continue to run UOA in the same non-lucrative manner they had, despite UOA's fulfillment of its end of the bargain.

125.    Now, through the actions of Clayton in breach of the restrictive covenant, Plaintiffs attempt to strip the last of the value out of UOA so that Mrs. Diaz will be left with no benefit of any bargain.


## AS AND FOR A FIRST COUNTERCLAIM

126.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

127.    Defendants have ongoing business relations with many customers and many physician referral sources and third-party payors.

128.    Upon information and belief, Plaintiffs are and have been aware of Defendants' existing and prospective business relationships with several entities, including but not limited to UOA customers, referral sources, and third-party payors.

129.    Plaintiffs have interfered with Defendants' business relations with third parties by its conduct as described above.

130.    Plaintiffs have acted with the sole purpose of harming Defendants with regard to its interference with Defendants' business relationships.

131.    Plaintiffs has used dishonest, unfair, or improper means to interfere with Defendants' business relationships.

26

675630v.2

132.    As a result of Plaintiffs' conduct, Defendants have suffered damages in an amount to be determined upon the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A SECOND COUNTERCLAIM

133.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

134.    Defendants have entered into a contractual relationship with third parties for the provision, by Defendant to said third parties, of certain services.

135.    Plaintiffs were, at all relevant times, aware of Defendants' contractual relationship with certain third parties.

136.    Plaintiffs, through the actions described above, have intentionally induced said third parties to breach or terminate their contracts with Defendants or have otherwise rendered Defendants' performance under those contracts impossible.

137.    As a result of Plaintiffs' conduct, Defendants have suffered damages in an amount to be determined upon the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A THIRD COUNTERCLAIM

138.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

139.    Plaintiffs have made certain disparaging statements to Defendants' current and prospective business contacts regarding Defendants' services and business operations.

27

140.    Upon information and belief, Plaintiffs have published their disparaging statements to third parties orally.

141.    The referenced disparaging remarks, made by Plaintiffs about Defendants, were false.

142.    Plaintiffs knew its disparaging remarks regarding Defendants were false when they published said statements to third parties.

143.    Plaintiffs' disparaging remarks are defamatory *per se*, as the remarks tend to disparage Defendants in the way of their profession or trade.

144.    As a result of Plaintiffs' conduct, Defendants have suffered damages in an amount to be determined upon the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A FOURTH COUNTERCLAIM

145.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

146.    Plaintiff Clayton Herzoff entered into an employment agreement with Defendant UOA.

147.    UOA has materially performed all of its obligations under the agreement.

148.    Plaintiff Clayton Hertzoff has materially breached the terms of the employment agreement with UOA.

28

149.    As a direct and proximate result of Clayton Hertzoff's material breaches of the employment agreement, UOA has suffered damages in an amount to be determined at the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A FIFTH COUNTERCLAIM

150.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

151.    The names of UOA's clients and referral sources, and its financial statements, business plans, internal memoranda, reports, audits, patient surveys, employee surveys, operating policies, quality assurance materials, fees, and other such materials or records of proprietary nature are trade secrets that give UOA a competitive advantage in the relevant marketplace.

152.    UOA uses reasonable efforts to maintain the secrecy of its trade secrets, including requiring its contractual employees to acknowledge and treat its trade secrets as confidential.

153.    Plaintiff Clayton Hertzoff has used and is using his knowledge of UOA's trade secrets for his own benefit and for that of his new employer in breach of his agreement, confidence, and duty to maintain said trade secrets as confidential.

154.    As a result of Plaintiff Clayton Hertzoff's misappropriate of trade secrets, Defendants have suffered damages in an amount to be determined at the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A SIXTH COUNTERCLAIM

155.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

675630v.2

156.    Plaintiffs entered into various agreements with Defendants, including but not limited to a Stock Purchase Agreement.

157.    Defendants have materially performed all of its obligations under the agreements.

158.    Plaintiffs have materially breached the terms of the agreements with UOA.

159.    As a direct and proximate result of Plaintiffs' material breaches of the agreements, UOA has suffered damages in an amount to be determined at the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A SEVENTH COUNTERCLAIM

160.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

161.    Plaintiffs entered into several agreements with Defendants, including but not limited to a Stock Purchase Agreement, selling all stock in UOA to Noreen Diaz.

162.    Plaintiffs, through their actions described above, have breached the agreements.

163.    Plaintiffs, through their actions described above, have injured or destroyed Defendants' rights to receive the benefits of the agreements entered into between the parties.

164.    Plaintiffs have acted knowingly and in bad faith.

165.    As a result of Plaintiff's actions, Defendants have suffered damages in an amount to be determined at the trial of this matter, but in any event no less than $5,000,000.

675630v.2

## AS AND FOR AN EIGHTH COUNTERCLAIM

166.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

167.    Plaintiff Clayton Hertzoff physically took and/or copied UOA's trade secrets and confidential and proprietary information illegally and without authorization from UOA.

168.    Plaintiff Clayton Hertzoff's conduct as alleged above was patently unfair and disadvantaged UOA.

169.    Plaintiff Clayton Hertzoff's conduct amounted to a misappropriation of and exploitation of confidential information belonging to his employer and/or misappropriation of a commercial advantage that belonged exclusively to UOA.

170.    As a result of Plaintiff's actions, Defendants have suffered damages in an amount to be determined at the trial of this matter, but in any event no less than $5,000,000.

## AS AND FOR A NINTH COUNTERCLAIM

171.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

172.    Defendants have provided services to Plaintiffs, namely collection of outstanding accounts receivable, and have made payments for the benefit of Plaintiffs on certain accounts payable owed by Plaintiffs.

173.    As a result of Defendants' services and payments on Plaintiffs' behalf, Plaintiffs have been enriched.

31

675630v.2

174.    Defendants have been impoverished by their provision of services to Plaintiffs and by Plaintiffs' actions as alleged above.

175.    But for Plaintiffs' enrichment, Defendants would not have been so impoverished.

176.    There exists no justification for Defendants' impoverishment nor Plaintiffs' enrichment at Defendants' expense, same being contrary to equity.

177.    Defendants' have no adequate remedy at law.

178.    Accordingly, Plaintiffs are liable to Defendants for their unjust enrichment at Defendants' expense in an amount to be determined at trial, but in any event no less than $5,000,000.

## AS AND FOR A TENTH COUNTERCLAIM

179.    Defendants repeat and reallege the above allegations as if set forth more fully herein.

180.    Clayton Hertzoff is presently in violation of the restrictive covenant set forth in the employment agreement he entered into with UOA.

181.    Clayton Hertzoff has acknowledged that his breach of those provisions of his employment agreement would leave UOA without an adequate remedy at law.

182.    The balance of the hardships tips in favor of UOA with regard to issuance of an injunction preventing Clayton Hertzoff's further breach of the restrictive covenant.

183.    Clayton Hertzoff has acknowledged that his breach of the restrictive covenant would cause UOA irreparable harm.

32

184.    In the absence of injunctive relief issued by the Court, Defendants will suffer irreparable injury.

185.    As a result, UOA is entitled to permanent injunctive relief estopping Clayton Herztoff from continuing to breach the restrictive covenant in his employment agreement with UOA.

WHEREFORE, Defendants Noreen Diaz and United Orthopaedic Appliances Co., Inc., demand judgment against the Plaintiffs as follows:

(a)    dismissing the Complaint dated August 16, 2006 with prejudice;

(b)    awarding Defendants judgment on their first counterclaim together with damages in an amount to be determined at the trial of this action;

(c)    awarding Defendants judgment on their second counterclaim together with damages in an amount to be determined at the trial of this action;

(d)    awarding Defendants judgment on their third counterclaim together with damages in an amount to be determined at the trial of this action;

(e)    awarding Defendants judgment on their fourth counterclaim together with damages in an amount to be determined at the trial of this action;

(f)    awarding Defendants judgment on their fifth counterclaim together with damages in an amount to be determined at the trial of this action;

(g)    awarding Defendants judgment on their sixth counterclaim together with damages in an amount to be determined at the trial of this action;

(h)    awarding Defendants judgment on their seventh counterclaim together with damages in an amount to be determined at the trial of this action;

33

(i)     awarding Defendants judgment on their eighth counterclaim together with damages in an amount to be determined at the trial of this action;

(j)     awarding Defendants judgment on their ninth counterclaim together with damages in an amount to be determined at the trial of this action;

(k)     awarding Defendants a permanent injunction against Plaintiff Clayton Hertzoff's breach of the restrictive covenant in his employment agreement with UOA as set forth in Defendants' tenth counterclaim;

(l)     awarding Defendants the attorneys' fees, costs, and disbursements it incurred in this lawsuit; and

(m)     awarding the Defendants such other relief that the Court deems proper.

| Dated: Great Neck, New York<br>October 12, 2007 | |
|---|---|
| | GARFUNKEL WILD & TRAVIS, P.C.<br>*Attorneys for Defendants Noreen Diaz and UOA*<br><br>By: _____<br>Andrew L. Zwerling, Esq. (AZ-5455)<br>Colleen M. Tarpey, Esq. (CT-7572)<br><br>111 Great Neck Road<br>Great Neck, New York 11021<br>516-393-2200<br>fax 516-466-5964<br>azwerling@gwtlaw.com<br>ctarpey@gwtlaw.com |

34

675630v.2

STOCK PURCHASE AGREEMENT

by and among

BEVERLY HERTZOFF, EDWIN HERTZOFF, CLAYTON HERTZOFF,

and

NOREEN DIAZ

Prepared By:

Garfunkel, Wild & Travis, P.C.
111 Great Neck Road, Suite 503
Great Neck, NY 11021
(516) 393-2200

439987.06

## TABLE OF CONTENTS

PAGE

ARTICLE I
    SALE AND PURCHASE OF STOCK...........................................................................1

ARTICLE II
    THE CLOSING AND TRANSFER OF STOCK ..................................................3

ARTICLE III
    REPRESENTATIONS AND WARRANTIES OF SELLERS............................................4

ARTICLE IV
    REPRESENTATIONS AND WARRANTIES BY PURCHASER ...................................9

ARTICLE V
    SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS............10

ARTICLE VI
    INDEMNIFICATION................................................................................................10

ARTICLE VII
    GENERAL PROVISIONS .........................................................................................12

439987.06

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Purchase Agreement") is made effective as of the 20th day of August, 2006 (the "Effective Date") by and among Beverly Hertzoff ("B. Hertzoff"), Edwin Hertzoff ("E. Hertzoff") and Clayton Hertzoff ("C. Hertzoff," together with B. Hertzoff and E. Hertzoff, sometimes referred to herein as "Sellers") and Noreen Diaz ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Sellers own the shares of the issued and outstanding capital stock of United Orthopaedic Appliances Co., Inc. (the "Corporation") set forth on Schedule A hereto, which shares represent one hundred percent (100%) of the issued and outstanding capital stock of the Corporation;

WHEREAS, Sellers have agreed to sell to Purchaser and Purchaser has agreed to purchase from the Sellers that number of shares of capital stock of the Corporation necessary to cause Purchaser to own one hundred percent (100%) of the issued and outstanding capital stock of the Corporation; and

WHEREAS, in furtherance of the foregoing, Sellers desire to sell to Purchaser and Purchaser desires to purchase from Sellers, an aggregate of one hundred (100.00) shares of capital stock of the Corporation (the "Stock"); and

WHEREAS, C. Hertzoff is presently employed by the Corporation and will remain employed subsequent to Closing Date, as defined at Article II hereof, pursuant to an employment agreement made effective as of Closing Date (the "Employment Agreement").

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### SALE AND PURCHASE OF STOCK

1.1.    Purchase and Sale. On the Closing Date, as defined at Article II hereof, subject to and upon the terms and conditions set forth herein, Sellers will sell, convey, transfer, assign and deliver the Stock to Purchaser and Purchaser shall purchase and accept from Sellers, all right, title and interest of Sellers in and to the Stock.

1.2.    Accounts Payable. Notwithstanding any provision to the contrary, but subject to the terms of Section 1.3 below, the Corporation shall, as of the Closing Date, assume and remain liable only for the accounts payable set forth in Schedule 1.2 attached hereto ("Accounts Payable"). The parties agree that, except for the Accounts Payable, (i) the Sellers shall assume and remain jointly and severally liable for any and all outstanding debts, loans, obligations or

439987.06

liabilities of the Corporation as of the Effective Date which obligations shall be paid, performed and/or discharged by the Sellers when due, other than those debts, loans, obligations or liabilities of the Corporation which were incurred in the ordinary operation of the Corporation prior to the Effective Date which obligations shall remain with the Corporation; and (ii) the Corporation shall not assume and shall not be responsible for any of the outstanding debts, loans, obligations or liabilities of the Corporation as of the Closing Date or relating to the operations of the Corporation prior to the Closing Date. The parties acknowledge and agree that, notwithstanding the fact that certain of the Corporation's liabilities and obligations assumed by the Sellers hereunder may not be expressly assignable (or may prohibit assignment), the Sellers shall satisfy such liabilities and obligations when due.

    1.3.   <u>Accounts Receivable</u>. Purchaser shall cause the "Net Accounts Receivable" to be billed and collected, to the extent reasonably collectable, in the normal course of the Corporation's operations. For purposes of this payment, "Net Accounts Receivable" shall be calculated as the accounts receivable of the Corporation earned prior to and collected during the twenty-four (24) month period immediately following the Closing Date less any refunds or repayments. Each dollar of the Net Accounts Receivable actually collected will be allocated to discharge the Accounts Payable in the following order of priority: (i) an amount equal to the outstanding amount of the HSBC line of credit on the Effective Date (provided the expenses for which the HSBC line of credit was utilized were expenses ~~in~~ incurred in the ordinary operation of the Corporation) collected, to the extent such amount is actually collected, shall be applied against and discharge the HSBC Line of Credit (as such term is defined on Schedule 1.2); (ii) the next One Hundred Thousand Dollars ($100,000) collected, to the extent such amount is actually collected, shall be applied against and discharge the Outstanding Rental Amounts (as such term is defined on Schedule 1.2; and (iii) the next One Hundred Forty Five Thousand Dollars ($145,000) collected, to the extent such amount is actually collected, shall be applied against and discharge the Seller Loan Amount (as such term is defined on Schedule 1.2). To the extent that the Corporation's Net Accounts Receivable exceed the Accounts Payable, such excess amount shall be distributed to the Sellers within thirty (30) days of the second annual anniversary of this Agreement. In the event that the Corporation's Net Accounts Receivable are less than the Accounts Payable, Purchaser shall fund such shortfall (the "Net Accounts Receivable Shortfall") up to a maximum amount of One Hundred Thousand Dollars ($100,000), and apply such funds to discharge the Accounts Payable, to the extent that Purchaser is responsible to fund the Net Accounts Receivable Shortfall hereunder, in the order of priority set forth above in this Section 1.3. Such payment by the Purchaser shall fully and completely discharge the Corporation's and the Purchaser's obligations to pay the Accounts Payable hereunder and, notwithstanding any provision to the contrary, the Sellers shall be jointly and severally responsible for discharging and paying the Accounts Payable, to the extent that the Net Accounts Receivable Shortfall exceeds the sum of (a) the Net Accounts Receivable; plus (b) One Hundred Thousand Dollars ($100,000). Any accounts receivables generated by the Company from and after the Effective Date shall be the property of the Company and no Seller shall have any right or interest in adnd to the same. Notwithstanding any provision to the contrary, the Purchaser shall ensure that the Corporation shall not borrow any additional amounts, as of the Effective Date, under the HSBC Line of Credit. Sellers shall execute and deliver any and all documents or instruments necessary



439987.06

to terminate the HSBC Line of Credit and to cause the removal of any liens or encumbrances related thereto after the HSBC Line of Credit has been repaid as aforesaid.

## ARTICLE II

### THE CLOSING AND TRANSFER OF STOCK

2.1.    <u>Closing</u>.  The Closing of the transaction contemplated by this Agreement (the "Closing") shall occur as of August 8, 2006 (the "Closing Date") unless otherwise extended by the mutual agreement of the parties hereto.

2.2.    <u>Purchaser Delivery</u>.  At the Closing, the Purchaser shall deliver to the Sellers:

2.2.1.  An executed Lease by and among the Sellers and the Corporation for the property located at 791 Broadway, New York, NY, in the form attached hereto as <u>Schedule 2.2(b)</u>.

2.2.2.  An executed Employment Agreement by and between C. Hertzoff and the Corporation effective the Closing Date, in the form attached hereto as <u>Schedule 2.2(c)</u>.

2.3.    <u>Seller Delivery</u>.  At the Closing, the Sellers shall deliver or cause to be delivered:

2.3.1.  Lost Stock Affidavits from each of the Sellers for all the stock issued by the Company, other than the Stock being sold hereunder;

2.3.2.  New stock certificates representing all of the Stock being sold hereunder;

2.3.3.  Stock Transfer Powers representing the Stock, duly endorsed for transfer;

2.3.4.  All books and records of the Corporation; and

2.3.5.  All documents which counsel for the Purchaser shall reasonably deem necessary or advisable in order to accomplish a complete transfer of the shares of Stock to the Purchaser.

2.3.6.  An opinion of counsel to Seller in the form attached hereto as Schedule 2.3.6.

3

439987.06

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Purchaser as of the date hereof, and as of Closing, as follows:

3.1.   Authority.   Sellers have the full legal power and authority, and the right, without the consent of any other person, to execute and deliver this Agreement and to carry out the transactions contemplated hereby.   Sellers own the Stock being transferred hereunder free and clear of any claims, liens and encumbrances.

3.2.   Validity.   This Agreement has been, and the documents to be delivered at Closing will be, duly executed and delivered by Sellers and will constitute lawful, valid and legally binding obligations of Sellers enforceable in accordance with their respective terms.

3.3.   Ownership of Stock.   Sellers own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Corporation, and no party other than the Sellers possess any rights, title or interest in the capital stock or other form of capital or ownership interest of the Corporation.   Sellers' will, on the Closing Date, convey good and marketable title to the Stock from the Sellers, free and clear of any liens, encumbrances, restrictions on transfer, charges or claims.

3.4.   Conflicts.   Neither the execution of this Agreement by Sellers, nor the consummation of the transactions contemplated hereby will result in (i) the creation of any lien, charge, pledge, security interest or encumbrance of any nature, whatsoever, on any Seller, the Corporation, or on the Stock, or (ii) a breach, default, or violation of, or conflict with (A) any document, instrument, agreement, contract or obligation to which the Corporation or any Seller is a party, or (B) any judgment, order, decree, ruling, law, rule, or regulation of any court, governmental body or arbitrator in proceedings to which the Corporation or any Seller is a party. Sellers affirm that they have not impermissibly issued any stock to some other party that is not a party to this Agreement.

3.5.   Organization and Existence of the Corporations.   The Corporation is a corporation that is duly organized, validly existing and in good standing under the laws of the State of New York.   The Corporation is in compliance with all federal, state and local laws, regulations and ordinances, including, without limitation, the regulations of governmental agencies or authorities having jurisdiction over the Corporation's business where the failure to be in compliance would have a material adverse effect on the Corporation as a whole.   The Corporation possesses all necessary licenses, permits, credentials, certifications, qualifications, and approvals that the Corporation reasonably believes is required by applicable federal and state laws, regulations and ordinances, and that are necessary for the conduct of the Corporation's business in the manner presently conducted.

4

3.6.    Litigation.    Except as set forth on Schedule 3.6, there are no claims, complaints, causes of action, suits, litigation, any administrative, arbitration, or enforcement actions, whether before any court or any federal, state, or other governmental or professional bureau, agency, authority or instrumentality of any kind or nature or otherwise (each individually and collectively referred to as an "Action"), pending against or, threatened against, the Sellers or the Corporation. No Action has been asserted against the Sellers or the Corporation, nor have the Sellers or the Corporation been a party to an Action as a defendant.

3.7.    Taxes.    The Corporation has or will have by the date of this Agreement (i) paid all income, sales, use, occupancy, property, real estate, excise, payroll, withholding taxes and all license fees imposed upon the Corporation, and its properties and assets, and (ii) timely filed all federal, state and local tax returns and related documents heretofore, required to be filed by the Corporation, or has a valid extension of time to file. All tax returns and related documents filed by the Corporation have been prepared in accordance with all applicable laws and requirements and accurately reflect the taxable income of the Corporation.

3.8.    Judgments.    Neither the Sellers nor the Corporation are subject to, or in violation or default of, any judgment, order, writ, injunction or ruling of any court or any federal state, or municipal commission, bureau, agency, authority or instrumentality.

3.9.    Truthful and Accurate.    All representations and warranties of the Sellers and the Corporation contained in this Agreement, or in any document, instrument or agreement delivered pursuant to the provisions of this Agreement shall be true and accurate when made and on the Closing Date. No representation or warranty by the Sellers or the Corporation in this Agreement contains or will contain any untrue statement of fact or omits or will omit any fact required to be stated therein or necessary in order to make the statements contained therein not misleading.

3.10.    Qualification of the Corporation.    The Corporation is duly qualified and authorized to do business and is in good standing under the laws of each jurisdiction in which the character of the properties owned or leased or the nature of the activities conducted by it make such qualification necessary, except where failure to so qualify does not have a material adverse effect on the assets, financial condition, results of operations or business of the Corporation.

3.11.    Consents and Approvals.    No consent, order, approval or authorization or permit of, or the exemption by or registration or filing with, or notification to (any such consent, approval, authorization, permit, exemption, registration, filing or notification being a "Consent"), any governmental, regulatory or administrative agency, commission or authority, domestic or foreign (a "Governmental Entity"), is necessary or required to be obtained or given or waiting period required to expire as a condition to the execution, delivery and performance of this Agreement by any of the Sellers or the consummation by the Sellers of the sale of the Stock. No consent, approval, waiver or other action by any person under any contract, agreement, indenture, lease, instrument or other document to which any of the Sellers, or the Corporation, or any of their respective properties are bound or affected, is required or necessary for the execution, delivery and performance of this Agreement by Sellers or the consummation by Sellers of the sale of the Stock where the failure to obtain such consent, approval, waiver or other

5

action will have a material adverse effect on the assets, financial condition, results of operations or business of the Corporation .

3.12. No Other Stock Purchase Agreements. There are no options, agreements, contracts or other rights in existence involving Sellers, the Corporation to purchase or acquire the Stock, in whole or in part, or any other shares of stock in the Corporation, whether now or hereafter authorized or issued. Additionally there are no options, agreements, contracts or other rights in existence to purchase or acquire from the Corporation or any of its or their material assets.

3.13. Employee Plans and Agreements.

(a) *Plans and Related Documents.* Schedule 3.13 of this Agreement lists the 401K Plan (the "401K Plan") and the medical, dental and all other employee benefit plans, including any deferred compensation or top-hat plans to a select group of management and highly compensated employees (the "Employee Plans") for the Corporation, such plans being the only employee benefit plans supplied and/or sponsored by the Corporation, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Except for the Employee Plans listed on Schedule 3.13, there are no other employee benefit plans, programs, arrangements or agreements, whether formal or informal, whether in writing or not, to which the Corporation is a party, with respect to which the Corporation has or is reasonably likely to incur any obligations or liability or which are maintained, contributed to, or sponsored by the Corporation for the benefit of any current or former employee, officer or director, including any deferred compensation or top-hat plans to a select group of management and highly compensated employees. The Corporation does not have any commitment (1) to create, incur liability with respect to, or cause to exist, any other employee benefit plan, program or arrangement, (2) to enter into any contract or agreement to provide compensation or benefits to any individual or (3) to modify, change or terminate any Employee Plan, other than with respect to a modification, change or termination required by ERISA or the Internal Revenue Code of 1986, as amended (the "Code"), except as required by law.

(b) *Absence of Certain Types of Plans.* None of the Employee Plans is a multiemployer plan (within the meaning of Section 3(37) or 4001 (a)(3) or ERISA) (a "Multiemployer Plan") or a single employer pension plan (within the meaning of Section 4001 (a)(15) or ERISA) for which the Corporation is reasonably likely to incur liability under Section 4063 or 4064 of ERISA (a "Multiple Employer Plan"). None of the Employee Plans obligates the Corporation to pay separation, severance, termination or similar-type benefits solely as a result of any transaction contemplated by this Agreement or as a result of a "change in control" with respect to the Corporation, within the meaning of such terms under Section 280G of the Code. None of the Employee Plans provides for or promises retiree medical or life insurance benefits to any current or former employee, officer or director of the Corporation.

(c) *Compliance with Applicable Law.* Each Employee Plan has been operated in all material respects in accordance with the requirement of all applicable laws, including, without limitation, ERISA and the Code. The Corporation has performed all material obligations

6

439987.06

required to be performed by such entity, are not in any respect in material default under or in violation of, and have no knowledge of any material default or violation by any party to, any Employee Plan. No legal action, suit or claim is pending or threatened with respect to any Employee Plan.

(d)     *Qualification of Plans.* Each Employee Plan which is intended to be qualified under Section 401(a) of the Code or Section 401(k) of the Code has received a favorable determination letter of the Internal Revenue Service (the "IRS") that it is so qualified and each trust established in connection with any Employee Plan which is intended to be exempt from federal income taxation under Section 501(a) of the Code has received a favorable determination letter from the IRS that it is so exempt, and no fact or event has occurred since the date of such determination letter from the IRS to materially adversely affect the qualified status of any such Employee Plan or the exempt status of any such trust.

(e)     *Absence of Certain Liabilities and Events.* There has been no prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Employee Plan. The Corporation has not incurred any liability for any excise tax arising under Sections 4971, 4972, 4976, 4977, 4979, 4980, 4980B or 5000 of the Code. The Corporation has not incurred any liability under, arising out of, or by operation of, Title IV of ERISA, including, without limitation, any liability in connection with (1) the termination or reorganization of any employee benefit plan subject to Title IV of ERISA, or (2) the withdrawal from any Multiemployer Plan or Multiple Employer Plan. No complete or partial termination has occurred within the five years preceding the date hereof with respect to any Employee Plan governed by or subject to ERISA. No reportable event (within the meaning of Section 4043 of ERISA) has occurred or is expected to occur with respect to any Employee Plan subject to Title IV of ERISA. No Employee Plan had an accumulated funding deficiency (within the meaning of Section 302 of ERISA or Section 412 of the Code), whether or not waived, as of the most recently audited plan year of such Employee Plan. None of the assets of the Corporation is the subject of any Lien arising under Section 302(f) of ERISA or Section 412(n) of the Code. The Corporation has not been required to post any security under Section 307 of ERISA or Section 401(a)(29) of the Code.

(f)     *Plan Contributions and Funding.* All contributions, premiums, or payments required to be made with respect to any Employee Plan have been made, and all such contributions, premiums, or payments have been made on or before their due dates, except where the failure to make such contributions, premiums or payments on or before such due dates does not have a material adverse effect on the Stock, or the assets, financial condition, results of operations or business of the Corporation. All such contributions have been fully deducted for income tax purposes and no such deduction has been challenged or disallowed by any Governmental Entity and no fact or event exists which could give rise to any such challenge or disallowance. As of the Closing, no Employee Plan which is subject to Title IV of ERISA will have an "unfunded benefit liability" (within the meaning of Section 4001(a)(18) of ERISA).

7

439987.06

3.14.  Environmental Matters

(a)  The Corporation has obtained all permits, licenses and other authorizations which are required with respect of the operation of its respective business under all applicable federal, state or local law, statute, ordinance, rule, regulation, code, permit, consent, approval, license, judgment, order, writ, decree, injunction, agreement or other authorization or mandate by any Governmental Entity relating to (1) pollution, waste disposal (including, but not limited to biohazard medical waste), or the protection, preservation or restoration of the environment, and (2) the use, treatment, storage, release or disposal, recycling, generation, processing, labeling, manufacture, production, sale, transportation or shipment of any hazardous or toxic waste, material, substances, products or by-products.

(b)  The Corporation is in substantial compliance with all environmental laws.

(c)  There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, or demand letter pending or threatened in writing relating to the businesses of the Corporation or any real property or facility owned, leased or operated by the Corporation or by Sellers under any environmental law by Governmental Entity or other person and neither Sellers nor the Corporation have received any written notification that any of them is a responsible party under any environmental law, including, without limitation, any written notice from the owner of any real property or other facility leased or operated by Sellers, or the Corporation , of any violation of any environmental law, or requiring Sellers or the Corporation to take remedial action with respect to the presence of any hazardous substance on any part of the real properties or other facilities, owned, leased or operated by the Corporation or Sellers.

3.15.  Employees.  Schedule 3.16 of this Agreement lists all of the officers, directors, employees and independent contractors (other than physicians performing independent medical exams) employed or retained by the Corporation by entity, and sets forth the following information for each employee:  (a) name and job title; (b) current compensation paid or payable; (c) vacation and service credited for vesting in any pension, retirement, profit sharing, deferred compensation, stock option, cash bonus, savings, employee stock ownership, insurance, medical, welfare, vacation, and other employee benefit plans; and (d) current employment status, indicating whether such employee is actively employed, on leave of absence, on disability, or on workers' compensation.  Sellers represent warrant and covenant that the Company has discharged and paid in full any and all liabilities, obligations and funds (including, without limitation, any accrued benefits, vacation days, sick days and holidays) due to the employees listed on Schedule 3.16 through the Closing Date.

3.16.  Licenses and Permits.  The Corporation has all licenses and permits required to operate its respective business in substantial compliance with all federal, state and local statutes and regulations and in accordance with its current practice.

3.17.  Absence of Encumbrances .  Except as set forth on Schedule 3.17, as of the Closing Date, neither the Company nor the Sellers on behalf of the Company has:

8

(a)    incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, in excess of $15,000 in the aggregate, except liabilities or obligations incurred in the ordinary course of business and consistent with prior practice which do not exceed $50,000 in the aggregate;

(b)    mortgaged, pledged or subjected to lien, restriction or any other encumbrance any of the property, businesses or assets, tangible or intangible, of the Company, except for purchase money liens;

(c)    made any loans to or guaranteed any loans for any officer, director, shareholder or other affiliate of the Company,

(d)    cancelled, waived, released or otherwise compromised any debt or claim other than in the ordinary course of business, or any material right;

(e)    instituted or threatened any litigation, action or proceeding before any court, governmental or regulatory body, administrative agency or arbitrator relating to it or its property; or

(f)    issued, authorized for issuance or sold any capital stock, notes, bonds or other securities, or any option, warrant or other right to acquire the same, of the Company, or declared or paid any dividend or made any other payment or distribution in respect of its capital stock, or directly or indirectly redeemed, purchased or otherwise acquired any of its capital stock or any option, warrant or other right to acquire such capital stock.

3.18.    Compliance with Laws.  The Corporation is in compliance in all material aspects and not in violation of any federal, state, or local statutes, regulations and administrative orders.

3.19.    No Questionable Practices.  Neither any of the Sellers nor the Corporation nor any officer, director, employee, or agent of the Corporation has directly, or indirectly, made, promised to make, or authorized the making of an offer, payment or gift of money or anything of value to any governmental official, political party or official thereof, candidate for political office or employee, agent or fiduciary of a customer or client, to obtain a contract for or to influence a decision in favor of the Corporation where such offer, payment or gift was or would be, if made, in violation of any applicable law or regulation, or any policy of any such customer.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES BY PURCHASER

Purchaser hereby represents and warrants to Sellers as of the date hereof, and as of the closing, as follows:

4.1.    Authority; Financial Ability.  Purchaser has the full legal right, power and authority, without consent of any other person, to execute and deliver this Agreement and to

9

439987.06

carry out the transactions contemplated hereby. Purchaser has and will continue to have adequate financial ability to perform any and all of his obligations to Sellers.

4.2.    Validity. This Agreement has been, and the documents to be delivered at Closing will be, duly executed and delivered by Purchaser and will constitute lawful, valid and legally binding obligations of Purchaser, enforceable in accordance with their respective terms.

4.3.    Conflicts. To Purchaser's knowledge, neither the execution of this Agreement by Purchaser, nor the consummation of the transactions contemplated hereby will result in (i) the creation of any lien, charge, pledge, security interest or encumbrance of any nature, whatsoever, on Purchaser, or (ii) a breach, default, or violation of, or conflict with (A) any document, instrument, agreement, contract or obligation to which Purchaser is a party, or (B) any judgment, order, decree, ruling, law, rule, or regulation of any court, governmental body or arbitrator in proceedings to which Purchaser is a party.

4.4.    Judgments. To Purchaser's knowledge, Purchaser is not subject to, or in violation or default of, any judgment, order, writ, injunction or ruling of any court or any federal, state, or municipal commission, bureau, agency, authority or instrumentality.

4.5.    Truthful and Accurate. All representations and warranties of Purchaser contained in this Agreement, or in any document, instrument or agreement delivered pursuant to the provisions of this Agreement shall be true and accurate when made and on the Closing Date. No representation or warranty by Purchaser in this Agreement contains or will contain any untrue statement of a material fact or omits or will omit any material fact required to be stated therein or necessary in order to make the statements contained therein not misleading.

## ARTICLE V

## SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS

5.1.    Survival. All representations, warranties and covenants contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by the parties hereto, and shall survive the Closing for a period of three (3) year; provided, however, that the three (3) year limitation on the survival of the representations, warranties and covenants contained in this Agreement or in any documents delivered pursuant hereto shall be void and inapplicable in any instance in which (i) any of the Sellers had or should have had knowledge, prior to or at the Closing Date, of the falsity of any such representation, warranty or covenant; (ii) any of the Sellers had knowledge of and failed to disclose to Purchaser, prior to or at the Closing Date, a material liability of the Corporation; or (iii) any liability or obligation in existence prior to the Closing Date results in personal liability to the Corporation's shareholders.

## ARTICLE VI

## INDEMNIFICATION

10

439987.06

6.1.    Indemnification of Purchaser.

6.1.1.  Each of the Sellers and his/her respective estate and each of their heirs, successors and assigns agrees, jointly and severally, to indemnify and hold harmless Purchaser and the Corporation from and against any and all liabilities, obligations, contingencies, damages, costs, expenses (including, without limitation, all court costs and reasonable attorneys' fees and experts' fees and expenses), losses, and amounts paid in settlement (collectively, a "Loss" or "Losses"), whether incurred by Purchaser or Corporation in connection with any suit, claim, demand, action, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to

(a)    any breach or inaccuracy of any representation or warranty of Sellers contained in or made pursuant to this Agreement or in any document, instrument or certificate delivered in connection with and contemplated by this Agreement; or

(b)    a breach or default in the performance of any covenant, agreement or obligation that Sellers are required to perform under this Agreement or in any document, instrument, or certificate delivered in connection with any contemplated by this Agreement, or

(c)    any and all liabilities and obligations of Sellers or the Corporation incurred prior to the Closing date or arising from the operations of the Corporation prior to Closing; or

(d)    any claims of (i) Sellers' or the Corporation's past or current clients including without limitation, claims alleging malpractice or grounded on or arising out of medical equipment provided by Sellers, or (ii) taxing or other governmental authorities for periods prior to the Closing Date; or

(e)    Any and all actions, suits, proceedings, demands, assessments, judgments, costs and reasonable legal and other third party expenses incident to the foregoing.

6.2.    Medicare/Medicaid; Taxes.  Notwithstanding anything to the contrary contained in this Agreement, Sellers and their respective estate and heirs, successors and assigns, jointly and severally, covenant and agree to fully defend, indemnify and hold harmless Purchaser and the Corporation from and against any and all claims, liabilities, losses, costs, expenses or damages of any kind, nature or amount whatsoever, together with reasonable legal fees, costs and expenses incurred in defense thereof, which arise out of, result from or relate to (i) any audit, assessment, deficiency or other liability asserted by Medicare and/or Medicaid attributable to services rendered by the Corporation on or before the Closing Date, including without limitation any claims or liabilities related to over-billing and/or recoupment of overpayments; and (ii) any audit, assessment, deficiency or other liability asserted by any federal, state or local taxing authority for income, profits, franchise, sales, use, occupation, property, excise, payroll or other taxes of the Corporation and/or Sellers attributable to or arising out of the period prior to the Closing Date.  Purchaser shall provide Sellers with such access to the Corporation's books and records as may be necessary and reasonable in order to defend any action or proceeding in

11

connection with this Section 6.2, and shall fully cooperate with Sellers with respect to the defense of any such action or proceeding. This Section 6.2 shall survive the Closing forever.

6.3.    Survival. The indemnification provisions contained in Section 6.1 and 6.2 of this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by the parties hereto, and shall survive the Closing for a period of three (3) year; provided, however, that the three (3) year limitation on the survival of the indemnification provisions contained in this Agreement or in any documents delivered pursuant hereto shall be void and inapplicable in any instance in which (i) any of the Sellers had or should have had knowledge, prior to or at the Closing Date, of the falsity of any representation, warranty or covenant; (ii) any of the Sellers had knowledge of and failed to disclose to Purchaser, prior to or at the Closing Date, a material liability of the Corporation; or (iii) any liability or obligation in existence prior to the Closing Date results in personal liability to the Corporation's shareholders.

ARTICLE VII

GENERAL PROVISIONS

7.1.    Waiver. No amendment or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the parties hereto, and then such waiver or consent shall be effective only in a specific instance for the specific purpose for which it is given.

7.2.    Notices. All notices, demands, and requests required or permitted to be given under the provisions of this Agreement shall be (i) in writing; (ii) delivered by personal delivery or sent by commercial delivery service or registered or certified mail, return receipt requested; (iii) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt; and (iv) delivered to the address designated by each of the parties:

|  |  |
|---|---|
| If to Sellers: | Beverly Hertzoff<br>Edwin Hertzoff<br>and Clayton Hertzoff<br>c/o Jay Fox, Esq.<br>O'Donnell & Fox, P.C.<br>880 Third Avenue<br>New York, NY 10022<br>Fax: (212) 319-3597 |
| With Copy To: | Jay Fox, Esq.<br>O'Donnell & Fox, P.C.<br>880 Third Avenue<br>New York, NY 10022 |

12

439987.06

Fax: (212) 319-3597

If to Purchaser: Noreen Diaz
Complete Orthopedic Services, Inc.
2094 Front Street
East Meadow, NY 11554
Fax: (516) 478-4420

With Copy To: Andrew E. Blustein, Esq.
Garfunkel, Wild & Travis, P.C.
111 Great Neck Road, Suite 503
Great Neck, NY 11021

 7.3. Expenses. Except as otherwise expressly provided herein, each party to this Agreement shall pay its own costs and expenses in connection with the transactions contemplated hereby.

 7.4. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

 7.5. Entire Transaction. This Agreement and the documents referred to herein contain the entire understanding among the parties with respect to the transactions contemplated hereby and supersede all other agreements and understandings among the parties on the subject matter hereof.

 7.6. Applicable Law. This Agreement is a contract made and to be performed in the State of New York and shall in all respects be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of law rules, and shall be enforced in any court of competent jurisdiction in the State of New York.

 7.7. Successors and Assigns; No Third-Party Beneficiaries. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, heirs, executors, administrators and assigns; provided, however, that no party shall assign or delegate any of the obligations created under this Agreement without the prior written consent of the other parties. Nothing in this Agreement shall confer upon any person or entity, other than the Corporation, not a party to this Agreement, or the legal representatives of such person or entity, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.

 7.8. Severability. This Agreement shall be deemed severable, and the invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of this Agreement or of any other term or provision hereof. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as part of

13

this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

7.9.    Further Assurances.  Each party hereto agrees at any time or times and from time to time, to make, execute and deliver any and all such other and further instruments or documents and do any and all such acts and/or things as the other party hereto shall reasonably require for the purpose of giving full force and effect to this Agreement.

7.10.    Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

7.11.    Construction.  The parties have participated jointly in the negotiation and drafting of this Agreement, and they agree that any ambiguity or question of intent of interpretation that may arise shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

IN WITNESS WHEREOF, each of the parties hereto has entered into this Agreement as of the date first above written.

PURCHASER:

_____
Noreen Diaz

SELLERS:

_____
Beverly Hertzoff

_____
Edwin Hertzoff

_____
Clayton Hertzoff

14

<u>SCHEDULE A</u>

| <u>Shareholder</u> | <u>Stock</u> |
|---|---|
| Beverly Hertzoff | 37.5 |
| Edwin Hertzoff | 37.5 |
| Clayton Hertzoff | 25.0 |

439987.06

SCHEDULE 1.2

Accounts Payable

1.     The outstanding amount as of the Effective Date under the Buisiness Revolving Line of Credit of up to $250,000, dated August 14, 2005, from HSBC Bank USA, N.A. in favor of the Corporation and the related General Security Agreement, dated the same date, between HSBC Bank USA, N.A. and the Corporation.

2.     Promissory Note from the Company to Beverly Hertzoff in the amount of $145,000.00 relating to monies loaned t the Company to repair damages from a fire in the Company premises.

3.     Accrued and unpaid rent in the amount of $100,000.00 payable by the Company to Beverly Hertzoff and Edwin Hertzoff, as landlord.

## SCHEDULE 2.2(b)

Lease

439987.06

<u>SCHEDULE 2.2(c)</u>

Employment Agreement

439987.06

<u>SCHEDULE 3.6</u>

Litigation

None.

<u>SCHEDULE 3.13</u>

Employee Plans

1.    United Orthopaedic Appliances Co., Inc. Profit Sharing Plan managed by Allmerican Financial.

2.    Oxford Health Plan Insurance of United Orthopaedic Appliances Co., Inc.

439987.06

## SCHEDULE 3.16

### Employees

| | |
|---|---|
| Edwin F. Hertzoff | 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 |
| Clayton R. Hertzoff | 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 |
| Richard Manfredi | 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 |
| Mark R. Kuller | 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 |
| Jacquiline Pilego | 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 |
| Desiree Torres | 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 |
| Gennady Dovzhik | 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 |
| Virindra Grivistava | 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 |
| Telly Mangual | 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 |
| Francisco Ramirez | 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 |

439987.06

## SCHEDULE 3.17

Encumbrances

1.    Business Revolving Line of Credit of up to $250,000, dated August 14, 2005, from HSBC Bank USA, N.A. in favor of the Corporation and the related General Security Agreement, dated the same date, between HSBC Bank USA, N.A. and the Corporation. Outstanding balance of One Hundred Forty-Four Thousand Seven Hundred Forty-Two Dollars and Thirty-Two Cents ($144,742.32) Dollars on the Closing Date.

439987.06

CLAYTON HERTZOFF
EMPLOYMENT AGREEMENT

AGREEMENT (the "Agreement"), entered into August 20, 2006, by and between United Orthopaedic Appliances, Co., Inc, a New York corporation with offices at 791 Broadway, New York, New York ("Company") and Clayton Hertzoff, residing at 58 Winthrop Road, Short Hills, New Jersey, 07078 ("Employee" or "You").

In consideration of the mutual covenants and agreements hereinafter set forth, Company and Employee agree as follows:

1.    Agreement Term.

The term of this Agreement shall commence on August 20, 2006 and continue for ten (10) years until July 31, 2016, unless sooner terminated in accordance with the terms hereof (the "Agreement Term"). During the Agreement Term, the period beginning August 20, 2006 and ending December 31, 2006 shall be referred to as the "Initial Period" and each subsequent twelve (12) month period beginning January 1st and ending December 31st (or earlier upon any termination or expiration of the Agreement) shall be referred to a "Calendar Year."

2.    Employment.

a.    *Employment by Company.*  Company agrees to employ Employee for the Agreement Term upon the terms and subject to the conditions set forth in this Agreement. Employee shall be employed as a Prosthetist (working in the field of orthotics and prosthetics) and Manager of the Orthotics & Prosthetics Shop ("O&P Shop") and shall report to the Chief Executive Officer or his designee. Employee's duties and responsibilities shall be consistent with Employee's position as the Chief Executive Officer of Company or his designee may from time to time designate. Employee's duty shall include, but not be limited to, overseeing production of the staff of Company and the O&P Shop.

b.    *Performance of Duties.*  Throughout the Agreement Term, Employee shall faithfully and diligently perform his duties. Employee shall provide services on a full-time basis and shall devote Employee's entire working time to the business and affairs of Company, subject to vacations and sick leave in accordance with policies established by Company. During Employee's term of employment hereunder, Employee shall not, without the prior written consent of Company, which may be withheld in Company's sole discretion, engage in any other business or professional activity (other than as a passive investor), whether or not such business or professional activity is pursued for gain, profit or other pecuniary advantage.

1

440096.05

3.    <u>Compensation and Benefits.</u>

a.    *Base Salary.*

i.    Subject to the requirements of Subsection 3(a)(ii) below, Company agrees to pay to Employee for his services hereunder, a salary (the "Base Salary") in respect of each Calendar Year during the Agreement Term at the annual rate of one hundred twenty thousand ($120,000) dollars per year in the aggregate, prorated for any portion thereof and for the Initial Period. The Base Salary is payable in bi-weekly installments in accordance with the general practice of Company, less appropriate and customary payroll deductions.

ii.    During Agreement Term, Employee shall be required to maintain a level of "Personal Sales Collection" greater than six hundred thousand ($600,000) dollars for each Calendar Year (prorated for the Initial Period) ("Minimum Sales"). For purposes of this Agreement, Company shall measure "Personal Sales Collection" of Employee, within ninety (90) days of the end of each Calendar Year or the Initial Period, based upon net collections of Company from sales solely initiated and completed by Employee on behalf of Company in any Calendar Year or the Initial Period without giving effect to collection failures related solely to Company billing failures. If, for any Calendar Year or the Initial Period, Company determines that Minimum Sales will not be achieved by Employee, Company's continued employment of Employee shall be conditioned upon the parties agreeing upon a revised mutually acceptable reduced Base Salary.

b.    *Incentive Bonus.* For the Agreement Term, Company shall pay to Employee an Incentive Bonus consisting of a portion of Employee's Personal Sales Collection (measures as set forth in Subsection 3(a)(ii) above). In the Initial Period, the Incentive Bonus shall be calculated as follows: three percent (3%) of the Personal Sales Collection in the Initial Period. In each subsequent Calendar Year, the Incentive Bonus shall be calculated as follow: (i) five percent (5%) of the Personal Sales Collection in any Calendar Year less than or equal to five hundred thousand ($500,000) dollars plus (ii) ten percent (10%) of the Personal Sales Collection in any Calendar Year greater than five hundred thousand ($500,000) dollars. For example purposes only, if Employee's Personal Sales Collection in a Calendar Year is $650,000, his Incentive Bonus for such Calendar Year shall be $40,000 calculated as ($500,000 * .05) + ($150,000 * .10). Employee's Incentive Bonus for each Calendar Year or the Initial Period shall be paid to him on a quarterly basis during the Calendar Year or Initial Period based upon monthly collections of the applicable Personal Sales Collection during such Calendar Year or Initial Period and in accordance with the general practice of Company, less appropriate and customary payroll deductions.

c.    *Discretionary Bonus.* For the Agreement Term, Company shall pay Employee an discretionary bonus of twenty-five thousand ($25,000) dollars per Calendar Year. The discretionary bonus shall be paid within ninety (90) days of the end of the applicable Calendar Year in accordance with the general practice of Company, less appropriate and customary payroll deductions.

2

440096.05

d.    *Other Benefits.*

i.    Employee shall receive health insurance benefits for himself and his dependents and life insurance benefits for himself as such benefits are customarily provided to other full-time employees of Company, as amended or revised from time to time by Company in its sole discretion, subject to any waiting periods for benefits in accordance with Company's policies.  Employee shall further be provided with use of cellular telephone to be used solely in connection with his employment duties under this Agreement.

ii.    Employee shall be entitled, each Calendar Year, to five (5) weeks of paid leave, three (3) sick days and four (4) personal days, prorated as appropriate for any portion thereof and the Initial Period.  Unused vacation, personal and sick days shall not carry over into the subsequent Calendar Year.  All leave shall be taken in accordance with the policies of Company and at times agreeable to and approved by Company.

iii.    Employee shall be entitled (1) a monthly car allowance of up to $500 per month; (2) reimbursement for his automobile insurance for the car used in connection with his employment hereunder; (3) reimbursement of bridge, tunnel and gas expense incurred in commuting to and from Company; and (4) reimbursement of the downpayment in connection with leasing the Employee's automobile not to exceed $3,500.00.  All reimbursement payment for expenses provided under this subsection shall be subject to and only be paid upon Employee's provision of written receipts to Company sufficient to satisfy Company and meet the requirements of the reimbursement policies of Company.  Company shall maintain of a parking space in garage near the 791 Broadway, New York, New York office location for use by Employee in connection with his performance of duties hereunder.

4.    <u>Termination of Employment.</u>

a.    *For Cause Termination.*    This Agreement, and the employment relationship between Company and Employee, shall be deemed immediately terminated upon the occurrence of any of the following: (a) Employee's breach of any material term or condition set forth in this Agreement; (b) Employee's failure or refusal to comply with the reasonable directions, policies, standards and regulations that Company may establish from time to time; (c) Employee willfully or intentionally undertakes or commits any conduct that is harmful to Company's business; (d) Company acquiring evidence of Employee's current illegal drug use, alcohol abuse, or other substance abuse; (e) Employee's commission of, indictment for, conviction of, or guilty or nolo contendere plea to, a felony or misdemeanor; (f) Employee's failure as a result of illness, injury or incapacity for a period in excess of ninety (90) days ("permanent disability"); or (g) Employee's death.

b.    *Payments Upon Termination.*

i.    Upon termination of Employee's employment for any reason, Employee shall only be entitled to the Based Salary accrued but unpaid as of the date of the termination of Employee's employment with Company and the Severance Payment set forth in Section 4(b)

3

below in the event such termination is the result of Employee's death or permanent disability. Employee shall not be entitled to any additional compensation from Company.

ii.    Should Employee's employment terminate or expire prior to the end of the Agreement Term solely as the result of Employee's death or permanent disability, Company agrees that it shall pay Employee (or his estate), annually for the remainder of the Agreement Term, a Severance Payment. The annual Severance Payment made to Employee shall be equal to the discretionary bonus paid to Employee for the Calendar Year immediately prior to his death or permanent disability.

5.    Assignment and Transfer.

Employee's duties and obligations under this Agreement shall not be transferable by Employee by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void.

6.    Employer's Authority

a.    Employee agrees to observe and comply with the rules and regulations of Company, as adopted from time to time, whether orally or in writing.

b.    Employee acknowledges that Company shall have final authority over its acceptance or refusal to service customers and over the amount of the fees to be charged customers for professional services.

c.    All files and records of every type pertaining to customers of Company for whom Employee shall render services hereunder shall belong to Company and Employee shall not, without the express written consent of Company, remove them from Company's office, copy them, allow them to be removed from Company's office, or allow them to be copied, except as reasonably required in the ordinary course of services provided by Employee as an employee of Company.

7.    Disclosure of Information; Non-Solicitation

a.    Employee acknowledges that the names of the clients and referral sources of Company, as may exist from time to time, and the financial statements, business plans, internal memoranda, reports, audits, patient surveys, employee surveys, operating policies, quality assurance materials, fees, and other such materials or records of proprietary nature of Company (collectively, the "Confidential Information") are valuable, special and unique assets of Company and are deemed to be trade secrets.

b.    Employee agrees that he will not, after the date hereof and for so long as any such Confidential Information may remain confidential, secret, or otherwise wholly or partially protectable: (i) use the Confidential Information, except in connection with his retention by

4

Company, or (ii) divulge any such Confidential Information to any third party, unless Company gives its prior written consent to such use or divulgence.

c.     In the event of a breach or threatened breach by Employee of the provisions of this Section 7, Company shall be entitled to an injunction restraining Employee from (i) disclosing, in whole or in part, any such Confidential Information; (ii) interfering with Company's relationships with its employees, customers and referral sources, or with any hospital or managed care entity with which Company has a contractual relationship; and/or (iii) rendering any professional services to (A) any customer of Company who has been solicited by Employee in violation of this Agreement, or (B) any person, firm, corporation, association, or other entity to whom any such Confidential Information, in whole or in part, has been disclosed by Employee or is threatened to be disclosed by him.

d.     Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to Company for such breach or threatened breach, including the recovery of damages from Employee.

8.     <u>Non-Compete and Non-Solicitation</u>

a.     Employee shall not, either directly or indirectly, at any time during the term of his employment and for twelve (12) months following the termination of this Agreement, except with the written consent of Company: (i) solicit, interfere with or endeavor to entice away from Company, any of its employees, agent, contractor, customer, or referral sources; (ii) for his own account or for the account of others, induce any customers to patronize any competing billing service provider, request or advise any customer to withdraw, curtail, or cancel such customer's relationship with Company or disclose to any other person, partnership, firm, corporation or other entity the names or addresses of any customers of Company.

b.     Employee shall not, at any time during the term of his employment under this Agreement and for twelve (12) months after the termination of this Agreement: (i) engage in the sale of orthotics and prosthetics as an employee, independent contractor, shareholder, partner, or otherwise and whether separately or in conjunction with any other entity or individual within a three (3) mile radius of Company's location; and/or (ii) operate or have any financial or other interest in any entity involved in the business of providing orthotics and prosthetics within a three (3) mile radius of Company's location.

c.     In the event of a breach by Employee of the provisions of this Section 8, Company shall also be entitled to an injunction restraining Employee from violating the terms of the restrictive covenant set forth herein (without the necessity of securing a bond) and any other legal or equitable remedies available for such breach or threatened breach.

d.     Employee agrees that damages at law would be an insufficient remedy for Company in the event Employee violates these provisions, and that Company shall be entitled to, among other remedies, make an application to a court of competent jurisdiction, to obtain injunctive relieve of any such action by Employee.

5

440096.05

e.      If Employee violates this restrictive covenant and Company brings legal action for injunctive or other relief, Company shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the restrictive covenant. Accordingly, the restrictive covenant shall be deemed to have the duration specified herein, computed from the date the relief is granted but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by Employee.

f.      Employee acknowledges that (i) the terms contained in this Section 8 are necessary for the reasonable and proper protection of Company's interests, (ii) each and every covenant and restriction is reasonable in respect of such matter, length of time and geographical area; (iii) Company. has been induced to enter into this transaction with Employee in part due to the representation by Employee that he will abide by and be bound by each of the aforesaid covenants and restraints.

g.      If any court or tribunal of competent jurisdiction determines that the duration, geographical limit or any other aspect of the above non competition covenants is unenforceable in accordance with its terms in a particular jurisdiction, such covenant shall not terminate; instead, such covenant shall be deemed amended to the extent required to render it valid and enforceable in such jurisdiction and such court or tribunal is hereby authorized and directed to amend this agreement only to the extent that such court or tribunal determines such an amendment is necessary to make it valid and enforceable in said jurisdiction.

h.      Whenever possible, each provision shall be construed so as to be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement or the application thereof to any party or circumstance shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provision of this Agreement or the application of such provisions to other parties or circumstances. If any restriction contained in this Section 8 shall be deemed to be invalid, illegal or unenforceable by reason of the extent, duration or geographical scope thereof, or otherwise, then the court making such determination may reduce such extent, duration, geographical scope, or other provisions hereof, and in its reduced form, such restriction shall then be enforceable in the manner contemplated hereby.

i.      In the event Company is successful in judicial proceedings to enforce its rights under this Section 8, then Employee agrees to reimburse Company for the legal fees, costs, and disbursements which it incurs as a result of such proceedings. The terms of this Section 8 shall survive the expiration or termination of this Agreement.

9.    Compliance

a.      You acknowledge that Company is fully committed to ensuring its compliance, and the compliance of its employees, with all applicable rules, regulations and laws promulgated by the state and federal governments and by third party payors relating to the provision of billing services.

6

b.     You agree to cooperative fully with Company's compliance activities regarding the O&P Shop, including cooperation with Company's efforts to educate and train all employees and staff of the O&P Shop; to conduct audits of records or other appropriate compliance reviews or inquiries; and to institute any appropriate corrective actions when compliance issues are identified.  Your failure to cooperate with Company's compliance activities and efforts, as determined in the sole discretion of Company, will constitute grounds for discipline.

10.    Miscellaneous.

a.     *Governing Law.*    This Agreement, including the validity, interpretation, construction and performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

b.     *Venue and Acceptance of Service of Process.*    Each party to this Agreement hereby agrees and consents that any legal action or proceedings with respect to this Agreement shall only be brought in the courts of the State of New York in New York County.  By execution and delivery of this Agreement, each such party hereby (i) accepts the jurisdiction of the aforesaid courts; (ii) waives, to the fullest extent permitted by law, any objection which it may now hereafter have to the venue set forth above; and (iii) further waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. .

c.     *Entire Agreement.*    This Agreement contains the entire agreement and understanding between the parties hereto in respect of the subject matter hereof.

d.     *Amendment.*    This Agreement may be amended only by a written amendment which is signed by Employee and, on behalf of Company, by a director or officer other than Employee.

e.     *Severability.*    If any term, provision or covenant of this Agreement or part thereof, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void by a court of competent jurisdiction, the remainder of this Agreement and such term, provision or covenant shall remain in full force and effect, and any such invalid, unenforceable or void term, provision or covenant shall be deemed, without further action on the part of the parties hereto, modified, amended and limited, and the court shall have the power to modify, amend and limit any such term, provision or covenant, to the extent necessary to render the same and the remainder of this Agreement valid, enforceable and lawful.

f.     *Construction.*    The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement. The use herein of the word "including" when following any general provision, sentence, clause, statement, term or matter, shall be deemed to mean "including, without limitation".  As used herein, the words "day" or "days" shall mean a calendar day or days.

7

g.    *Non-waiver.*  Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of Company, by its duly authorized officer.

h.    *Remedies Cumulative.*    The rights and remedies of the parties hereto are cumulative and shall not be exclusive, and each such party shall be entitled to pursue all legal and equitable rights and remedies and to secure performance of the obligations and duties of the other under this Agreement, and the enforcement of one or more of such rights and remedies by a party shall in no way preclude such party from pursuing, at the same time or subsequently, any and all other rights and remedies available to it.

i.    *Prevailing Authority.*    In the event and to the extent of any inconsistencies between this Agreement and any Company employee or procedural manual, the terms of this Agreement shall prevail.

j.    *Notices.*  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given: (i) when personally delivered; (ii) when receipt is acknowledged, if sent by facsimile, telecopy or other electronic transmission device; provided, however, that if receipt is acknowledged after normal business hours of the recipient, notice shall be deemed to have been given on the next business day; (iii) one day after deposit with a nationally recognized overnight courier, specifying "next day delivery"; or (iv) three days after being sent by registered or certified mail, postage prepaid, return receipt requested.   Any notice, demand or other communication given by a party in connection with this Agreement shall be sent to the other party at the address set forth above for such other party.

k.    *Disclosure.*  Employee agrees that during the term of his employment with Company, he will disclose solely to Company all ideas, methods, plans, or improvements known by you which relate, directly or indirectly to, the practice of Company, whether acquired by Employee before or during his employment with Company; provided, however, that nothing in this paragraph shall be construed as requiring any such communication where the idea, method, plan or improvement is lawfully protected from disclosure as a trade secret of a third party or by any other lawful prohibition against such communication.

l.    *Authority to Contract.*  Employee shall have no authority to nor shall be entitled enter into any contracts, other than this Agreement or any amendments hereto, which shall be binding upon Company, or otherwise create any obligations on the part of Company.

8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first written above.

_(signature)_
Clayton Hertzoff

United Orthopaedic Appliances, Co., Inc.

By: _(signature)_
Name: Noreen Diaz
Title: President

9

294

## STANDARD FORM OF OFFICE LEASE
### The Real Estate Board of New York, Inc.

**AGREEMENT OF LEASE**, made as of this 23 day of August, 2006,

between EDWIN HERTZOFF and BEVERLY HERTZOFF, individuals residing at 2 Round Brook Dr. Short Hills NJ party of the first part, hereinafter referred to collectively as "Owner" or "Landlord", and UNITED ORTHOPAEDIC APPLIANCES CO., INC., a New York corporation, having an address at 2041 Front Street, East Meadow New York 11554 party of the second part, hereinafter referred to as "Tenant".

**WITNESSETH:** Owner hereby leases to Tenant and Tenant hereby hires from Owner the premises (hereinafter collectively called "premises", "demised premises", "Premises" or "Demised Premises") consisting of the entire first (1st) and second (2nd) floors and the entire basement space, substantially shown on the floor plans annexed hereto as Exhibit A and made a part hereof, in the building known as 791 Broadway, New York, New York (hereinafter called "building" or "Building"), for the term (hereinafter called "term" or "Term"), to commence on the date hereof (the "Commencement Date"), and to end on the last day of the month on which the two (2) year anniversary of Commencement Date occurs (the "Expiration Date"), or until such term shall sooner cease and expire as hereinafter provided, both dates inclusive, and at an annual rental rate (hereinafter called "rent", "fixed rent" or "fixed annual rent"), as set forth in Article 37 hereof, together with all other sums of money as shall become due and payable by Tenant under this Lease (hereinafter called "additional rent" or "Additional Rent"), which Tenant agrees to pay in lawful money of the United States by check drawn on a bank or trust company which is a member of the New York Clearing House Association, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any set off or deduction whatsoever, except that Tenant shall pay the first monthly installment on the execution hereof.

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows:

**Rent:**   1.    Tenant shall pay the rent as above and as hereinafter provided.

**Occupancy:**   2.    Tenant shall use and occupy the demised premises for office for the production, fitting and sale of prosthetics, orthotics and other similar items and for any other legal use.

Page 1 of 6

**Subordination:**

7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which the premises are a part...

**Property Loss, Damage, Reimbursement, Indemnity:**

8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise...

**Destruction, Fire and Other Casualty:**

9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth...

**Eminent Domain:**

10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding...

**Assignment, Mortgage, Etc.:**

11. Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others...

12. Rules and conditions in respect to subordinations or condemnation in the case may be, to and effect...

**Electric Current:**

RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation...

**Access to Premises:**

13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and, at other reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary...

RDG ☞ Rider to be added if necessary.

Document... Filed 12/2/... Page...

**Remedies and Waiver of Redemption:**

**Vaults, Vault Space, Area:**

**Occupancy:**

**Bankruptcy:**

**Default:**

**Fees and Expenses:**

**Building Alterations and Management:**

**No Representation by Owner:**

**End of Term:**

22. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition...

**Quiet Enjoyment:**

23. Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 31 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to Give Possession:**

24. If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants or if the demised premises are located in a building being constructed and the building shall not be ready for occupancy...

**No Waiver:**

25. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations, set forth in this lease or hereafter adopted by Owner...

**Waiver of Trial by Jury:**

26. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other...

**Inability to Perform:**

27. This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Owner is prevented or delayed from so doing by reason of strike or labor troubles or any cause whatsoever including, but not limited to, government preemption or restrictions or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions which have been or are affected, either directly or indirectly, by war or other emergency.

**Bills and Notices:**

28. Except as otherwise in this lease provided, a bill, statement, notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the

*Rider to be added if necessary.*

**Services Provided by Owner:**

29. As long as Tenant is not in default under any of the covenants of this lease beyond the applicable grace period provided in this lease for the curing of such defaults, Owner shall provide: (a) necessary elevator facilities on business days from 8 a.m. to 6 p.m. and have one elevator subject to call at all other times; (b) heat to the demised premises when and as required by law, on business days from 8 a.m. to 6 p.m. and (c) water for ordinary lavatory purposes, but if Tenant uses or consumes water for any other purposes or in unusual quantities (of which fact Owner shall be the sole judge), Owner may install a water meter at Tenant's expense which Tenant shall thereafter maintain at Tenant's expense in good working order and repair to register such water consumption and Tenant shall pay for water as shown on said meter as additional rent as and when bills are rendered...

RIDER to be added in respect to rates and conditions for such additional service; (i) Owner reserves the right to stop service of the heating, elevator, plumbing, electric or other system, when necessary by reason of accident or emergency, or for repairs, alterations, replacements or improvements, in the judgment of Owner desirable or necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed...

**Captions:**

30. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provisions thereof.

**Definitions:**

31. The term "office", or "offices", wherever used in this lease, shall not be construed to mean premises used as a store or stores, for the sale or display at any time of goods, wares or merchandise, of any kind, or as a restaurant, shop, booth, bootblack or other stand, barber shop, or for other similar purposes or for manufacturing. The term "Owner" means a landlord or lessor, and as used in this lease means only the owner, or the mortgagee in possession, for the time being of the land and building (or the owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, or the said lessee of the building, or of the land and building, that the purchaser or the lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner, hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays, Sundays and all days observed by the State or Federal Government as legal holidays and those designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service. Wherever it is expressly provided in this lease that consent shall not be unreasonably withheld, such consent shall not be unreasonably delayed.

**Adjacent Excavation-Shoring:**

32. If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the demised premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which demised premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and Regulations:**

33. Tenant and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt, provided however, that in case of any conflict between the provisions of this lease and any such additional Rules and Regulations, the provisions of this lease shall control. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing upon Owner within fifteen (15) days after the giving of notice thereof. Nothing

In Witness Whereof, Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

Witness for Owner:

EDWIN HERTZOFF

BEVERLY HERZZOFF

Witness for Tenant:

UNITED ORTHOPAEDIC APPLIANCES CO., INC.

By: ...........................................

Name: Doreen Diaz

Title: President

48

SEE RIDER ANNEXED HERETO CONTAINING ARTICLES 37 THROUGH _____ HEREOF.

## ACKNOWLEDGEMENTS

**CORPORATE OWNER,**
STATE OF NEW YORK,    ss.:
County of

On this _____ day of _____, 19____,
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in
that he is the
of
the corporation described in and which executed the foregoing
instrument, as CORPORATE OWNER; that he knows the seal of said corporation;
that the seal affixed to said instrument is such corporate seal; that it was
so affixed by order of the Board of Directors of said corporation,
and that he signed his name thereto by like order.

**INDIVIDUAL OWNER,**
STATE OF NEW YORK,    ss.:
County of

On this _____ day of _____, 19____,
before me personally came
to be known and known to me to be the individual
described in and who, as OWNER, executed the foregoing instru-
ment and acknowledged to me that he
executed the same.

**CORPORATE TENANT,**
STATE OF NEW YORK,    ss.:
County of

On this _____ day of _____, 19____,
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in
that he is the
of
the corporation described in and which executed the foregoing
instrument, as TENANT; that he knows the seal of said corporation;
that the seal affixed to said instrument is such corporate seal; that it was
so affixed by order of the Board of Directors of said corporation,
and that he signed his name thereto by like order.

**INDIVIDUAL TENANT,**
STATE OF NEW YORK,    ss.:
County of

On this _____ day of _____, 19____,
before me personally came
to be known and known to me to be the individual
described in and who, as TENANT, executed the foregoing
instrument and acknowledged to me that he
executed the same.

## GUARANTY

FOR VALUE RECEIVED, and in consideration ...

Guarantor's Residence

Business Address

Firm Name

STATE OF NEW YORK  )
                   )  ss.:
COUNTY OF          )

On this _____ day of _____, 19____, before me personally came _____ to me known, and known to me to be the individual described in, and who executed the foregoing Guaranty and acknowledged to me that he executed the same.

_____
Notary

Dated: _____ 19____

Witness _____

Guarantor _____

## IMPORTANT - PLEASE READ

### RULES AND REGULATIONS ATTACHED TO AND MADE A PART OF THIS LEASE IN ACCORDANCE WITH ARTICLE 31.

1. The sidewalks, entrances, driveways, passages, courts, elevators ...

14. Tenant shall not move any safe, heavy machinery, heavy ...

15. Refuse and Trash. (1) Compliance by Tenant ...

16. 



## STANDARD FORM OF

## Office Lease

The Real Estate Board of New York, Inc.
© Copyright 1994. All rights Reserved.
Reproduction in whole or in part prohibited.

TO

Dated _____ 19____

Rent Per Year

Rent Per Month

Term
From
To

Drawn by ........................

Checked by ........................

Entered by ........................

Approved by ........................

Printed using pCORRECTIONS Software, v. 406, (408) 945-2107

08/19/96

# RIDER ANNEXED TO AGREEMENT OF LEASE
## BETWEEN EDWIN HERTZOFF AND BEVERLY HERTZOFF (LANDLORD), AND UNITED ORTHOPAEDIC APPLIANCES CO., INC. (TENANT)

**FIXED RENT AND
PRORATION OF
FIXED RENT:**

37.    A.    The Fixed Rent shall be payable as follows:

(a)    for the period from the Commencement Date through the last day of the last day of the month in which the first anniversary of the Commencement Date shall occur at a rental rate of $120,000 per annum, and

(b)    for the period from the first day of the month immediately following the month in which the first anniversary of the Commencement Date shall occur through the last day of the month in which the second anniversary of the Commencement Date shall occur (the "Expiration Date") at a rental rate of $144,000.00 per annum.

B.    If the Commencement Date shall not be the first or last day of a month (as the case may be), Fixed Rent shall be prorated on a per diem basis, and any excess amount paid on the execution of this Lease shall be credited to the Fixed Rent for the next calendar month.

**ADJUSTMENTS OF RENT:**

38.    A.    Definitions as used herein:

(a)    "Taxes" shall mean (1) the amount finally determined to be legally payable, by legal proceedings or otherwise, of all real estate taxes or other taxes imposed in substitution thereof, assessments (including any Business Improvement District), and other governmental impositions and charges which shall be levied, assessed or imposed, or become due and payable or become liens upon, or arise in connection with the use, occupancy or possession of, the Building or any part thereof or interest therein during the term of this Lease "Taxes" shall not include (i) any succession, gains, recording, income, franchise, transfer, inheritance, capital stock, excise, excess profits, occupancy or rent, gift, estate, foreign ownership or control, payroll or stamp tax of Landlord or any superior party, (ii) any other tax, assessment, charge or levy on the rent reserved under this Lease, (iii) any charges and/or taxes which are paid by individual tenants, which shall be the obligation of such tenants as applicable or (iv) any penalties or late charges imposed against Landlord or any superior party with respect to real estate taxes, assessments and the like.

(b)    "Tax Base" shall mean the Taxes for the July 1, 2006 to June 30, 2007 Tax Year.

(c)    "Tenant's Proportionate Share" shall mean 58.7%.

(d)    "Tax Year" shall mean each period of twelve months, commencing on the first day of July, in which occurs any part of the Term or such other period as may hereafter be adopted as the fiscal year for real estate tax purposes of The City of New York.

"Landlord's Tax Statement" shall mean an annual statement setting forth the amount of Tenant's Tax Payment payable by Tenant for a specified Tax Year pursuant to this Article.

B.    If Taxes payable in any Tax Year shall exceed the Tax Base, Tenant shall pay as additional rent a sum (hereinafter referred to as "Tenant's Tax Payment") equal to Tenant's Proportionate Share of the amount by which the Taxes for such Tax Year exceed the Tax Base.

C.    Tenant's Tax Payment for each Tax Year shall be due and payable in installments in the same manner that Taxes for such Tax Year are due and payable by Landlord to the City of New York. Tenant shall pay each such installment of Tenant's Tax Payment within twenty (20) days after the rendering of a Landlord's Tax Statement by Landlord to Tenant, which statement shall be rendered so as to require Tenant's Tax Payment to be paid by Tenant no more

441745.02

than thirty (30) days prior to the date such Taxes first become due. Landlord's Tax Statement shall set forth in reasonable detail the computation of Tenant's Tax Payment with respect to the particular installment(s) being billed, and shall accurately reflect the amount of Taxes owed by Landlord with respect to the Property. A copy of the relevant tax bill shall accompany each statement or if such bill is not then available, Landlord shall deliver a copy thereof to Tenant promptly after Landlord's receipt thereof. If Landlord shall receive a refund or credit of Taxes for any Tax Year for which Tenant has made a Tenant's Tax Payment, Landlord shall either promptly pay to Tenant, or, at Landlord's election, credit against subsequent payments by Tenant of Rent hereunder, Tenant's Proportionate Share of the refund or credit, in either event not to exceed Tenant's Tax Payment paid for such Tax Year.

D.      At Tenant's request, Landlord shall commence a protest, action or proceeding to reduce the assessment applicable to Property. In the event Landlord fails to commence such protest, action or proceeding within thirty (30) days after request by Tenant, Tenant shall be permitted to commence the same as Landlord's agent and Tenant shall be entitled to reimbursement of any costs and expenses incurred by Tenant in connection with such protest, action or proceeding as well as Tenant's proportionate share of any refund with respect to Taxes previously paid by Tenant.

**UTILITIES:**

39.     Modifying the provisions of Articles 12 and 29 of this Lease, Tenant shall obtain and pay for all electric current, heating oil, gas, water and other fuels and utilities supplied to, or used in connection with or servicing the Premises and all mechanical systems therein, including without limitation, the heating, ventilation and air-conditioning system and lighting equipment and systems, by direct application to and arrangement with the utility company or companies providing such servicing and utilities to the Premises. Notwithstanding anything to the contrary contained herein, all building systems servicing the Premises shall be delivered to Tenant in good working order on the Commencement Date and Tenant's sole responsibility for the maintenance of such systems shall be limited to the fees payable for a maintenance contract for the same throughout the term of this Lease.

**BROKERAGE:**

40.     Landlord and Tenant each represents that in the negotiation of this Lease it dealt with no broker or brokers. Landlord and Tenant each hereby agrees to indemnify and hold the other harmless from and against any and all claims, liabilities, suits, costs and expenses including reasonable attorneys' fees and disbursements arising out of any inaccuracy or alleged inaccuracy of the above representation. The provisions of this Article shall survive the expiration or sooner termination of this Lease.

**ASSIGNMENT AND SUBLETTING:**

41.     **INTENTIONALLY OMITTED.**

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT:**

42.     Landlord shall obtain from all present and future ground leases, superior leases, and grants of term of the land on which the Building stands, all mortgages and building loan agreements, including leasehold mortgages and spreader and consolidation agreements, which may now or hereafter affect the land, the Building or any superior lease and all advances made thereunder, and all amendments, modifications, supplements, renewals, substitutions, refinancings and extensions thereto or thereof an agreement in recordable form between Tenant and any superior mortgagee or superior lessor, as the case may be, which shall provide in substance that, as long as Tenant is not then in default under this Lease after notice and the expiration of all applicable cure periods, if any, such superior mortgagee or superior lessor, as the case may be, will not name or join Tenant as a party defendant or otherwise in any suit, action or proceeding to enforce any such superior mortgage or superior lease, as the case may be, nor will this Lease be terminated by enforcement of any rights given to any such superior mortgagee or superior lessor, as the case may be, pursuant to the terms, covenants or conditions contained in any such superior mortgage or superior lease, as the case may be.

- 2 -

44174S.02

## INDEMNIFICATION:

43.     Landlord shall indemnify and save harmless Tenant against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Tenant shall not be reimbursed by insurance, including reasonable attorneys' fees actually incurred by Tenant, if and to the extent caused by or arising from (i) any breach by Landlord, Landlord's agents, contractors, employees, invitees, or licensees, of any covenant or condition of this Lease, or (ii) the negligence or willful misconduct of Landlord, Landlord's agents, contractors, employees, invitees or licensees, or (iii) any acts, omissions or negligence of Landlord, or the contractors, agents, employees, invitees or licensees of Landlord, in or about the Premises or the Property.

## ALTERATIONS:

44.     Supplementing the provisions of Article 3, Tenant shall be permitted to make all non-structural alterations that do not materially adversely effect the Building utility systems or the exterior of the Building, provided that Tenant delivers plans and specifications (to the extent plans and specifications are traditionally prepared for such alteration) and Landlord shall approve the same, which approval shall be unreasonably withheld, conditioned or delayed. All Alterations shall, upon installation become the property of Landlord and be surrendered on the expiration date or sooner termination of the Term hereof.

## HAZARDOUS MATERIALS

45.     A.     Tenant hereby represents, warrants and covenants that it shall not install or permit any Hazardous Materials (as hereinafter defined) to be placed or stored in or about the Premises (other than Hazardous Materials installed, placed, stored or placed in the Premises or the Building by Tenant). Tenant shall indemnify and hold Landlord harmless from and against any claims, demands, losses, liabilities, penalties and damages arising out of, or in any way connected with the installation, placement, storage or release of Hazardous Materials used or installed by Tenant, Tenant's employees, contractors or agents upon the Premises. As used herein, the term "Hazardous Materials" shall be any petroleum product, asbestos product, or any other material, substance or waste that is now, or hereafter during the Term, recognized as being hazardous or dangerous to health or the environment by any federal, state or local agency having jurisdiction over the Building of which the Premises is a part.

B.     Landlord represents, warrants and covenants that (i) to the best of Landlord's knowledge, there are no discharges of Hazardous Materials at or about the Building or the Land in violation of any Legal Requirement and (ii) Landlord has complied, as of the date hereof, and Landlord shall, at Landlord's sole cost and expense, continue to comply (or to cause compliance), with all legal requirements that concern the management, control, discharge, treatment and/or removal of Hazardous Materials at or about the Building or the land. Landlord shall indemnify and hold Tenant harmless from and against any claims, demands, losses, liabilities, penalties and damages arising out of, or in any way connected with the installation, placement, storage or release of Hazardous Materials in or about the Building or the land in violation of applicable legal requirements. Landlord shall be responsible, at Landlord's expense, for compliance with any applicable legal requirements, relating to the removal, encapsulation or other treatment of any Hazardous Material located within the Premises, unless such Hazardous Material shall have been placed in the Premises by Tenant or by any of Tenant's agents, employees or contractors. This covenant shall survive the expiration or earlier termination of this Lease.

## TERMINATION OPTION:

46.     Landlord or Tenant shall each have the right at any time after the first (1st) anniversary of the Commencement Date to cancel and terminate this Lease (the "Termination Option"), provided that the terminating party shall give at least ninety (90) days' prior written notice to the other of it's exercise of the Termination Option (the "Termination Notice"). In the event either party shall deliver the Termination Notice pursuant to the provisions of this Article, this Lease shall terminate and expire on the later of the date set forth in the Termination Notice as the termination date, if applicable, or ninety (90) days after the delivery of the Termination Notice, with the same force and effect as though said date were the expiration date and neither party shall have any liability to the other with respect to this Lease, except pursuant to those provisions which expressly survive its expiration or sooner termination.

- 3 -

441745.02

**DEFAULT:**

47.    Notwithstanding anything contained herein to the contrary, Tenant shall have the right to cure: (i) monetary defaults within fifteen (15) days after receiving notice of such a default from Landlord; and (ii) non-monetary defaults within thirty (30) days after receiving notice of such a default from Landlord. Notwithstanding anything contained herein to the contrary, it shall not be considered an event of default under this lease if Tenant shall have commenced to cure a non-monetary event of default within the time periods specified above and if Tenant shall thereafter proceed with due diligence and good faith to complete the curing of such breach within a reasonable period of time.

**MISCELLANEOUS PROVISIONS:**

48.    A.    If any of the provisions of this Lease, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

B.    Notwithstanding anything to the contrary contained in Article 9 or elsewhere in this Lease, if (i) an independent architect determines that the Premises cannot be restored in sixty (60) days after the fire or other casualty or (ii) the Premises or access thereto are damaged or rendered untenantable by fire or other casualty at any time during the last year of the term (whether or not any specified percentage of the Premises are damaged or rendered untenantable), Tenant shall have the right to terminate this Lease upon ten (10) days prior written notice to Landlord.

C.    Notwithstanding anything to the contrary contained in this Lease, including without limitation, Article 6, it is specifically understood that it shall be Landlord's obligation to make any and all repairs and/or alterations required to be performed in order to cure any violations of any federal, state, or local laws, ordinances, rules, regulations or requirements (collectively, "requirements") arising from or relating to conditions existing in the Premises prior to the commencement of the lease term, and any and all requirements governing (a) the installation of sprinklers and compliance with any fire safety regulations and (b) the removal or encapsulation of asbestos. Landlord further represents that the common areas of the Building and the means of egress and ingress thereto are in compliance with the Americans With Disabilities Act of 1990 as well as any other similar state and local and legal requirements currently exists. Tenant's responsibility for compliance with requirements shall be limited to non-structural alterations which are required as a result of Tenant's particular use of the Premises.

D.    Except as otherwise provided for in this Lease, Landlord shall provide Tenant with access to the Premises twenty-four (24) hours per day, seven (7) days per week, throughout the term of this Lease.

E.    All exhibits to this Lease and any and all rider provisions attached to this Lease are hereby incorporated into this Lease. If any provision contained in any rider hereto is inconsistent or in conflict with any printed provision of this Lease, the provision contained in such rider shall supersede said printed provision and shall control.

F.    This Lease may be executed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument.

G.    Tenant shall be permitted to install signage and/or awnings on the exterior of the Building with Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided that the same comply with all applicable legal requirements.

H.    Tenant shall name Landlord as an additional insured on the insurance required to be carried by Tenant hereunder.

- 4 -

441745.02